UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

JOSE ORTEGA and JOCE MARTINEZ, on their own behalf, and on behalf of those similarly situated,

                              Plaintiffs,

      -against-

UBER TECHNOLOGIES INC., RASIER LLC, UBER USA LLC, UBER NEW YORK LLC, UBER TRANSPORTATION LLC,  JOHN DOE "UBER AFFILIATES," fictitious name used to identify presently unknown entities,

                            Defendants.
--------------------------------------------------------------------X

Docket No. 15-CV-7387

**FIRST AMENDED COMPLAINT**

Jury Trial Demanded

Plaintiffs, complaining of the defendants, by their attorneys, **HELD & HINES, LLP**, allege, upon information and belief, that:

## PRELIMINARY STATEMENT

1.      Plaintiffs commence this action on behalf of themselves and all other individuals who have worked or are currently working as drivers for Defendants (hereinafter collectively referred to as "UBER"), and any and all affiliate entities of UBER, as defined by UBER's Terms and Conditions memorialized within their User Agreements.

2.      Plaintiffs are seeking compensatory, consequential, liquidated, statutory, and punitive damages against the defendants on behalf of themselves and all other UBER drivers, together with all other appropriate relief provided by state, federal and common law.

3.      Plaintiffs bring this action on behalf of themselves and all other UBER drivers whom UBER has deceptively misclassified as independent contractors and as such, have therefore been paying the expenses associated with operating the driven vehicles, including, but not limited to, fuel, maintenance, registration, tolls, insurance, and other expenses and fees

associated with the ownership, lease and/or operation of a vehicle for commercial passenger use.

4.      Specifically, Defendants' fraudulently structured their business model in a way that unlawfully shifts their costs of doing business onto Plaintiffs and members of this class.  To that end, Defendants' unlawfully require Plaintiffs and the class to assume costs associated with the tools of their trade.

5.      Defendants have also violated New York state law by failing to remit gratuities to the plaintiffs and class members which UBER riders believe they have paid as part of the quoted and charged fare.

## PARTIES

6.      At all times hereinafter mentioned, Plaintiff, JOSE ORTEGA, is a resident of the State of New York, County of Kings.

7.      At all times hereinafter mentioned, Plaintiff, JOCE MARTINEZ, is a resident of the State of New York, County of Bronx.

8.      Upon information and belief, Defendant, Uber Technologies, Inc., is a foreign corporation organized and existing by virtue of the laws of the State of Delaware, is authorized to transact business in the State of New York, with its principal place of business located in San Francisco, California.

9.      Upon information and belief, Defendant, Rasier, LLC, is a limited liability company organized and existing by virtue of the laws of the State of Delaware, is authorized to transact business in the State of New York, and is a subsidiary and/or affiliate of Uber Technologies, Inc.

10.      Upon information and belief, Defendant, Uber USA, LLC, is a limited liability company organized and existing by virtue of the laws of the State of Delaware, is authorized to transact business in the State of New York, and is a subsidiary and/or affiliate of Uber

Technologies, LLC.

11.     Upon information and belief, Defendant, Uber New York, LLC, is a limited liability company organized and existing by virtue of the laws of the State of New York, is authorized to transact business in the State of New York, and is a subsidiary and/or affiliate of Uber Technologies, LLC.

12.     Upon information and belief, Defendant, Uber Transportation, LLC, is a limited liability company organized and existing by virtue of the laws of the State of New York, is authorized to transact business in the State of New York, and is a subsidiary and/or affiliate of Uber Technologies, LLC.

13.     Upon information and belief, Defendants, "John Doe "Uber Affiliates," are business entities organized formed by or for the benefit of Uber Technologies, LLC, are authorized to transact business in the State of New York, and is a subsidiary and/or affiliate of Uber Technologies, LLC.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the state law claims asserted herein pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), since members of the putative Plaintiff class reside in states across the Country, including, but not limited to, New York; Defendants are entities incorporated within the States of California, Delaware, and New York; there are more than 100 putative class members; and the amount in controversy exceeds $5,000,000.00, exclusive of interests and costs.

15.     Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b)(2) because the plaintiff and putative class members reside in the geographic location within the Eastern District of New York, the defendants operate and advertise their business in the geographic location within the Eastern District of New York, and a substantial part of the events or omissions giving

rise to the claims occurred in the Eastern District of New York.

## CLASS ACTION ALLEGATIONS

16.     Plaintiffs have commenced this action as a class action on behalf of all UBER drivers, including, but not limited to, drivers of UBER's "Uber Black," "Uber SUV," and "Uber X" services in the State of New York.

