UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSE ORTEGA and JOCE MARTINEZ, on their own behalf, and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>UBER TECHNOLOGIES INC., RASIER LLC, UBER USA LLC, UBER NEW YORK LLC, UBER TRANSPORTATION LLC, JOHN DOE "UBER AFFILIATES," fictitious name used to identify presently unknown entities,<br><br>Defendants. | Case No: 1:15-cv-07387 (NGG) (JO)<br><br>**DECLARATION OF MICHAEL COLMAN IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL INDIVIDUAL ARBITRATION, DISMISS PLAINTIFF MARTINEZ'S CLAIMS, AND STRIKE PLAINTIFF'S CLASS ALLEGATIONS** |

I, MICHAEL COLMAN, hereby declare and state:

1. The information set forth herein is true and correct of my own personal knowledge (unless otherwise stated) and if asked to testify thereto, I would do so competently.

2. I am currently employed as an Operations Specialist at the San Francisco headquarters of Defendant Uber Technologies, Inc. ("Uber"). I have been employed by Uber since October 19, 2011, and have worked as an Operations Specialist since February 2013. In that role, I consult with operations teams throughout the country regarding nearly every facet of Uber's operations and have comprehensive personal knowledge of Uber's business model, including the operations of Uber's wholly-owned subsidiaries, including Defendants Rasier, LLC ("Rasier") and its affiliated companies, and Uber USA, LLC ("Uber USA").

3. Uber is a technology company based in San Francisco that acts as a conduit between individuals looking for transportation, and independent transportation providers looking for riders ("drivers"). Uber provides the technology, through its smartphone application (the "app"), that allows riders and drivers to connect based on their location. Uber offers the app as a

tool to both riders and drivers to facilitate transportation services, and it charges a service fee to drivers for use of the app.

4. Using the app, riders can connect with available drivers offering a variety of transportation options through several different platforms, including, but not limited to, UberBLACK, UberTAXI, UberSUV, and uberX. Uber USA, a wholly-owned subsidiary of Uber, contracts with drivers that desire to use the Uber platform to generate leads for potential riders in New York City. Rasier does not conduct business in New York City.

5. The app is available to riders and drivers in over 150 cities across the country.

6. As an Operations Specialist for Uber, I am familiar with the process drivers must go through to sign up to use the app and the various documents to which they must assent in order to use the app. I also have access to Uber's business records reflecting the identity of drivers that use the app, as well as the individuals whom these drivers have engaged. These records are maintained in the regular course of Uber's business and updated as new drivers join and leave the system.

7. Any driver who wishes to access the Uber platform in New York City to generate leads for potential riders must first enter into the applicable agreement with Uber USA to use the app. In New York City, pursuant to rules and regulations promulgated by the Taxi and Limousine Commission ("TLC"), to gain access to the platform, drivers must first present to Uber proof of a commercial vehicle license issued by the TLC, commercial grade insurance, and a vehicle inspected and approved by the TLC.

8. In order to electronically accept the operative agreement, a driver must first login to the app where the agreement is available for review by clicking a hyperlink presented on the screen. Drivers are free to spend as much time as they wish reviewing the agreement on their

1

smartphones. However, to advance past the screen with the hyperlink to the agreement and actively use the app, drivers need to click "YES, I AGREE" to the agreement presented. After clicking "YES, I AGREE," drivers are prompted to confirm their acceptance a second time. A true and correct copy of the "YES, I AGREE" screenshot is attached hereto as **Exhibit A**. A true and correct copy of the confirmation screenshot is attached hereto as **Exhibit B**. After drivers accept the agreement, the agreement is automatically transmitted to their Driver Portal (described below) where they can review it at their leisure, either online on any device or by printing a copy.

9. Uber periodically revises its agreements, and drivers who have previously entered into an agreement with Uber or its subsidiaries may be asked to assent to revised versions of the contract in order to receive continued access to the app. A total of four agreements, including the December 11, 2015 Technology Services Agreement (the "December 2015 Agreement"), have been used in New York City since Plaintiff first signed up to use the app. Only three different arbitration provisions have been in effect since that time. However, each time a revised agreement is rolled out, the process described above is repeated. That is, no driver is bound to the new agreement until he or she affirmatively accepts.

10. I have access to Uber's databases reflecting the dates and times that drivers accept their applicable agreements. These databases are maintained in the regular course of Uber's business and updated automatically as drivers agree to these documents. When a driver agrees to one of those documents through the app, an electronic receipt is generated at the time the driver agrees to the documents. The receipts include a date and timestamp indicating acceptance.

11. Based on my review of Uber's business records, Plaintiff Joce Martinez completed the sign-up process to use the Uber platform to generate leads for potential riders on

2

or about August 6, 2014. At that time, the agreement Plaintiff needed to electronically accept in order to use the app was the June 21, 2014 Software License Agreement (the "June 2014 Agreement"). Plaintiff accepted the June 2014 Agreement on August 6, 2014 through the process described above, and his account was activated. He completed his first trip using the app on August 6, 2014. A true and correct copy of the June 2014 Agreement Plaintiff Martinez accepted through the app is attached hereto as **Exhibit C**.