17.     **Ascertainable class**: The proposed Class is ascertainable in that its members can be identified and located using information contained in Defendants' records kept in the ordinary course of their business, specifically payroll and personnel records.

18.     **Numerosity**: The potential number of persons in the Class is so numerous that joinder of all members would be unfeasible and impractical. The disposition of their claims through this class action will benefit both parties and this Court. The number of persons in this Class is unknown to Plaintiffs at this time; however, it is estimated that the number exceeds 40,000 individuals.

19.     **Typicality**: Plaintiffs' claims are typical of the claims of all of the other members of the Class because all of the plaintiffs sustained similar injuries and damages arising out of Defendants' common cause or course of conduct in violation of State and Federal laws and regulations and the injuries and damages of all the other members of the Class were caused by Defendants' wrongful conduct as described in this Complaint.

20.     **Adequacy**:  Plaintiffs are adequate representatives of the Class; will fairly protect the interests of the other members of the Class; have no interests antagonistic to the members of the Class; and will vigorously pursue this suit via attorneys who are competent, skilled and experienced in litigating matters of this type. There will be no difficulty in the management of this action as a class action.

21.   **Superiority**:   The nature of this action makes the use of the class action vehicle a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the other members of the Class for the wrongs alleged herein, as follows:

a.  This case involves a large corporate Defendant and its large affiliates and a large number of individuals with many relatively small claims and common issues of law and fact;

b.  If each individual member of the Class was required to file an individual lawsuit, Defendants would necessarily gain an unconscionable advantage because, with its vastly superior financial and legal resources, it would be able to exploit and overwhelm the limited resources of each individual member of the Class;

c.  Requiring each individual member of the Class to pursue an individual remedy would also discourage the assertion of lawful claims by members of the Class who would be disinclined to pursue an action against Defendants because of an appreciable and justifiable fear of retaliation;

d.  The Prosecution of separate actions by the individual members of the Class, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual members of the Class against Defendants; would establish potentially incompatible standards of conduct for Defendants, would result in legal determinations with respect to individual members of the Class which would, as a practical matter, be dispositive of the interest of the other members of the Class who are not parties to the adjudications; and/or would substantially impair or impede the ability of the members of the Class to protect their own interests;

e.  The claims of the individual members of the Class may not be sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses thereto;

f.  Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or even impossible for individual member of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action; and

g.  The costs to the court system of adjudication of such individualized litigation would be substantial.

22.     **Existence of Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to members of the Class which predominate over questions affecting only individual members of the Class, including, but not limited to, the following:

**Common Questions of Fact and Law regarding UBER's Conduct with Respect to Gratuities and UBER's conduct with respect to its contracts with Members of the Class:**

a.   Whether reasonable customers believed that a gratuity was included in the fare Defendants' quoted and charged its customers;

b.   Whether Defendants' failed to distribute the proceeds of those gratuities, in their entirety, to the class members;

c.   What efforts Defendants' undertook to inform their customers and potential customers that gratuities for the plaintiff drivers were included in the quoted and charged fare and that it was therefore unnecessary to tip their drivers;

d.   Whether Defendants have led customers and potential customers to believe that the customary gratuity to the driver is included in the quoted and charged fare for the UBER service such that their riders did not tip their drivers on their own, thereby damaging the plaintiff class;

e.   Whether UBER breached its uniform contracts with Class Members by failing to remit all monies due Class Members and withholding payments due to Class Members and/or otherwise miscalculating UBER's share of the fares to the detriment of Class Members; and

f.   Whether UBER wrongfully applies taxes and ancillary charges to the Class Members.

**Common Questions of Fact and Law regarding UBER's Conduct with Respect to Members of the Class who have been Misclassified as Independent Contractors:**

a.   Whether Defendants improperly classified the plaintiff class as independent contractors;

b.   Whether class members have been required by UBER to follow uniform procedures and policies regarding their work for UBER;

c.   Whether the work performed by class members – providing car service to UBER's customers – is within UBER's usual course of business, and whether such service is fully integrated into UBER's business;

      d.  Whether Defendants placed the burden on the class members to incur the expenses associated with the tools of the trade, including, but not limited to, the costs of vehicle acquisition, fuel, maintenance, registration, tolls, and insurance.

### Common Questions Of Fact And Law Regarding UBER's False Advertising And Marketing To Drivers

      a.  Whether UBER's advertisements to prospective drivers and the general public promising guaranteed compensation are misleading;

      b.  Whether UBER's prominent advertisements and marketing offering guaranteed compensation while at the same time relegating to small separate print or separate application the precise terms of what is offered is misleading and constitutes consumer fraud.

### Additional Questions of Fact and Law regarding UBER's Conduct:

      a.  Whether Defendants are liable for attorneys' fees and costs associated with this litigation.