12. Following the same process described above, Plaintiff Martinez subsequently accepted the November 10, 2014 Transportation Company Agreement (the "November 2014 Agreement"), and the April 7, 2015 Transportation Company Agreement (the "April 2015 Agreement"), through the app on February 28, 2015, and October 17, 2015, respectively. A true and correct copy of the November 2014 Agreement Plaintiff Martinez accepted through the app is attached hereto as **Exhibit D**. A true and correct copy of the April 2015 Agreement Plaintiff Martinez accepted through the app is attached hereto as **Exhibit E**.

13. On December 12, 2015, Plaintiff was presented with and accepted the December 2015 Agreement through the app. As with the prior agreements, Plaintiff needed to accept the December 2015 Agreement electronically through the process described above in order to continue to generate leads for potential riders using the Uber platform. For the December 2015 Agreement, the hyperlink discussed above was entitled "UBER USA Technology Services Agreement December 10 2015." A true and correct copy of the December 2015 Agreement Plaintiff Martinez accepted through the app is attached hereto as **Exhibit F**. Based on my review of Uber's business records, Plaintiff Martinez remains "active" on the Uber system.

14. Drivers using the Uber platform in New York City can hire other individuals, either as employees or subcontractors, to drive vehicles and transport riders on their behalf under

3

their Uber account. Accordingly, all drivers must also accept a "Driver Addendum," which incorporates by reference the operative arbitration provision. Plaintiff Martinez accepted the June 2014 Driver Addendum on August 6, 2014. A true and correct copy of the June 2014 Driver Addendum is attached hereto as **Exhibit G**. Plaintiff Martinez accepted the November 2014 Driver Addendum on February 28, 2015. A true and correct copy of the November 2014 Driver Addendum is attached hereto as **Exhibit H**. Plaintiff Martinez accepted the December 2015 Driver Addendum on December 12, 2015. A true and correct copy of the December 2015 Driver Addendum is attached hereto as **Exhibit I**.

15. After accepting his/her agreement, drivers have the opportunity to opt out of the Arbitration Provision if they desire. As an Operations Specialist, I have access to Uber's business records reflecting the names of those individuals who have elected to opt out of a particular arbitration provision. The opt out records are maintained in the regular course of Uber's business and updated as drivers elect to opt out. Based on my review of these records, Plaintiff Martinez did not opt out of the Arbitration Provision in the December 2015 Agreement. Uber's business records reflect that thousands of drivers did, in fact, opt out of one or more of the arbitration provisions contained in the various agreements in place between Uber and its subsidiaries, and the drivers who use the app. For example, Plaintiff Jose Ortega opted out of the Arbitration Provision in the December 2015 Agreement on December 17, 2015. A true and correct copy of the e-mail Uber received from Plaintiff Ortega's counsel, attaching a copy of Plaintiff Ortega's opt out statement with respect to the Arbitration Provision in the December 2015 Agreement, is attached hereto as **Exhibit J**.

16. Based on my review of Uber's records, Plaintiff Martinez also did not opt out of the arbitration provision in the June 2014 or November 2014 Agreements. Plaintiff attempted to

4

opt out of the arbitration provision in the April 2015 Agreement, but his opt out attempt was invalid because the arbitration provision in the April 2015 Agreement is identical to the arbitration provision in the November 2014 Agreement. Accordingly, unlike the December 2015 Agreement, which contains modified arbitration language, the April 2015 Agreement did not create a renewed opportunity for Plaintiff to opt out. In any event, as stated above, Plaintiff Martinez did not opt out of the Arbitration Provision in the December 2015 Agreement.

17. All drivers who sign up to use the app are given access to an online "Driver Portal." The Driver Portal stores information (particular to each driver) regarding the services provided by that driver through Uber's various platforms. The Driver Portal also includes access to the contracts entered into by any given driver via a conspicuous download button. Drivers who use the Uber platform to generate leads for potential riders are able to access their portal and review the operative Agreement. The Driver Portal is accessible online to drivers at all times. They may access the information by logging into their Uber account by using the internet on a computer, tablet, smartphone, or similar device. A true and correct copy of Plaintiff Martinez's Driver Portal showing links to the contracts that he entered into is attached hereto as **Exhibit K**.

18. A true and correct copy of the electronic receipts that Uber received following Plaintiff Martinez's acceptance of the June 2014, November 2014, April 2015, and December 2015 Agreements, and the June 2014, November 2014, and December 2015 Driver Addenda, is attached hereto as **Exhibit L**.

19. Given the standards imposed by the TLC to obtain a for-hire vehicle license, neither Uber nor its agents procures consumer reports for drivers using the app in New York.

///

///

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at San Francisco, California, this 20 day of May 2016.

*Michael Colman*
Michael Colman (May 20, 2016)

MICHAEL COLMAN