23.    Plaintiffs intend to send notice to all members of the Class to the extent required by applicable law.

### STATEMENT OF FACTS

24.    UBER compensates its drivers weekly.

25.    UBER transacts business with its customers (or "riders") via its mobile application (or "App") installed by its users on their mobile devices. Through UBER's App, a rider is able to input a pick-up location and destination, and is then connected with one or more of UBER's drivers (the plaintiff class) available to accept the fare at that time. If a fare is agreeable to a rider, they accept the cost and complete the transaction via the App, and UBER's driver (a member of the plaintiff class) is then dispatched to the pick-up location. The entire transaction occurs via the App and no money is provided to the driver.

26.    UBER expressly informs its riders that they should not tip the driver as the gratuity is included in the cost of the fare. UBER intends and promotes that no money be

exchanged between its riders and drivers and that its service is 100% cashless, such that all exchanges of money are through its App.

27.     Of the total fare paid to UBER by a rider, UBER remits a percentage of the fare to the driver. While the gratuity due specifically to the driver is not segregated, as required by law, from the gross fare when calculating a driver's earnings per fare, UBER does reduce the gross fare by $1.00 as its "safe ride" fee and, therefore, artificially reduces the gross when calculating the amount due to the driver.

28.     UBER justifies its "safe ride" fee by claiming that the purpose of the safe ride fee is to pay for drivers' background checks, driver safety education, and the development of safety features in UBER's mobile application. Accordingly, the putative plaintiff class is being forced to bear UBER's costs of operation, while at the same time bear their own costs of operation. Meanwhile, UBER contributes nothing to the cost of the putative class's operation and, instead, requires its drivers to incur all expenses associated with the ownership, operation, maintenance and use of the driven vehicle, including, but are not limited to, fuel, tolls, liability insurance, workers' compensation insurance, maintenance and repair costs, inspection and registration costs, and all purchase, finance and/or lease payments for the driven vehicle.

**Plaintiff Jose Ortega**

29.     Prior to beginning his employment as an UBER driver, Plaintiff Jose Ortega was employed as a maintenance worker for E&S Maintenance US, Inc. (hereinafter referred to as "E&S"), located in Kings County, New York.

30.     While employed at E&S, Ortega earned approximately $400 per week in net income.

31.     While employed at E&S, Ortega began discussing the idea of becoming a professional driver with taxi drivers.

32.     At or around that time, Ortega began to notice advertising and marketing for UBER, which claimed that drivers would earn guaranteed money (i.e., salary) over a defined period of time.

33.     Thereafter, based on UBER's marketing and advertising materials Ortega began employment as a driver with UBER in or around August 2014.

34.     Ortega is still an UBER driver.

35.     Ortega is still employed by UBER as a black car driver.

36.     On average, Ortega works for UBER six days per week. On average, Ortega works for UBER approximately ten to twelve (10-12) hours per day. Accordingly, Ortega drives approximately 60 to 72 hours per week for UBER, on average.

37.     Defendants paid and continue to pay Ortega weekly.

38.     Initially, when Ortega first began driving for Defendants, UBER kept approximately 25% of the total gross fare monies he received while remitting the difference to Ortega.

39.     In or around, August of 2014, Defendants unilaterally changed the terms of Ortega's compensation. Thereafter, UBER began retaining approximately 28% of total gross fare monies collected by Ortega and remitted the rest of the fare monies to him.

40.     On average, as an UBER driver, Ortega has earned between $600 and $1000 in gross wages per week and UBER has compensated him same.

41.     However, throughout the course of Ortega's employment with UBER, Defendants shifted the burden of operating his vehicle onto Ortega.

42.     For example, UBER did not compensate Ortega for any of his incurred weekly/monthly/annual expenses, including but not limited to vehicle fuel, maintenance and repair, liability insurance, vehicle inspection and registration, mileage, and vehicle acquisition and carrying costs.

43.     Due to UBER's failure to reimburse Ortega for his expenses, despite all indicia that he is an employee of UBER, Ortega's net earnings have been reduced by hundreds of dollars each week.

44.     Ortega has not received guaranteed salary as advertised by UBER.

**Plaintiff Joce Martinez**

45.     Prior to beginning his employment as an UBER driver, Plaintiff Joce Martinez was employed as a livery driver for Prestige Car Service (hereinafter referred to as "Prestige"), located in Bronx County, New York.

46.     While employed at Prestige, Martinez earned approximately $500 per week in gross income.

47.     While employed at Prestige, Martinez heard a radio advertisement regarding UBER, which offered $500 to individuals who registered to become UBER drivers.

48.     Additionally, at or around that time, Martinez began to notice advertising and marketing for UBER, which claimed that drivers would earn a guaranteed amount of money over a defined period of time. At that time, UBER's advertising and marketing campaign claimed that drivers would earn $60,000.00 in their first year as an UBER driver.

49.     Thereafter, and partially as a result of the aforementioned advertising and marketing campaign, Martinez began employment as a driver with UBER in or around August 2014.

50.     Martinez is still an UBER driver. On average, Martinez works for UBER five to six days per week. On average, Martinez works approximately 5 to 10 (5-10) hours per day. Accordingly, Martinez drives approximately 25-60 hours per week for UBER, on average.

51.     Defendants paid and continue to pay Martinez weekly.

52.     On average, as an UBER driver, Martinez has earned approximately $700-$1,000.00 gross wages per week and UBER has compensated him same.

53.     However, throughout the course of Martinez' employment with UBER, Defendants shifted the burden of operating his vehicle onto Martinez.

54.     For example, UBER did not compensate Martinez for any of his incurred weekly/monthly/annual expenses, including but not limited to vehicle fuel, maintenance and repair, liability insurance, vehicle inspection and registration, mileage, and vehicle acquisition and carrying costs.

55.     Due to UBER's failure to reimburse Martinez for his expenses, despite all indicia that he is an employee of UBER, Martinez's net earnings have been reduced by hundreds of dollars each week.

56.     Martinez has not been compensated as advertised and marketed by UBER.

**<u>UBER Misclassifies Drivers as Independent Contractors and Instead of Appropriately Classifying Its Drivers as Employees</u>**

57.     UBER uniformly misclassifies all of its drivers as independent contractors when in fact they are employees.

58.     UBER exerts significant control over its drivers.

59.     Before beginning employment as a driver, UBER subjected Plaintiffs Ortega and Martinez to a sophisticated on-boarding and training process.

60.     Upon information and belief, any and all UBER drivers in New York State, including the putative class, were subjected to the same sophisticated on-boarding and training process prior to beginning employment as an UBER driver.

61.     Upon information and belief, any and all UBER drivers in the United States were subjected to the same sophisticated on-boarding and training process prior to beginning employment as an UBER driver.

62.     Prior to beginning their employment as a driver for UBER, individuals were required to view an online training video.

63.     This training video teaches and specifically instructs UBER drivers on how to interact with Defendants' customers.

64.     During this video, Defendants directed the plaintiffs and putative class to stock their cars with water, snacks, and phone chargers for use by the customer.

65.     During this video, the plaintiffs and putative class were also advised of UBER's dress code and directed to dress in a certain way that would convey the message that the driver is the rider's personal chauffeur.

66.     In addition to watching the training video, the plaintiffs and putative class were required to pass an examination qualifying them to drive for UBER. UBER refers to this test as the "City Competency Test" or "City Competency Exam."

67.     If an applicant does not earn a minimum score on the "City Competency Test" or "City Competency Exam," they will not be employed as an UBER driver.

68.     UBER also determines the rides and the fees that the plaintiffs and putative class can accept.  Individual rider fares are set by UBER though its App. Group fares are similarly

determined by UBER. Plaintiff and the putative class members have no ability to change the fares set by the UBER App or to offer the rider a credit.

69.    Within its App, UBER maintains a sophisticated review system of all of its drivers. To wit, the UBER App solicits feedback from each rider at the conclusion of the experience. This driver review system operates on a 5 star system. Every week, UBER sends each Plaintiff and putative class member an email that contains the individual driver's customer reviews and feedback for the preceding week. All UBER drivers must average a star rating of at least 4.5 out of a possible 5 stars. If a driver falls below the 4.5 star rating for the preceding week, the aforementioned weekly email will contain instructions and tips for improving the driver's rating.

70.    Also within those weekly emails are tips for improving performance and compensation, including, but not limited to, informing drivers of the best and most desirable hours to work. For example, UBER has emailed its drivers to inform them that they could have earned "X" amount more that week had they received fares during peak hour pricing.

71.    These emails also contain performance enhancing suggestions such as to drive slower or faster, to take better routes to the destination, to discuss different routes with the rider, and directives to carry water, snacks and phone chargers, particularly if a rider complained that the vehicle lacked these peripheral items.

72.    Rider feedback about a driver will have significant implications on the driver's future employment with UBER. If a driver fails to maintain a 4.5 star rating, UBER will deactivate that driver's ability to log in and access the App, thereby preventing the driver from connecting with and picking up riders. For all intents and purposes, preventing a driver from connecting with and picking up riders constitutes termination of the driver's employment. The

ability to discontinue an individual's employment, such as that between UBER and the plaintiffs and putative class members, is one of the hallmarks of an employer-employee relationship.

73.     Conversely, UBER drivers who engender favorable ratings will be afforded certain benefits (or bonuses) that "unsatisfactory" drivers are not afforded. These bonuses include discount codes to certain retailers and pre-paid cards and coupons that can be applied to defray the cost of fuel and maintenance of the driver's vehicle. Additionally, drivers who maintain a favorable rating will be given premier driving assignments, such as long distance rides for Defendants' VIP customers or the opportunity to work in exclusive geographic locations, such as the Hamptons in Long Island, New York. The ability to offer bonuses and incentives, such as those between UBER and the plaintiffs and putative class members, is one of the hallmarks of an employer-employee relationship.

74.     Additionally, UBER provides Plaintiffs and the putative class members with access to and log in credentials for its App. UBER's App is the sole and exclusive method for communications between drivers and riders. UBER tracked all of the fares that Plaintiffs and the Class Members earned through this App. The App also tracked the routes that drivers took to their destination. In addition, through this App, UBER calculated how much Plaintiffs and each Class Member earned. The ability to direct, monitor and control, such as that by UBER to the plaintiffs and putative class members, is one of the hallmarks of an employer-employee relationship.

**UBER Informs its Riders that Gratuities are Included in the Fare and Instructs its Drivers to Refuse Gratuities When Offered By Riders, Yet Fails to Segregate and Pay Gratuities Collected For Drivers And UBER Fails to Pay Class Members All Monies Due Under Its Contracts**

75.     UBER directs its drivers to decline and refuse to accept tips from riders.

76.    However, to appease the insistent rider who demands to give a tip, UBER permits its driver to accept the tip if the rider offers it three times. Only then, is the driver permitted to accept the tip. Under no other circumstances is a driver permitted to accept a tip from a rider.

77.    UBER has informed and represented to its customers that a gratuity is included with the price of the fare. As of the date of this filing, UBER's message to its riders continues to be that a tip is not required – the following appears in the "Help" section on UBER's website under the question "DO I NEED TO TIP MY DRIVER?"[1]:

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file – there's no need to tip.

78.    Also, as of the date of this filing, the following appears in an even more conspicuous section of UBER's website, the "Ride" section, even after UBER reached a proposed settlement in California and Massachusetts :[2]

## No cash, no tip, no hassle

When you arrive at your destination, just hop out—we'll automatically charge the credit card on file. And there's no need to tip.

79.    The custom and practice in New York City is to tip taxi, limousine and livery drivers between 18 and 22% of the full fare. As a result of UBER's directive to drivers that they cannot accept a tip (absent the little-known policy that a gratuity can be accepted if offered three

---

[1] https://help.uber.com/h/1be144ab-609a-43c5-82b5-b9c7de5ec073
[2] https://www.uber.com/ride/

times), and its message to riders that there is no need to tip, UBER has created and advanced the presumption amongst reasonable consumers that a fair tip is included in the price of the fare.

80.    UBER's representations to riders there is no need to tip, there is no reason to carry cash and your fare is automatically charged and its directives to Class Members not to accept tips allows riders to believe that a portion of the fare charged is a gratuity.

81.    UBER has never remitted tips to Plaintiffs and the Class Members.

82.    UBER has retained all gratuities attributable and due to Plaintiffs and the Class Members despite representing to its customers and advertising that the gratuity is included in the total fare.

83.    UBER has failed to provide Plaintiffs and the Class Members with a rate of pay notice form as required by New York State Wage Theft Prevention Act.

84.    UBER has failed to provide Plaintiffs and the Class Members with pay stubs in compliance with the New York State Wage Theft Prevention Act.

85.    Plaintiffs and the Class Members have worked in excess of ten hours per day, or multiple shifts in which the spread of time from the beginning of the first shift until the conclusion of the final shift exceeded ten hours. Despite working more than eight hours a day, UBER failed to pay Plaintiffs or the Class Members spread of hours premiums.

86.    UBER has failed to provide Plaintiffs and the Class Members with itemized wage statements, minimum wages,  and reimbursement of employment related expenses.

87.    UBER has failed to keep accurate payroll records showing Plaintiffs and the Class Members' hours worked and wages paid.

88.     As a result of UBER's purposeful misclassification of its drivers as independent contractors instead of employees, UBER has been able to increase its profits and avoid the legal and tax consequences of employing Plaintiffs and the Class Members.

89.     As a result of UBER's purposeful misclassification of its drivers as independent contractors instead of employees, Plaintiffs and the Class Members have been defrauded and damaged in hundreds of millions of dollars in unpaid gratuities and overtime, reduced wages, and burdened with unreimbursed employment-related expenses.

90.     Under UBER's agreement with Class Members, UBER agrees to remit to Class Members, (a) the Fare less UBER's applicable service fee, (b) the tolls, and (c) depending on the region certain added taxes and ancillary fees, which in New York City includes the Black Car Fund.

91.     UBER does not remit to the Class Members all the applicable taxes and ancillary fees, including state and local sales tax and other ancillary fees.

92.     UBER includes as its fee a proportion of the taxes and ancillary fees that should be paid by the riders in a way that the Class Members bear a larger percentage of such amounts even though they should not bear any part of such charges as spelled out in the UBER agreements and applicable law and regulation. The end result is UBRER's service fee, which is taken out of the Class Members pay is inflated beyond the amount set forth in the applicable agreements to financial detriment and pecuniary loss to the Class Members.

93.     UBER cancels and/or adjusts the fares that have been earned by the Class Members because of rider complaints about the service.

94.     In such an instance the Class Member is unilaterally docked or deducted pay for alleged performance reasons.

95.     UBER also deducts from Class Members pay fares earned by the Class Member but UBER believe the Class Member took an inefficient route.

96.     Said deductions are not allowed by law and a true independent contractor, which Class Members are not, can set the method and means of work.

**UBER's Mass Marketing To Recruit Drivers**

97.     UBER prominently advertises on buses, billboards, public displays and the like to recruit drivers.

98.     UBER's advertisements and marketing display's prominently state "$5000 Guaranteed" [To Drivers] and similar promises of guaranteed compensation.

99.     In reality, no such compensation is guaranteed and the prominent displays are made to induce drivers to sign on with UBER and, like named Plaintiffs, induce them to leave their employment and work for UBER.

100.     The Class Members have sustained actual pecuniary loss as a result of UBER's false advertising.

**AS AND FOR A FIRST CAUSE OF ACTION:**
**Violations of New York State Labor Laws**

101.     Plaintiffs, on behalf of themselves and the Class Members, repeat and re-allege the allegations set forth in paragraphs 1 through 100 as if set forth fully herein.

102.     Plaintiffs and the putative class members are employees of UBER.

103.     As set forth above, UBER has substantial direction, supervision and control over its drivers, in contravention of its classification of Plaintiffs and the putative class members as independent contractors.

104.   Defendants' customers reasonably believed that the fares charged by Defendants included gratuities to be paid to the driver. Defendants are required to remit these gratuities to Plaintiffs and the Class Members, but have failed to do so.

105.   Plaintiffs and the putative class members routinely worked more than ten consecutive hours in a workday. Defendants willfully failed to compensate the plaintiffs and putative class members one hour's pay at the basic New York minimum hourly wage rate on days in which the length of their workday was more than 10 hours, as required by New York law.

106.   Defendants made illegal deductions from the plaintiffs and the putative class members' gratuities and wages in violation of New York Labor Law and New York Codes, Rules and Regulations.

107.   Defendants willfully failed to furnish the plaintiffs and the putative class members with a notice containing the rate of pay and the basis thereof, whether paid by the hours, shift, day, week, salary, piece, commission, or otherwise, the name of the employer, any "doing business as" names used by the employer, the physical address of the employer's main office or principal place of business and a mailing address if different, the telephone number of the employer, and anything else otherwise required by law.

108.   Defendants also willfully failed to furnish the plaintiffs and the putative class members with every payment of wages, a wage statement that included the phone number of the employer, the proper overtime rate, and anything else otherwise required by law.

109.   In addition to the foregoing, UBER has failed to keep required payroll records, failed to provide its drivers with the requisite meal and rest periods, failed to pay its drivers a minimum wage, and failed to pay its drivers at the premium rate for overtime.

110.    Given the foregoing, Plaintiffs and the putative class members seek damages against the defendants pursuant to New York Labor Law §196-d (for unlawfully retaining portions of gratuities intended for UBER's drivers); New York Labor Law §193, *et seq*. (for unlawfully retaining monies intended and specifically meant for UBER's drivers); New York Labor Law §195 (for failure by Defendants to keep required payroll records); New York Labor Law §191 (for failure to provide prompt payment of wages to driver employees upon termination and resignation); New York Labor Law §652 (for failure to pay minimum wages); 12 NYCRR §142-2.1 (for failure to pay Plaintiffs and Class Members in accordance with the basic minimum hourly wage rate allowable pursuant to the instant regulation, in accordance with New York State law); 12 NYCRR §142-2.2 (for failure to pay overtime); and 12 NYCRR §142-2.2 (for failure to compensate Plaintiffs and Class Members pursuant to the instant regulation, in accordance with New York State law).

111.    By virtue of the foregoing willful violations of New York Labor Law, Plaintiffs and the putative class members are entitled to recover their withheld gratuities, unpaid overtime and minimum wages, unpaid spread of hours compensation, statutory damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION:
### Unlawful Deductions and Kickbacks

112.    Plaintiffs, on behalf of themselves and the Class Members, repeat and re-allege the allegations set forth in paragraphs 1 through 111 as if set forth fully herein.

113.    New York Labor Law §193(1) prohibits employers from making any deductions from an employee's wages except for those permitted by law or those made for the benefit of the employee which are explicitly authorized in writing by the employee.

114.    New York Labor Law §193(2) prohibits employers from making any charge against an employee's wages or requiring an employee to make any payment by separate transaction, unless such payment is a permitted deduction pursuant to New York Labor Law §193(1).

115.    In requiring Plaintiffs and the putative class members, as employees, to acquire and maintain the driven vehicles, purchase fuel, pay for tolls, pay for the registration, inspection and insurance of the vehicles, workers compensation insurance, purchase a mobile device that conforms to UBER's requirements, purchase a minutes and data plan for said mobile device, purchase, install and use UBER's "Driver App", and by requiring Plaintiffs and the putative class members to solely bear these and other costs of operating UBER's business, Defendants have violated New York Labor Law §§193 and 198.

116.    By making deductions to wages because of rider complaints or Defendant's belief that Class Members took an inefficient route, UBER is making unlawful deductions against wages.

117.    By virtue of the foregoing, Plaintiffs and the putative class members are entitled to recover the cost of the tools of the trade the defendants illegally shifted to Plaintiffs and the putative class members, attorneys' fees and costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION:**
**Tortious Interference with Business Relations**

118.    Plaintiffs, on behalf of themselves and the Class Members, repeat and re-allege the allegations set forth in paragraphs 1 through 117 as if set forth fully herein.

119.    By accepting riders and agreeing to take that rider to a designation of the rider's choice for a fare, Class Members and their customers have entered into a business relationship.

120.     UBER discourages its customers from providing gratuities to its drivers, expressly advises its customers that "there is no need to tip" its drivers, and prevents its driver from accepting a gratuity when initially offered.

121.     UBER's affirmative act of collecting its drivers' gratuities, yet failing to remit the total proceeds of the gratuities to its drivers, constitutes unlawful tortious interference with the business relationship that exists between the drivers and riders, in direct contravention of New York State law.

122.     As a result of the foregoing, Plaintiffs and the putative class members have been damaged and are entitled to restitution for any and all monies improperly withheld by Defendants.

**AS AND FOR A FOURTH CAUSE OF ACTION:**
<u>**Breach of Contract**</u>

123.     Plaintiffs, on behalf of themselves and the Class Members, repeat and re-allege the allegations set forth in paragraphs 1 through 122 as if set forth fully herein.

124.     UBER has entered into contracts, as amended, with Plaintiffs and the putative class members which purport to set forth the terms of their employment as UBER drivers.

125.     Pursuant to these contracts, UBER is required to remit to its drivers the proceeds of all gratuities received.

126.     UBER has not remitted the total proceeds of all gratuities to Plaintiffs and the putative class members.

127.     UBER have never remitted any amount of gratuities to Plaintiffs and the putative class members.

128.     At all times alleged herein, UBER has withheld and continues to withhold all gratuities paid by riders to its drivers.

129.    At all times alleged herein, UBER has withheld and continues to withhold all gratuities paid by riders to its drivers that are incorporated into the fare set by the UBER App.

130.    At all times alleged herein, UBER has withheld and continue to withhold a portion of the gratuities and/or tips given by riders to UBER drivers that are incorporated into the fare set by the UBER application.

131.    UBER's withholding of any portion of the gratuities constitutes a breach of contract.

132.    UBER also fails to remit to the Class Members applicable taxes and ancillary fees, including sales tax and Black Car Fund, as set forth in Class Members agreements with UBER

133.    UBER inflates the service fee charged Class Members by including applicable taxes and ancillary charges (including sales tax and Black Car Fund charges) in the fare instead of calculating the fare net of such charges. The result is that the Class Members pay an inflated service fee contrary to their agreements with UBER.

134.    As a result of the foregoing, Plaintiffs and the putative class members have been damaged and are entitled to restitution for any and all monies improperly withheld and improperly calculated by Defendants to the detriment of Class Members.

## AS AND FOR A FIFTH CAUSE OF ACTION:
### Conversion

135.    Plaintiffs, on behalf of themselves and the Class Members, repeat and re-allege the allegations set forth in paragraphs 1 through 134 as if set forth fully herein.

136.    Defendants have unlawfully withheld gratuities which were intended for Plaintiffs and the putative class members.

137.    Defendants have unlawfully withheld funds paid by riders to cover the cost of tolls from Plaintiffs and the putative class members.

138.    Defendants have unlawfully withheld reimbursement of Plaintiffs and the putative class members' expenses. These expenses include, but are not limited to the cost of vehicle acquisition and carrying charges, fuel, maintenance, registration, insurance, inspection, and mileage.

139.    Defendants unlawfully take as part of its service fee a proportion of taxes and ancillary charges, such as sales tax and Black Car  Fund that should be surcharges paid by riders as part of their overall fare, thereby converting part of the Class Members fee for itself.

140.    By Defendants wrongful conduct as set forth herein, they have wrongfully exerted control over Class Members gratuities, fees and reimbursable expenses in a manner inconsistent with Class Members rights in such property.

141.    Plaintiffs and the putative class members never permitted Defendants to withhold any monies that were intended to be remitted to them.

142.    As a result of the foregoing, Plaintiffs and the putative class members have been damaged and are entitled to restitution for any and all monies improperly withheld by Defendants.

143.    As a consequence of Defendants' aforementioned withholdings, Plaintiffs are entitled to treble damages.

## AS AND FOR AN SIXTH CAUSE OF ACTION:
### False Advertising

144.    Plaintiffs, on behalf of themselves and the Class Members, repeat and re-allege the allegations set forth in paragraphs 1 through 143 as if set forth fully herein.

145.    UBER's marketing materials and advertisements to drivers induce them to work

for UBER are materially misleading in that UBER offers guaranteed compensation without disclosing the actual conditions imposed.

146.    Named Plaintiffs and the class have been induced to work for UBER based upon UBER's misleading advertisements.

147.    Below is an example of one of these advertisements:



148.    To the limited extent UBER sets forth the actual conditions of employment, such conditions are buried in separate small and inconspicuous print so as to mislead drivers (employees).

149.    Under New York General Business Law § 350-a UBER's advertising activities to recruit drivers constitutes false advertising.

150.    Named Plaintiff's Ortega and Martinez suffered actual pecuniary loses as a result of UBER's deceptive marketing materials as they were induced to give up reliable and consistent income for UBER's compensation method that unlawfully makes deductions from income, purposes untenable conditions, such as long work hours just to eke out a living (which were not disclosed) and by forcing class members to make illegal out-of-pocket expenditures.

151.    Such mandatory conditions imposed by UBER are not displayed along with the false guarantees UBER makes in its public advertisements.

152.    Class members are entitled to the guaranteed payments promised by UBER in its advertisements that UBER has failed to pay.

153.    As set forth above, UBER has made material misrepresentations of fact to its drivers, riders, and the public to the detriment of Plaintiffs and the putative class members.

## JURY DEMAND

154.    Plaintiffs, on behalf of themselves and the proposed class, hereby demand a trial by jury of all claims.

## REQUEST AND PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs individually and on behalf of the proposed class, request relief against the Defendants as set follows:

a.  Notice to the Classes of the action;

b.  Certify this case as a class action;

c.  Award of damages, including compensatory, consequential, liquidated, punitive, and treble damages, as well as back pay and restitution for all charged gratuities, with interest, not remitted to Plaintiffs and Class Members, in accordance with New York State and applicable Federal law;

d.  Award reimbursement, with interest, to the Plaintiffs and Class members of expenses and costs who were misclassified as independent contractors and as a consequence were required to bear;

e.  An injunction prohibiting all Defendants from engaging in each of the unlawful practices, policies, and patterns set forth herein;

f.  Reasonable attorneys' fees, costs, and expenses of this action;

g.  Pre-judgment and post-judgment interested as provided by law; and

h.  Such other, further, and different relief that the Court may deem just and

proper.

Dated: Brooklyn, New York
       April 25, 2016

Respectfully submitted,

JOSE ORTEGA and JOCE MARTINEZ,
individually and on behalf of all others similarly
situated,

By their attorneys,

HELD & HINES, LLP


_____/s/_____
Philip M. Hines, Esq.
Marc J. Held, Esq.
Scott B. Richman, Esq.
*Attorneys for Plaintiffs and Proposed Class*
Office and P.O. Address
2004 Ralph Avenue
Brooklyn, New York 11234
Tel: (718) 531-9700
Fax: (718) 444-5768
Email: phines@heldhines.com
        mheld@heldhines.com
        srichman@heldhines.com


COBURN & GREENBAUM, PLLC


_____/s/_____
Jonathan W. Greenbaum
1710 Rhode Island Ave, NW
Second Floor
Washington, DC 20036
Email: jg@coburngreenbaum.com