UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

MANZOOR MUMIN and VICTOR MALLH,
individually and on behalf of all others similarly
situated,

                Plaintiffs,

      -against-

UBER TECHNOLOGIES, INC., RASIER, LLC,
and JOHN DOES 1-10,

                Defendants.
------------------------------------------------------------------X

JOSE ORTEGA and JOCE MARTINEZ, on their
own behalf, and on behalf of those similarly
situated,

                Plaintiffs,

      -against-

UBER TECHNOLOGIES INC., RASIER, LLC,
UBER USA LLC, UBER NEW YORK LLC,
UBER TRANSPORTATION LLC, and JOHN
DOE "UBER AFFILIATES,"

                Defendants.
------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**15-CV-6143 (NGG) (JO)**

**15-CV-7387 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiffs in these two related putative class actions assert claims under New York Labor

Law ("NYLL") and other New York statutory and common law against Uber Technologies, Inc.

and a number of related or affiliated entities (collectively, "Uber"). In the first action

(the "Mumin Action"), Plaintiffs Manzoor Mumin and Victor Mallh (the "Mumin Plaintiffs")

bring their action against Defendants Uber Technologies, Inc., Rasier, LLC, and John Does 1-10.

1

(Mumin 3d Am. Compl. ("Mumin Compl.") (Dkt. 22 in No. 15-CV-6143).)  In the second action

(the "Ortega Action"), Plaintiffs Jose Ortega and Joce Martinez (the "Ortega Plaintiffs," and

together with the Mumin Plaintiffs, "Plaintiffs") have filed suit against Defendants Uber

Technologies, Inc., Rasier, LLC, Uber USA LLC, Uber Transportation LLC, and John Doe

"Uber Affiliates."  (Ortega Am. Compl. ("Ortega Compl.") (Dkt. 16 in No. 15-CV-7387).)

Before the court are Uber's motions to (1) compel arbitration as to Plaintiff Victor Mallh

in the Mumin Action and Plaintiff Joce Martinez in the Ortega Action; and (2) dismiss the

operative complaints in both actions pursuant to Federal Rules of Civil Procedure 9(b)

and 12(b)(6).  (See Mumin Defs.' Mot. to Compel Arbitration (Dkt. 28 in No. 15-CV-6143);

Ortega Defs.' Mot. to Compel Arbitration (Dkt. 19 in No. 15-CV-7387); Mumin Defs.' Mot. to

Dismiss (Dkt. 26 in No. 15-CV-6143); Ortega Defs.' Mot. to Dismiss (Dkt. 22 in

No. 15-CV-7387).)  Because of the substantial similarity in facts and the legal issues raised, the

court will address these motions together in this Memorandum and Order.

For the following reasons, the court GRANTS Uber's motions to compel Plaintiffs Mallh

and Martinez to arbitrate their claims.  The court also GRANTS IN PART and DENIES IN

PART Uber's motions to dismiss Plaintiffs' operative complaints.

## I.    BACKGROUND

### A.    Facts as Alleged in the Operative Complaints

#### 1.    General Allegations

Uber is a ride-sharing service that uses a mobile application to connect its drivers to

potential passengers.  (Mumin Compl. ¶¶ 3, 16; Ortega Compl. ¶ 25.)  Uber's mobile application

allows a rider to request a ride by inputting a pick-up location and a destination.

(Ortega Compl. ¶ 25.)  The application matches the rider with one of Uber's available drivers in

the vicinity and then provides the rider with an estimated fare.  (Id.)  If the rider accepts the

estimated fare, then the available Uber driver is dispatched to pick up the rider. (Id.) At the end of the ride, the passenger completes the transaction by paying Uber through the mobile application. (See id.; see also Mumin Compl. ¶ 46.) Uber pays drivers, on a weekly basis, their share of the fares earned for their rides. (See Mumin Compl. ¶ 46; Ortega Compl. ¶¶ 25, 27.)

Plaintiffs allege that Uber misclassifies its drivers as independent contractors rather than employees in order to avoid New York Labor Law requirements, such as minimum wage, overtime pay, and expense reimbursement. (Mumin Compl. ¶¶ 4, 41; Ortega Compl. ¶ 57.) They assert that Uber "exercised control over their wages, their hours, and their working conditions," and "regulate[d] every aspect of Uber Drivers' job performance." (Mumin Compl. ¶¶ 25-26; see also Ortega Compl. ¶ 58.) Uber controls the qualifications of the drivers it chooses to hire, requiring prospective drivers to submit to background checks and to complete an in depth training process. (Mumin Compl. ¶¶ 27, 43-44; Ortega Compl. ¶¶ 28, 59-68.) For example, potential drivers must watch an instructional video detailing Uber's rules for how drivers are to interact with riders. (Mumin Compl. ¶ 44; Ortega Compl. ¶¶ 62-65.) The video allegedly directs drivers "to stock their cars with water, snacks, and phone chargers for use by the customer," and "to dress in a certain way that would convey the message that the driver is the rider's personal chauffeur." (Ortega Compl. ¶ 65.) Uber also allegedly requires its drivers to pass a "City Competency Test" before they can begin working. (Id. ¶¶ 66-67.) In addition, Uber drivers must register their vehicles with Uber, which bars the use of vehicles over ten years old. (Mumin Compl. ¶ 28.)

Once a driver begins working for Uber, his or her performance is monitored through a five-star rating system whereby riders are asked to rate the driver at the end of each trip. (See Mumin Compl. ¶ 45; Ortega Compl. ¶ 69.) Drivers must maintain an average customer

rating of 4.5 stars out of 5.  (See Mumin Compl. ¶ 45; Ortega Compl. ¶ 69.)  If drivers' customer rating falls below the minimum threshold, they have 30 days to improve their rating.  (See Mumin Compl. ¶ 45; see also Ortega Compl. ¶¶ 69-72.)  Failure to increase the rating to the required 4.5 stars will result in the deactivation of a driver in Uber's mobile application, effectively terminating the parties' working relationship.  (Mumin Compl. ¶ 45; Ortega Compl. ¶ 72.)

Plaintiffs allege that they incurred weekly expenses such as fuel, insurance, finance payments for their vehicles, as well as cleaning, tolls, and car maintenance costs, while driving for Uber.  (Mumin Compl. ¶¶ 10, 15; Ortega Compl. ¶ 28.)  Uber did not reimburse Plaintiffs for their expenses.  (Mumin Compl. ¶ 11; Ortega Compl. ¶ 28.)  Plaintiffs additionally allege that Uber shifts the burden of its own expenses onto the drivers through its $1 per ride "safe ride" fee.  (Mumin Compl. ¶ 33; Ortega Compl. ¶¶ 27-28.)  Uber supposedly uses this fee to pay for background checks, driver safety education, and the development of safety features in its mobile application.  (Mumin Compl. ¶ 33; Ortega Compl. ¶ 28.)

Plaintiffs also take issue with Uber's policy on gratuities.  Uber directs its drivers to decline any tips offered by their riders.  (Mumin Compl. ¶ 38; Ortega Compl. ¶¶ 75-76 (noting that Uber permits drivers to accept gratuity only after a rider offers it three times).)  Uber allegedly represents to riders that gratuity is included in the cost of the fares.  (Mumin Compl. ¶ 37; Ortega Compl. ¶ 77.)  Uber's website advises riders that "there's no need to tip."  (Mumin Compl. ¶ 69; Ortega Compl. ¶ 77.)

Plaintiffs further allege that Uber misled them in marketing materials designed to recruit prospective drivers.  (Mumin Compl. ¶¶ 34-35; Ortega Compl. ¶¶ 98-99.)  The details of the

deceptive advertisements vary between the two Complaints, and are described in greater detail below.

> 2. Allegations Specific to the Mumin Action

Plaintiff Manzoor Mumin allegedly drove for Uber from November 2011 to July 2013, while Plaintiff Victor Mallh began driving for Uber in June 2015 and continues to do so. (Mumin Compl. ¶¶ 8, 13.) Mumin worked an estimated 55 hours per week as an Uber driver, and Mallh works 70 hours per week. (Id. ¶¶ 9, 14.) Mumin alleges that he earned approximately $1,100 a week before taking into account weekly expenses of about $766, and Mallh states that he earns $1,400 each week while incurring $900 in weekly expenses. (Id. ¶¶ 10, 15.) After deducting his weekly expenses, Mumin calculates that his effective hourly wage was $6.07. (Id. ¶ 10.) Mallh similarly estimates his effective wage to be $7.14. (Id. ¶ 15.) During Mumin's time with Uber, the minimum wage in New York was $7.25 and later $8.00 per hour. (Id. ¶ 10.) The minimum wage is $9.00 an hour for the time that Mallh drove for Uber. (Id. ¶ 15.)

The Mumin Plaintiffs further allege that Uber's drivers are required to log a certain number of hours driving or they risk deactivation. (Id. ¶ 45.) Relatedly, drivers who accept less than 90% of the ride requests sent to them through the Uber mobile application risk temporary deactivation. (Id. ¶ 61 (including screenshots of the Uber application in which a driver was deactivated for 24 hours for accepting less than 90% of the ride requests and, separately, an Uber recommendation to its drivers that they should accept at least 80% of trip requests).) Drivers are also prohibited from soliciting or accepting requests for future rides from their Uber passengers outside of the Uber mobile application. (Id. ¶ 47.)

As to gratuity, the Mumin Complaint includes specific allegations that up until the end of 2012, Uber's website contained statements such as "There's no need to hand your driver any

payment and the tip is included," and "Please thank your driver, but tip is already included." (Id. ¶ 69.) Although Uber revised its website in 2013 to state only that "there's no need to tip," Uber has on occasion continued to represent to passengers that "tip [is] included" as late as April 2015. (Id. ¶¶ 69-70.) The Mumin Plaintiffs assert that Uber's "there's no need to tip" statement harmed its drivers by depriving them of tips that they otherwise would have received. (Id. ¶ 40.)

Finally, the Mumin Plaintiffs assert that Uber misled its drivers by claiming that "drivers can earn $2,000 a week by driving for Uber." (Id. ¶ 34 (including a screenshot of an Uber advertisement which states: "Depending on your market, it is easy to make $2,000 a week driving for uber").) The Mumin Plaintiffs argue that they did not earn this "guaranteed . . . pay," despite working over 40 hours a week. (Id.) They further assert that, even if $2,000 a week in gross income is possible, the advertisement is deceptive because it does not account for expenses, which in their case reduce their hourly wage below New York's minimum wage. (Id. ¶ 35.)

    3.    Allegations Specific to the Ortega Action

The Ortega Plaintiffs are current Uber drivers. (Ortega Compl. ¶¶ 34, 50.) Plaintiff Jose Ortega became an Uber driver around August 2014, after seeing Uber advertisements that contained claims that its drivers would make certain guaranteed income. (Id. ¶¶ 32-33.) Ortega alleges that he works 6 days a week on average, for 10 to 12 hours per day, or approximately 60 to 72 hours per week. (Id. ¶ 36.) He receives gross weekly wages that range from $600 to $1,000 a week, and incurs "hundreds of dollars each week" in work-related expenses. (Id. ¶¶ 40, 42-43.) Plaintiff Joce Martinez similarly applied to be an Uber driver around August 2014. (Id. ¶ 49.) Martinez was allegedly induced to join Uber after seeing advertisements that claimed drivers would earn $60,000 in their first year. (Id. ¶¶ 48-49.)

Martinez alleges that he works an average of 5 to 6 days a week for 5 to 10 hours per day, or approximately 25 to 60 hours per week. (Id. ¶ 50.) He receives gross weekly wages that range from $700 to $1,000 a week, and incurs "hundreds of dollars each week" in expenses related to driving for Uber. (Id. ¶¶ 52, 54-55.)

The Ortega Plaintiffs allege that Uber not only penalizes drivers who receive poor customer ratings, but also provides certain benefits to drivers with high customer ratings, such as discounts to certain retailers and premier driving assignments, including long-distance rides and the ability the work in exclusive locations. (Id. ¶¶ 72-73.)

On the issue of gratuities, the Ortega Plaintiffs assert that the custom in New York City is to tip taxi drivers 18-22% of the full fare. (Id. ¶ 79.) They point to Uber's alleged representation that tip is included in the fare and argue that a portion of the fare charged to a rider is a gratuity, which Uber withholds from its drivers in violation of New York law. (Id. ¶¶ 80-82.)

Finally, the Ortega Plaintiffs claim that Uber's marketing prominently states that drivers can make "$5,000 Guaranteed." (Id. ¶ 98.) Their Complaint includes one example of these allegedly misleading advertisements, which states "Drive & Make $5,000 Guaranteed, during your first month. Go to uber.com/5000." (Id. ¶ 147.) The Ortega Plaintiffs contend that Uber used this and similar offers of guaranteed compensation to induce them to work for Uber. (Id. ¶ 146.)

### B.    Additional Factual Allegations

In support of its motions to compel arbitration against Plaintiffs Mallh and Martinez, Uber submitted declarations by one of its operation specialists, who reviewed Uber's business records and was familiar with the process an individual must go through to become an Uber driver. (Decl. of Michael Colman ("Mumin Colman Decl.") (Dkt. 30 in No. 15-CV-6143); Decl. of Michael Colman ("Ortega Colman Decl.") (Dkt. 21 in No. 15-CV-7387).)

The operation specialist represented that a prospective driver cannot begin using Uber's mobile application to connect to potential riders until the driver agrees to a service agreement with Uber.  (Mumin Colman Decl. ¶ 7; Ortega Colman Decl. ¶ 7.)  A hyperlink to an electronic version of the operative agreement is available when the driver first opens Uber's mobile application.  (Mumin Colman Decl. ¶ 8; Ortega Colman Decl. ¶ 8.)  This initial screen is titled "TERMS AND CONDITIONS," and states near the top "TO GO ONLINE, YOU MUST REVIEW ALL THE DOCUMENTS BELOW AND AGREE TO THE CONTRACTS BELOW."  (Ex. A to Mumin Colman Decl.; Ex. A to Ortega Colman Decl.)  At the bottom of the screen, below hyperlinks to the operative agreement and other addenda, there is a button labeled "YES, I AGREE."  (Ex. A to Mumin Colman Decl.; Ex. A to Ortega Colman Decl.)  Above this button is the statement "By clicking below, you represent that you have reviewed all the documents above and that you agree to all the contracts above."  (Ex. A to Mumin Colman Decl.; Ex. A to Ortega Colman Decl.)  A potential driver cannot advance past this initial screen unless he or she selects the "YES, I AGREE" button.  (Mumin Colman Decl. ¶ 8; Ortega Colman Decl. ¶ 8.)  Once this button is selected, a new screen pops up on the mobile application that asks the user to "PLEASE CONFIRM THAT YOU HAVE REVIEWED ALL THE DOCUMENTS AND AGREE TO ALL THE NEW CONTRACTS."  (Ex. B to Mumin Colman Decl.; Ex. B to Ortega Colman Decl.)  The driver may select either "NO" or "YES, I AGREE."  (Ex. B to Mumin Colman Decl.; Ex. B to Ortega Colman Decl.)  Only after a driver confirms acceptance of the terms and conditions will the driver be granted access to the rest of the mobile application, allowing the driver to begin connecting with riders.  (Mumin Colman Decl. ¶ 8; Ortega Colman Decl. ¶ 8.)  The agreement that the driver accepted is available for review at any time through the Driver Portal of the mobile application.  (Mumin Colman Decl. ¶ 8; Ortega Colman Decl. ¶ 8.)

Uber periodically revises its agreements and, when it does, drivers must repeat these same steps to accept the new agreement. (Mumin Colman Decl. ¶ 9; Ortega Colman Decl. ¶ 9.) A driver is prompted to review the revised documents and must accept and then confirm their acceptance of the new agreement in order to receive continued access to Uber's mobile application. (Mumin Colman Decl. ¶ 9; Ortega Colman Decl. ¶ 9.)

At the time Plaintiff Victor Mallh initiated the process to become an Uber driver, the operative service agreement was the April 3, 2015, Transportation Company Agreement (the "April 2015 Agreement"). (Mumin Colman Decl. ¶ 11; see also April 2015 Agreement (id., Ex. C).) Mallh accepted the April 2015 Agreement on June 9, 2015, and began driving for Uber. (Mumin Colman Decl. ¶ 11.) On December 14, 2015, Uber presented Mallh with a revised agreement, the December 11, 2015, Technology Services Agreement (the "December 2015 Agreement"), through the mobile application. (Id. ¶ 12; see also December 2015 Agreement (id., Ex. D).) Mallh accepted the December 2015 Agreement. (Mumin Colman Decl. ¶ 12.)

Plaintiff Joce Martinez began the process to become an Uber driver in August 2014, when the operative agreement was the June 21, 2014, Software License Agreement (the "June 2014 Agreement"). (Ortega Colman Decl. ¶ 11; see also June 2014 Agreement (id., Ex. C).) Martinez accepted the June 2014 Agreement on August 6, 2014. (Ortega Colman Decl. ¶ 11.) Uber presented Martinez with a revised agreement, the November 10, 2014 Transportation Company Agreement (the "November 2014 Agreement"), which Martinez accepted on February 28, 2015. (Id. ¶ 12; see also November 2014 Agreement (id., Ex. D).) Uber later provided Martinez with another revision, the April 2015 Agreement, and Martinez accepted its terms on October 17, 2015. (Ortega Colman Decl. ¶ 12.) The last revised

agreement with which Martinez was presented was the December 2015 Agreement.  (Id. ¶ 13.)
He accepted the agreement on December 12, 2015.  (Id.)

Each of the Uber agreements Plaintiffs Mallh and Martinez agreed to contained a
substantially similar arbitration clause.  (See, e.g., December 2015 Agreement § 15.3.)
Arbitration is not mandatory: a driver may opt out of arbitration within 30 days of accepting the
underlying agreement.  (See, e.g., id. § 15.3(viii).)  A driver opts out of arbitration by notifying
Uber in writing of his or her intent to do so by email, a nationally-recognized delivery service
such as U.P.S., or hand delivery.  (See, e.g., id.)

Plaintiff Mallh did not opt out of the arbitration provision of either the April 2015
Agreement or the December 2015 Agreement.  (Mumin Colman Decl. ¶ 14.)

Plaintiff Martinez did not opt out of arbitration for the June 2014 Agreement or the
November 2014 Agreement.  (Ortega Colman Decl. ¶ 16.)  He did attempt to opt out of
arbitration a week after his receipt of the April 2015 Agreement by a letter drafted by Martinez's
counsel and delivered to Uber via email and U.P.S. delivery.  (Decl. of Joce Martinez (Dkt. 26 in
No. 15-CV-7387) ¶¶ 7-11.)  Uber claims that this attempted opt-out was invalid because a
provision of the November 2014 Agreement stated that "[u]nless changes are made to the
arbitration provisions herein, [Martinez] agrees that modification of this Agreement does not
create a renewed opportunity to opt out of arbitration."  (November 2014 Agreement § 14.1.)
The arbitration provision did not change between the November 2014 Agreement and the
April 2015 Agreement.  (Ortega Colman Decl. ¶ 16.)  Martinez disputes this contention, and
states that his opt-out was "retroactive and prospective."  (Decl. of Joce Martinez ¶ 12.)  After
the April 2015 Agreement, Martinez agreed to one additional revised contract with Uber, the
December 2015 Agreement.  (Ortega Colman Decl. ¶ 16.)  The arbitration provision in the

December 2015 Agreement was modified,[1] and thus Uber agrees Martinez could have opted out of arbitration within 30 days of agreeing to this revised contract.  (See id.)  However, Martinez did not opt out of the arbitration provision in the December 2015 Agreement.  (Id.)

The arbitration clause in each of the aforementioned agreements contained similar language regarding its scope.  The operative provision (the "Arbitration Provision") in the December 2015 Agreement, the latest agreement agreed to by Mallh and Martinez, provides that:

> **Except as it otherwise provides, this <u>Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law</u> or before any forum other than arbitration, with the exception of proceedings that must be exhausted under applicable law before pursuing a claim in a court of law or in any forum other than arbitration.  Except as it otherwise provides, this Arbitration Provision requires all such disputes to be <u>resolved only by an arbitrator through final and binding arbitration on an individual basis</u> only and not by way of court or jury trial, or by way of class, collective, or representative (non-PAGA)[2] action.**
>
> Except as provided in Section 15.3(v), below, regarding the Class Action Waiver, such disputes include without limitation <u>disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision.</u>  All such matters shall be decided by an Arbitrator and not by a court or judge. . . .
>
> Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to <u>all disputes between You and Uber,</u> . . . <u>including</u> but not limited to any disputes arising out of or related to this Agreement and <u>disputes arising out of or related to Your relationship with Uber,</u> including termination of the relationship. . . .

---

[1] The substance of the modification is not material for any of Plaintiffs' claims.  For purposes of the present discussion, the only material issue is the fact of the change itself.

[2] "PAGA" refers to California's Private Attorneys General Act of 2004.

(December 2015 Agreement § 15.3(i) (underlining added, bold in original).)  This agreement

also includes a "Class Action Waiver," which states:

> **You and Uber agree to resolve any dispute that is in arbitration**
> **on an individual basis only, and not on a class or collective action**
> **basis ("Class Action Waiver").  The Arbitrator shall have no**
> **authority to consider or resolve any claim or issue any relief on**
> **any basis other than an individual basis.  The Arbitrator shall**
> **have no authority to consider or resolve any claim or issue any**
> **relief on a class, collective, or representative basis.**
> Notwithstanding any other provision of this Agreement, the
> Arbitration Provision or the JAMS Streamlined Arbitration Rules &
> Procedures, disputes regarding the enforceability, revocability or
> validity of the Class Action Waiver may be resolved only by a civil
> court of competent jurisdiction and not by an arbitrator.

(Id. § 15.3(v) (underlining added, bold in original).)

## II.    PROCEDURAL HISTORY

The Mumin Plaintiffs originally filed their action in the Supreme Court of New York,

Kings County, but it was removed by Uber on October 26, 2015, on the basis of diversity of

citizenship and under the Class Action Fairness Act.  (See Not. of Removal (Dkt. 1 in

No. 15-CV-6143).)  The operative complaint in this action is the Third Amended Class Action

Complaint, filed on March 18, 2016.  (Mumin Compl.)  The Mumin Plaintiffs assert the

following claims, all under New York law: (1) violations under the New York Labor Law,

including (a) unlawfully retaining gratuities, (b) failure to keep required payroll records, and

(c) failure to pay minimum wages; (2) tortious interference with a contract and business

relations; (3) breach of contract; (4) unjust enrichment; (5) conversion; (6) fraud and

misrepresentation; and (7) promissory estoppel.  (Id. ¶¶ 59-105.)

The Ortega Plaintiffs filed their action in this court on December 29, 2015.  The operative

complaint is the First Amended Class Action Complaint, filed on April 25, 2016.

(Ortega Compl.)  This action was initially before Judge I. Leo Glasser of this court but, on

12

March 9, 2016, the case was reassigned to the undersigned as related to the <u>Mumin</u> Action.

(Mar. 9, 2016, Order in No. 15-CV-7387.)  The <u>Ortega</u> Plaintiffs assert the following claims, all

under New York law: (1) violations under the New York Labor Law, including (a) unlawfully

retaining gratuities, (b) failure to pay spread-of-hour wages, (c) illegal deductions of gratuities

and wages, (d) failure to keep required payroll records and provide necessary wage statements

and other notices, (e) failure to provide meal and rest periods, (f) failure to pay minimum wages,

(g) failure to pay overtime wages, and (h) unlawful deductions and kickbacks; (2) tortious

interference with business relations; (3) breach of contract; (4) conversion; and (5) false

advertising.  (<u>Id.</u> ¶¶ 101-53.)

## III.    DISCUSSION

Pending before the court are Uber's motions to compel individual arbitration as to two of

the plaintiffs: Victor Mallh in the <u>Mumin</u> Action, and Joce Martinez in the <u>Ortega</u> Action.[3]  (<u>See</u>

<u>Mumin</u> Defs.' Mot. to Compel Arbitration; <u>Ortega</u> Defs.' Mot. to Compel Arbitration.)  Uber

concedes that Plaintiffs Manzoor Mumin and Jose Ortega properly opted out of arbitration, and

thus does not seek to compel individual arbitrations against them.  Also before the court are

Uber's motions to dismiss the operative complaints in both actions pursuant to Rules 9(b)

and 12(b)(6) of the Federal Rules of Civil Procedure.  (<u>See</u> <u>Mumin</u> Defs.' Mot. to Dismiss;

<u>Ortega</u> Defs.' Mot. to Dismiss.)

---

[3] Plaintiff Martinez maintains that he opted out of arbitration.  However, as noted previously, Martinez agreed to two versions of the software license agreement before attempting to opt out of arbitration in the April 2015 Agreement. Martinez does not dispute that the terms of the agreements he executed do not allow him to opt out of arbitration in the April 2015 Agreement.  He only argues that it would be against public policy to require drivers to opt out again every time there is a revised agreement, and the manifestation of his intent with the April 2015 Agreement not to arbitrate should be sufficient.  However, he does not provide any case law in support of these arguments, and the court declines to consider such unsupported claims.

### A.    Motion to Compel Arbitration

Plaintiffs Mallh and Martinez contest Uber's motions to compel arbitration on a number

of grounds.  The court finds that the Arbitration Provision provides clear and unmistakable

evidence that the parties intended to delegate the issue of arbitrability to an arbitrator, and further

finds that the Provision is not unconscionable.  The court also holds that the Class Action Waiver

is valid and enforceable.  Accordingly, Plaintiffs Mallh and Martinez are both compelled to

arbitrate their claims on an individual basis.

### 1.    Legal Standard

The Federal Arbitration Act ("FAA") establishes a "federal policy favoring arbitration,"

requiring federal courts to "rigorously enforce agreements to arbitrate."  Shearson/Am. Exp., Inc.

v. McMahon, 482 U.S. 220, 226 (1987).  A written agreement to arbitrate "shall be valid,

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

revocation of any contract." 9 U.S.C. § 2.  Under the FAA, a party may move the district court

for an order directing that arbitration proceed pursuant to the parties' written agreement.  Nicosia

v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016).  In deciding such motions to compel

arbitration, "courts apply a 'standard similar to that applicable for a motion for summary

judgment.'"  Id. (quoting Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)).  Therefore,

courts must "consider all relevant, admissible evidence submitted by the parties and contained in

'pleadings, depositions, answers to interrogatories, and admissions on file, together with . . .

affidavits.'"  Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002) (quoting Fed. R.

Civ. P. 56(c)).  All reasonable inferences must be drawn in favor of the non-moving party.

Nicosia, 834 F.3d at 229.

Questions of arbitrability are generally reserved for judicial determination, including "whether the parties are bound by a given arbitration clause," or "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83-84 (2002). However, determinations of arbitrability may be delegated to an arbitrator "if there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." Shaw Grp. Inc. v. Triplefine Intern. Corp., 322 F.3d 115, 121 (2d Cir. 2003) (internal quotation marks omitted) (quoting Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002)). "This principle 'flow[s] inexorably from the fact that arbitration is simply a matter of contract between the parties.'" Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011) (quoting First Options, 514 U.S. at 943).

### 2. Choice of Law

Plaintiff Mallh argues that California law applies to the interpretation of the parties' agreement to arbitrate because the December 2015 Agreement contains a California choice of law provision. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Compel ("Mumin Arb. Opp'n") (Dkt. 34 in No. 15-CV-6143) at 6-8.)[4] By its own terms, however, the choice of law provision of the December 2015 Agreement "do[es] not apply to the arbitration clause . . . , such arbitration clause being governed by the Federal Arbitration Act." (December 2015 Agreement § 15.1.)

---

[4] Plaintiff Mallh also refers to a similar choice of law provision in the April 2015 Agreement, but does not argue that the terms of the April 2015 Agreement should apply over those in the December 2015 Agreement. Because "[i]t is a well settled principle of contract law that a new agreement between the same parties on the same subject matter supercedes the old agreement," and because Mallh puts forth no argument to the contrary, the court will treat the December 2015 Agreement as the operative agreement. Ottawa Office Integration Inc. v. FTF Bus. Sys., Inc., 132 F. Supp. 2d 215, 219 (S.D.N.Y. 2001) (citation omitted).

Where there is no applicable choice of law provision, courts in New York apply a "center of gravity" approach to determine the governing law in contract cases. In re Frito-Lay N. Am., Inc., No. 12-MD-2413 (RRM) (RLM), 2013 WL 4647512, at *19 (E.D.N.Y. Aug. 29, 2013) (citing Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997)); see also Lazard, 108 F. 3d at 1539 ("A federal court sitting in diversity must apply the choice of law rules of the forum state, in this case New York."). In determining the "center of gravity," courts "consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter [of the contract], and the domicile or place of business of the contracting parties." In re Frito-Lay, 2013 WL 4647512, at *19 (quoting Lazard Freres & Co., 108 F.3d at 1539). The places of contracting and performance are typically given the greatest weight. Id. Here, while Uber is headquartered in California, Plaintiff Mallh is a New York resident, holds a New York State Driver's License as well as a For-Hire-Vehicle License issued by the New York City Taxi & Limousine Commission, performed the contract at issue in New York, and presumably agreed to the December 2015 Agreement in New York. (See Mumin Compl. ¶¶ 12-15, 16, 49, 50; Driver's Portal (Mumin Colman Decl., Ex. F).) The weight of contacts thus points to a "center of gravity" in New York, and the court accordingly finds that New York law governs.

        3.     Clear and Unmistakable Evidence of Intent to Delegate Arbitrability

Having determined that New York law applies, the court next analyzes whether "there is clear and unmistakable evidence from the arbitration agreement, as construed by [New York] law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." Shaw Grp. Inc., 322 F.3d at 121 (citations and internal quotation marks omitted). The Arbitration Provision specifically states that "disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity

16

of the Arbitration Provision or any portion of the Arbitration Provision . . . shall be decided by an Arbitrator and not by a court or judge." (December 2015 Agreement § 15.3(i).) This language clearly and unmistakably evinces the parties' intent to submit to an arbitrator any disputes relating to the interpretation or application of the arbitral clause. See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 371 F. Supp. 2d 571, 575-76 (S.D.N.Y. 2005) (applying New York law and finding contractual language that delegates to an arbitrator disputes involving "meaning, construction, validity and/or enforceability" of the parties' agreement "clearly and unmistakably evidences the parties' intent to submit questions of arbitrability to an arbitrator"). Courts examining contracts with much less explicit statements have found clear and unmistakable evidence of intent. See, e.g., Contec Corp. v. Remote Sol., Co., 398 F.3d 205, 208 (2d Cir. 2005) (arbitration rules incorporated by reference, some of which "empower an arbitrator to decide issues of arbitrability"); Bell, 293 F.3d at 568 (broad language that "any controversy arising in connection with or relating to this Agreement . . . or any other matter or thing").

Plaintiff Mallh argues that the delegation of arbitrability was not clear and unmistakable because other portions of the parties' agreement conflict with the Arbitration Provision. (Mumin Arb. Opp'n at 8-9.) He first points to the April and December Agreements' forum selection clause, which provided for courts in San Francisco to have "exclusive jurisdiction" over any disputes arising out of the parties' agreement. (Id. at 9; see also December Agreement § 15.1.) Mallh argues that this provision conflicts with the Arbitration Provision, relying exclusively on a Northern District of California decision, the relevant portions of which were recently reversed by the Ninth Circuit. (Id.) See Mohamed v. Uber Techs. Inc., — F.3d —, Nos. 15-16178, 15-1618, 15-16250, 2016 WL 7470557, at *4-5 (9th Cir. Sept. 7, 2016) (reversing in part Mohammad v.

Uber Techs. Inc, 109 F. Supp. 3d 1185 (N.D. Cal. 2015)). This argument fundamentally fails for two reasons. First, the clause analyzed in Mohamed differs materially from the provision here, which explicitly governs only those disputes "that are not subject to the arbitration clause." (December 2015 Agreement § 15.1.) Even without this carve-out, the court would agree with the Ninth Circuit that the Arbitration Provision is consistent with the "exclusive jurisdiction" language of the forum selection clause. Mohamed, 2016 WL 7470557, at *4. The Ninth Circuit reasoned:

> "No matter how broad the arbitration clause, it may be necessary to file an action in court to enforce an arbitration agreement, or to obtain a judgment enforcing an arbitration award, and the parties may need to invoke the jurisdiction of a court to obtain other remedies." It is apparent that the venue provision here was intended for these purposes, and to identify the venue for any other claims that were not covered by the arbitration agreement.

Id. (quoting Dream Theater, Inc. v. Dream Theater, 21 Cal. Rptr. 3d 322, 328 (Cal. Ct. App. 2004)). Other federal courts that have analyzed Uber's agreements have similarly found no inconsistency. See, e.g., Varon v. Uber Techs., Inc., No. 15-CV-3650 (MJG), 2016 WL 1752835, at *6 (D. Md. May 3, 2016); Sena v. Uber Techs., Inc., No. 15-CV-2418, 2016 WL 1376445, at*3-4 (D. Ariz. Apr. 7, 2016). The court thus finds no conflict between the

unambiguous language of the Arbitration Provision and the December 2015 Agreement's forum selection clause.[5]

Plaintiff Martinez argues that the Arbitration Provision of the December 2015 Agreement does not apply to him because he notified Uber of his intent to opt out of arbitration in the prior April 2015 Agreement. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Compel ("Ortega Arb. Opp'n") (Dkt. 25 in No. 15-CV-7387) at 11-14.) "It is a well settled principle of contract law that a new agreement between the same parties on the same subject matter supersedes the old agreement." Ottawa Office Integration Inc. v. FTF Bus. Sys., Inc., 132 F. Supp. 2d 215, 219 (S.D.N.Y. 2001) (citation omitted). Regardless of whether he previously opted out of arbitration, Martinez agreed to the subsequent December 2015 Agreement and did not opt out of its Arbitration Provision. (Ortega Colman Decl. ¶ 13.) The relevant inquiry before the court then is whether "there is clear and unmistakable evidence from the [operative] arbitration agreement . . . that the parties intended that the question of arbitrability shall be decided by the arbitrator." Shaw Grp. Inc., 322 F.3d at 121 (citations and internal quotation marks omitted, emphasis added). As discussed earlier, the Arbitration Provision's language clearly and unmistakably states that disputes as to arbitrability are to be decided by an arbitrator. Martinez's arguments

---

[5] Mallh also argues that the service agreements' severability clause is "in some tension" with the Arbitration Provision because, "given their close proximity to the forum-selection clauses, [they] could be read as delegating severance power to the court." (Mumin Arb. Opp'n at 9.) This argument is equally unavailing. Mallh again relies solely on the Northern District of California's decision analyzing a materially different version of the Uber's contracts with its drivers. In Mohamed v. Uber Technologies, Inc., 109 F. Supp. 3d 1185 (N.D. Cal. 2015), aff'd in part, rev'd in part, 2016 WL 7470557 (9th Cir. Sept. 7, 2016), the court reasoned that "given its placement in the very same paragraph that provides that all disputes arising out of the Uber contracts will be settled in court, it is reasonable to assume that the typical Uber driver might read this severability language to provide further evidence that Uber intended any determination as to whether 'any provision of this Agreement is . . . invalid or unenforceable' to be made in court, and not arbitration." Id. at 1201-02. Here, however, not only is the severability clause not in the same paragraph as the forum selection clause, it is in a different section of the parties' agreement. (December 2015 Agreement § 14.3 (severability); id. § 15.1 (forum selection clause).) As such, any potential confusion that may have been present in the earlier contracts analyzed by the California district court is not present in this case.

that he expressed his intent to opt out of a prior arbitral clause before agreeing to the

December 2015 Agreement is irrelevant. Under New York law, "where the language is clear and

unambiguous, the court is required to ascertain the intent of the parties from within the four

corners of the instrument, and not from extrinsic evidence." Alliance Bernstein Inv. Research &

Mgmt., Inc. v. Schaffran, 455 F.3d 121, 127 (2d Cir. 2006) (quoting Von Buren v. Von

Buren, 675 N.Y.S.2d 739, 739-40 (N.Y. App. Div. 1998)).[6]

     The court finds that Uber, Plaintiff Mallh, and Plaintiff Martinez intended to delegate

questions of arbitrability to an arbitrator, and therefore any challenge to the scope, enforceability,

or applicability of the Arbitration Provision is for an arbitrator to resolve in the first instance.

### 4.   Validity of Delegation of Arbitrability

     Where a court finds clear and unmistakable evidence that contractual parties agreed to

arbitrate arbitrability, a party may nonetheless challenge the delegation of arbitrability itself as

invalid for unconscionability. See Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 69-70

(2010). Because an agreement to arbitrate threshold issues such as interpretation and

applicability of an arbitration clause is simply "an additional, antecedent agreement the party

seeking arbitration asks the federal court to enforce," this antecedent agreement itself must be

valid and enforceable. Id. at 70. As the Supreme Court explained, the "'clear and unmistakable'

requirement . . . pertains to the parties' manifestation of intent, and not the agreement's validity."

Id. at 69 n.1. The court has concluded that the parties agreed to arbitrate arbitrability, but the

---

[6] The court also rejects Martinez's complaint that the language regarding delegation of arbitrability was "buried within [] dense language" and that it was not "bolded [or] underlined, [and did not] contain capitalized words." (Ortega Arb. Opp'n at 17-18.) Martinez read the Uber agreements "very carefully," however, and discussed the arbitration clause in one of the agreements with counsel. (Decl. of Joce Martinez ¶¶ 8-9.) He cannot now claim that the delegation clause was "hidden." (Ortega Arb. Opp'n at 18.) Gold v. Deutsche Aktiengesselschaft, 365 F.3d 144, 149 (2d Cir. 2004) (finding that parties are assumed to have read the terms of the contract to which they agree). The court also sees no issue with the location of the contested delegation clause. It is located in the third paragraph of a section entitled "How This Arbitration Provision Applies," following two paragraphs that explain the general scope of the Arbitration Provision. (See December 2015 Agreement § 15.3(i).)

question remains whether that agreement is itself enforceable.  Id.  However, Plaintiffs'
challenge must be aimed squarely upon the delegation of arbitrability itself, rather than the
remainder of the Arbitration Provision or the December 2015 Agreement as a whole.  Id.
at 71-72.  This is because attacks on the latter are reserved to the arbitrator.  Id. at 72.  (See also
December Agreement § 15.3(i) ("This Agreement is intended to require arbitration of every
claim or dispute that lawfully can be arbitrated, except for those claims and disputes
which . . . are expressly excluded from the Arbitration Provision.").)

Under New York law, an agreement is unconscionable only if "the contract was both
procedurally and substantively unconscionable when made."  Robinson v. Entm't One US LP,
No. 14-CV-1203 (AJN), 2015 WL 3486119, at *9 (S.D.N.Y. June 2, 2015) (citations omitted).
"The procedural element of unconscionability concerns the contract formation process and the
alleged lack of meaningful choice; the substantive element looks to the content of the contract."
Id. (quoting Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 121-22 (2d Cir. 2010)).  An
agreement is not procedurally unconscionable if there is a meaningful opportunity to opt out.
Valle v. ATM Nat'l, LLC, No. 14-CV-7993 (KBF), 2015 WL 413449, at *6 (S.D.N.Y.
Jan. 30, 2015) (approving of a 45-day window to opt out of arbitration clause); Teah v. Macy's
Inc., No. 11-CV-1356, 2011 WL 6838151, at *6 (E.D.N.Y. Dec. 29, 2011) (concluding that an
arbitration agreement was not procedurally unconscionable because it contained an opt-out
provision and noting that other cases have not even required such opt-out clauses); cf. also
Mohamed, 2016 WL 7470557, at *5-6 (finding Uber arbitration provision not unconscionable
under California law because the drivers could have opted out).

Here, Mallh and Martinez had 30 days to opt out of the Arbitration Provision, as
Plaintiffs Manzoor and Ortega had done, but failed to do so.  Even a form contract that is offered

21

on a "take it or leave it" basis, without a chance to opt out, may be valid. Nayal v. HIP Network Servs. IPA, Inc., 620 F. Supp. 566, 571-72 (S.D.N.Y. 2009). Moreover, inequality in bargaining position alone is not sufficient unless it is combined with "high pressure tactics that coerce [a signatory's] acceptance of onerous terms." Valle, 2015 WL 413449, at *6. No such "high pressure tactics" are alleged here. Uber presented the agreement to arbitrate to its drivers, specifically noting in bold that "[a]rbitration is not a mandatory condition of your contractual relationship with Uber." (December 2015 Agreement § 15.3(viii).) The agreement to arbitrate arbitrability thus was not procedurally unconscionable.

Because Plaintiffs Mallh and Martinez cannot make the necessary showing of procedural unconscionability, the court need not decide whether the delegation of arbitrability is substantively unconscionable.[7]

### 5.   Class Action Waiver

The only question remaining is whether the court compels individual arbitration as to Plaintiffs Mallh and Martinez. Uber seeks to enforce the Class Action Waiver portion of the Arbitration Provision, which states:

---

[7] Plaintiff Martinez additionally argues procedural unconscionability on the grounds that the language of the Arbitration Provision was convoluted and confusing. (Ortega Arb. Opp'n at 19-20.) However, the provision plainly states that it covers "disputes arising out of or relating to interpretation or application of this Arbitration Provision, including [its] enforceability, revocability or validity . . . ." (December 2015 Agreement § 15.3(i).) The fact that this language was not highlighted for Martinez does not create an issue of procedural unconscionability where none exists. Cf. Application of Whitehaven S.F., LLC v. Spangler, 45 F. Supp. 3d 333, 351 (S.D.N.Y. 2014) ("[F]ine print of the clauses does not make them unconscionable as long as those clauses have the same font size and color with other clauses."). Martinez also complained that the Arbitration Provision was only provided in English, even though Uber knew many of its drivers spoke English as a second or third language. (Ortega Arb. Opp'n at 19-20.) He cites no case law that supports the proposition a contract must be translated into the other party's primary language to avoid a finding procedural unconscionability. Indeed, "New York courts have repeatedly ruled that even the fact that a prospective employee possesses an imperfect grasp of the English language will not relieve the employee of making a reasonable effort to have the document explained to him." See Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 122 (2d Cir. 2010) (citation omitted).

The court also declines to address Mallh and Martinez's remaining arguments that attack the December 2015 Agreement or the Arbitration Provision as a whole, including on public policy grounds (Mumin Arb. Opp'n at 16-22; Ortega Arb. Opp'n at 22-23) as these questions are for an arbitrator to decide, Rent-A-Center, West, Inc., 561 U.S. at 72.

> **You and Uber agree to resolve any dispute that is in arbitration on an individual basis only, and not on a class or collective action basis ("Class Action Waiver").  The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on any basis other than an individual basis.  The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on a class, collective, or representative basis.**

(December 2015 Agreement § 15.3(v) (bold in original).)  The service agreement specifies that "disputes regarding the enforceability, revocability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator." (Id.) Plaintiff Mallh does not appear to challenge the validity of the Class Action Waiver. (Mumin Arb. Opp'n at 16 (arguing that the Class Action Waiver is unenforceable only because the Arbitration Provision is void on California public policy grounds).)  Plaintiff Martinez, however, argues that the Class Action Waiver is unenforceable because it violates the Norris-La Guardia Act. (Ortega Arb. Opp'n at 24-25.)

The Norris-La Guardia Act protects an individual employee's right to engage in "concerted activities for the purpose of . . . mutual aid or protection." 29 U.S.C. § 102.  Any agreement that infringes on this right is unenforceable. Id. § 103.  Martinez contends that the ability to pursue arbitration on a class-wide basis is a "concerted activit[y] for the purpose of . . . mutual aid or protection," and that the Class Action Waiver is thus invalid as a matter of law. However, the Second Circuit has rejected this argument twice—implicitly and explicitly.  In Sutherland v. Ernst & Young LLP, 726 F.3d 290 (2d Cir. 2013), the court addressed whether a similar right under Sections 7 and 8(a)(1) of the National Labor Relations Act ("NLRA")[8] rendered class action waivers in an arbitration agreement unenforceable. Id. at 292.  The court

---

[8] As with the Norris-LaGuardia Act, the NLRA prohibits any agreement that interferes with an employee's ability to take part in "concerted activities for the purpose of . . . mutual aid or protection." 29 U.S.C.§§ 157, 158(a)(1).

found that it did not, rejecting the National Labor Relations Board's contrary decision in D.R. Horton, Inc., 357 N.L.R.B. No. 184 (Jan. 3, 2012). Sutherland, 726 F.3d at 297 n.8. In a later summary order, the Second Circuit analyzed whether a "prohibition of class or collective adjudication of work-related claims illegally restricts employees' substantive rights under the NLRA and the Norris-La Guardia Act, and is unenforceable under the FAA." Patterson v. Raymours Furniture Co., 659 F. App'x 40, 42 (2d Cir. Sept. 2, 2016) (summary order), petition for cert. filed (U.S. Jan. 9, 2017) (No. 16-388). The court again found no infringement. Id. at 43. Although Sutherland did not directly reference the Norris-La Guardia Act, the Patterson opinion noted that "the parties in Sutherland extensively briefed their arguments under the NLRA and [the Norris-La Guardia Act], and the panel's rejection of those arguments was necessary to its judgment." Id. The court in Patterson therefore found that it was bound by the holding in Sutherland "until such time as it is overruled either by an en banc panel of [the Second Circuit] or by the Supreme Court." Id. (quoting United States v. Wilkerson, 361 F.3d 717, 732 (2d Cir. 2004)).[9] For the same reasons, the undersigned now rejects Martinez's challenge to the Class Action Waiver under the Norris-La Guardia Act.

*     *     *

---

[9] The circuit courts are split over whether a class action waiver runs afoul of the NLRA or the Norris-La Guardia Act. The Second, Fifth, and Eighth Circuits found such waivers enforceable under the FAA, but the Seventh and Ninth Circuits found them unenforceable. Patterson, 659 F. App'x at 43 (collecting cases). The Supreme Court is poised to resolve this dispute. On January 13, 2017, the Supreme Court granted the petitions for a writ of certiorari in Murphy Oil USA, Inc. v. National Labor Relations Board, 808 F.3d 1013 (5th Cir. 2015), Morris v. Ernst & Young, LLP, 834 F.3d 975 (9th Cir. 2016), and Lewis v. Epic Systems Corp., 823 F.3d 1147 (7th Cir. 2016), on whether the NLRA prohibits a class action waiver in arbitration agreements. 2017 WL 125664.

For the foregoing reasons, Uber's motion to compel Plaintiffs Mallh and Martinez to arbitrate their claims on an individual basis is granted.[10]

## B.   Motion to Dismiss

The court next addresses Uber's motions to dismiss all claims asserted by Plaintiffs Manzoor Mumin and Jose Ortega, both of whom opted out of the Arbitration Provision. Plaintiffs raise a raft of claims based in New York Labor Laws, consumer protection statutes, and various common law causes of action. Uber seeks to dismiss all of these claims as insufficiently pleaded under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. The court finds that Plaintiff Ortega adequately pleads claims that Uber (a) failed to remit gratuities and pay overtime, (b) engaged in unlawful deductions, (c) provided inadequate pay statements, and (d) engaged in false advertising. The court separately finds that Plaintiff Mumin's Complaint contains sufficiently pleaded claims that Uber failed to remit gratuities and pay minimum wage. The court dismisses Plaintiffs' remaining claims.

### 1.   Legal Standard

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief. Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007). In reviewing a complaint, the court must accept as true all allegations of fact, and draw all reasonable inferences in favor of the plaintiff. ATSI Commc'ns, Inc. v. Shaar Fund,

---

[10] The court also rejects Martinez's argument that Uber's motion to compel individual arbitration is "premature as no discovery has been exchanged between the parties." (Ortega Arb. Opp'n at 25.) Because a motion to compel arbitration is reviewed pursuant to a standard similar to that for summary judgment, some discovery may be necessary as to the factual predicates relevant to such a motion. Lismore v. Societe Generale Energy Corp., No. 11-CV-6705 (AJN), 2012 WL 3577833, at *1 (S.D.N.Y. Aug. 17, 2012). However, there is no genuine issue as to the material facts relevant to the present motion. This is not a case where discovery is needed to determine whether Martinez executed the December 2015 Agreement; he has not denied that he did. See, e.g., Hudson v. Babilonia, No. 14-cv-1646 (MPS), 2015 WL 1780879, at *2 (D. Conn. Apr. 20, 2015) (finding motion to compel arbitration premature because plaintiff denied in sworn affidavits that he never signed the relevant contracts). Indeed, the discovery that Martinez seeks relates to other potential plaintiffs or to the merits of his underlying claims, not to whether he himself agreed to arbitrate his claims. (See Ortega Arb. Opp'n at 25-26.)

Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  A complaint will survive a motion to dismiss if it contains

"sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007)).  Plausibility "is not akin to a 'probability requirement,'" but requires

"more than a sheer possibility that a defendant has acted unlawfully."  Id. at 678 (quoting

Twombly, 550 U.S. at 556).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Id.  "[M]ere 'labels and conclusions' or 'formulaic recitation[s] of the

elements of a cause of action will not do'; rather, the complaint's '[f]actual allegations must be

enough to raise a right to relief above the speculative level.'"  Arista Records, LLC v. Doe 3, 604

F.3d 110, 120 (2d Cir. 2010) (emphasis in original) (quoting Twombly, 550 U.S at 555).

     In contrast to the more generous standard applicable to most pleadings, complaints that

include allegations of fraud must be "pled with particularity" under Rule 9(b) of the Federal

Rules of Civil Procedure.  See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175

(2d Cir. 1993).  While the court must continue to accept as true all factual allegations in the

complaint and draw inferences in favor of the pleader, the pleader must include more detailed

information in order to give rise to an inference of fraudulent intent.  Id.  Specifically,"[i]n

alleging fraud or mistake, a party must state with particularity the circumstances constituting

fraud or mistake." Fed. R. Civ. P. 9(b); see also Mills, 12 F.3d at 1175 (Complaints subject to

9(b) must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and (4) explain why the statements

were fraudulent.").

The particularity requirement applies to "all averments of fraud . . . and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004). Determining whether a non-fraud claim sounds in fraud such that it falls within the ambit of Rule 9(b) requires a case-by-case analysis of the particular pleadings. In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (citing Rombach, 355 F.3d at 172). The focus of a court's inquiry is the conduct alleged. Rombach, 355 F.3d at 171. "A claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim." Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc., 341 F. Supp. 2d 258, 269 (S.D.N.Y. 2004) (applying Rombach, 355 F.3d at 171); see also Marchak v. JPMorgan Chase & Co., 84 F. Supp. 3d 197, 211 (E.D.N.Y. 2015). "Courts have found non-fraud claims to sound in fraud where the underlying conduct alleged has been fraud or closely linked with fraudulent behavior, such as claims for which fraud is a necessary element or claims that the other party has attempted to induce action through misrepresentations or material omissions." Levy v. Young Adult Inst., Inc., 103 F. Supp. 3d 426, 443 (S.D.N.Y. 2015) (collecting cases).

### 2. New York Labor Laws

Uber primarily attacks three alleged violations of New York Labor Laws: that Uber failed to remit gratuities that were due to Plaintiffs, failed to pay minimum wage (to both Ortega and Mumin) and overtime (solely as to Ortega), and applied unlawful deductions to Ortega's pay. The proper classification of Uber drivers is not at issue in the motions to dismiss, and the court assumes for the purpose of deciding these motions that both Ortega and Mumin are employees. (See Ortega MTD Mem. at 5 n.1; Mumin MTD Mem. at 7 n.1.) Uber argues that these claims contain an averment of fraud and lack the specificity required by Rule 9(b). The

27

court finds that these claims are not subject to Rule 9(b)'s heightened pleading standard.  The court further finds both Plaintiffs sufficiently plead claims that Uber unlawfully retained gratuities; that Ortega adequately pleads claims for failure to pay overtime, unlawful deductions, and inadequate pay statements; and that Mumin makes out a sufficient claim for minimum wage violations.  The court dismisses Plaintiffs' other Labor Law claims.

*a.    Gratuities*

i.    <u>Heightened Pleading under Rule 9(b)</u>

Uber first argues that the heightened pleading standards of Rule 9(b) applies to Mumin and Ortega's gratuity claims and that both Plaintiffs failed to meet their burdens.  (<u>See</u> Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("<u>Mumin</u> MTD Mem.") (Dkt. 27 in No. 15-CV-6143) at 3-6; Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("<u>Ortega</u> MTD Mem.") (Dkt. 23 in No. 15-CV-7387) at 3-5.)  Uber contends that Plaintiffs' gratuity-related allegations sound in fraud because they are premised on the idea that Uber misled riders into believing that tip is included in the charged fare. (<u>Mumin</u> MTD Mem. at 3; <u>Ortega</u> MTD Mem. at 3-4.)

Turning first to Ortega's gratuity claim, the court finds that fraud is not "an integral part of the conduct giving rise to the claim."  <u>Xpedior Creditor Trust</u>, 341 F. Supp. 2d at 269.  Uber construes Ortega's Amended Complaint to claim that Uber misrepresented to riders that the fare includes a tip. (<u>Ortega</u> MTD Mem. at 3).  However, Ortega actually relies on Uber's alleged representation at face value, namely that: (1) "a fair tip is included with the price of the fare" and

28

(2) Uber unlawfully retained this "fair tip." (<u>Ortega</u> Compl. ¶¶ 79-82.) Fraudulent conduct therefore is not integral to this claim, and the particularity requirement does not apply.[11]

Mumin's allegations are considerably more convoluted because he asserts multiple claims involving gratuities, including a "fraud and misrepresentation" cause of action, but did not "carefully structure[ his Complaint] so as to draw a clear distinction between [the non-fraud] and fraud claims." <u>In re Refco, Inc. Sec. Litig.</u>, 503 F. Supp. 2d at 632. He alleges that "Uber intentionally misrepresents to the public how it compensates its Drivers so that it can retain a disproportionate percentage of the fares generated by Uber Drivers." (<u>Mumin</u> Compl. ¶ 5; <u>see also</u> <u>id.</u> ¶ 39 ("Uber intentionally misrepresented that gratuity was included in the cost of fares and instructed passengers not to leave a tip in addition to the amount of the fare.").) This alleged scheme forms the basis for Mumin's tortious interference claim that, but for Uber's misrepresentations, riders would have paid Mumin and others similarly situated a tip on top of the charged fare. (<u>Id.</u> ¶¶ 75-76.) He separately alleges that Uber misrepresented to its drivers that it would remit gratuities to them, asserting claims of fraud and misrepresentation (<u>id.</u> ¶¶ 93-98) and promissory estoppel (<u>id.</u> ¶¶ 99-105). However, separating the overlapping allegations, the crux of Mumin's NYLL gratuity claim is that "Uber markets its rides as gratuity-included, but Uber does not remit the gratuity (or an amount in-kind) to Uber Drivers." (<u>Id.</u> ¶ 5.) This is the same theory asserted by Ortega. The underlying conduct alleged—i.e., that Uber retained the portion of the fare that is supposed to be a gratuity to the drivers—was thus not "fraud or closely linked with fraudulent behavior." <u>Levy</u>, 103 F. Supp. 3d at 443. Indeed, it would be difficult to

---

[11] While Ortega does allege that Uber "fraudulently structured their business model," and that "Plaintiffs and the Class Members have been defrauded," these allegations relate to "Uber's purposeful misclassification of its drivers as independent contractors instead of employees." (<u>Ortega</u> Compl. ¶¶ 4, 89.) The court does not read these allegations as a basis of the conduct underpinning Ortega's gratuity claim. Whether Ortega was indeed misclassified as an independent contractor goes to the applicability of NYLL, which does not apply to independent contractors.

understand Mumin's gratuity claim if the court assumed that Uber's alleged statement to riders that tip was included was a misrepresentation. The logical consequence of this assumption is that tip was not included in the fare charged to the rider, which means Uber did not wrongfully retain any gratuity intended for Mumin. Construing his claim to be premised on the same legal theory as that put forth by Ortega, Mumin's gratuity claim likewise does not fall within the ambit of Rule 9(b).

### ii.   Sufficiency of Claim

Uber alternatively argues that the gratuity claims fail under Rule 12(b)(6). NYLL prohibits an employer from "demand[ing] or accept[ing], directly or indirectly, any part of the gratuities, received by an employee, or retain[ing] any part of a gratuity or of any charge purported to be a gratuity for an employee." N.Y. Lab. Law § 196-d. Gratuity "can include mandatory charges when it is shown that employers represented or allowed their customers to believe that the charges were in fact gratuities for their employees." Samiento v. World Yacht Inc., 883 N.E.2d 990, 996 (N.Y. 2008). Contrary to Uber's contention, Samiento did not require that an alleged gratuity be separately and specifically itemized before it is covered by Section 196-d. Id. at 992, 994-95. (See Mumin MTD Mem. at 7-8; Ortega MTD Mem. at 6-7.)

In Samiento, the Court of Appeals of New York addressed whether a dining cruise operator violated Section 196-d when it retained two types of charges that the plaintiffs, waitstaff on the cruise, purported were gratuities. 883 N.E.2d at 991-92. The first was a separately itemized 20% mandatory service charge that the defendant explained to its customers was a gratuity that would be remitted to the plaintiffs. Id. at 992. Second, the defendant represented to its customers that gratuity was included in the overall price of the dining cruise. Id. In the latter scenario, there was no segregated charge purporting to be a tip, and the defendant never specified

what portion of the total price was gratuity intended for the plaintiffs.[12]  In both cases, the dining

cruise customers refrained from tipping because they believed the price they paid already

included gratuity.  Id. at 992.  The court held that the "plaintiffs should be allowed to go forward

on [the gratuity] cause of action as it relates to all [] types of cruises."  Id. at 996.

The second type of gratuity analyzed in Samiento is substantially similar to Mumin and

Ortega's allegations here.  In both instances, plaintiffs allege that tipping is customary in their

line of work, but that their employers "represented to customers that gratuity is included in the

total price paid.  As a result of that representation, customers did not tip the employee, believing

that they already paid the tip as part of the total price.  The portion of the price that was meant to

be a tip for the employee is not expressly stated.  Lastly, the employer fails to remit any part of

the total price to the employee as a gratuity.  Because the Court of Appeals permitted

Section 196-d claims based on this same set of circumstances, Uber's alleged retention of

gratuity is also actionable.

Having concluded that a gratuity need not be separately itemized, the only question

remaining as to the viability of Mumin and Ortega's claim is whether a "reasonable [customer]

would understand a service charge was being collected in lieu of a gratuity."  Id. at 995.

Accepting as true Plaintiffs' allegations that Uber told riders that "there is no need to tip" or that

"tip is included" (Mumin Compl. ¶¶ 37, 69; Ortega Compl. ¶¶ 79-80), as the court must on a

motion to dismiss, the court considers it plausible that a reasonable rider would believe a portion

---

[12] While it is admittedly unclear from the text of the Samiento opinion whether there was a separate charge, a review of the parties' briefing in the Court of Appeals shows that there was not.  Br. for Defs.-Resps., Samiento, 883 N.E.2d 990, 2007 WL 4938098, at *28 ("[no] representation as to the amount of the 'gratuity' that is included in the [] ticket price"); Rep. Br. for Pls.-Apps., id., at *28-29 ("percentage of the bill attributable to the 'gratuity' is not expressly stated").

of the fare was "collected in lieu of a gratuity." Accordingly, Uber's motions to dismiss the gratuity claims are denied.

### b.     Overtime and Minimum Wages

Uber next asserts that Ortega failed to adequately allege that he was entitled to overtime pay, and that both Ortega and Mumin fail to adequately allege that they were not paid minimum wage pursuant to New York law. Whether a party plausibly pleaded a violation of NYLL's overtime and minimum wage provisions is a case-specific analysis. See Dejesus v. HF Mgm't Servs., LLC, 726 F.3d 85, 88 (2d Cir. 2013).[13] To state a plausible overtime claim, "a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of 40 hours." Lundy v. Catholic Health Sys. of Long Island, 711 F.3d 106, 114 (2d Cir. 2013). The Second Circuit has found pleadings insufficient to support a plausible claim where the "typical[]" hours allegedly worked per week did not add up to more than 40 hours, where the plaintiff does not allege that she was denied overtime pay in a week she worked more than 40 hours, id. at 114-15, or where a plaintiff vaguely alleges that "in some or all weeks she worked more than forty hours a week," Dejesus, 726 F.3d at 89 (internal quotation marks omitted).

The court concludes that Ortega sufficiently alleged he worked more than 40 hours in a given week. Ortega alleges that he worked an average of 6 days a week for 10 to 12 hours per

---

[13] While the Second Circuit's analysis in DeJesus focuses on the Fair Labor Standards Act, the opinion states that "[i]n light of the fact that '[t]he relevant portions of New York Labor Law do not diverge from the requirements of the FLSA,' our conclusions below about the FLSA allegations 'appl[y] equally to [the NYLL] state law claims.' Dejesus, 726 F.3d at 89 n.5 (citing Whalen v. J.P. Morgan Chase & Co., 569 F. Supp. 2d 327, 329 n.2 (W.D.N.Y. 2009)); see also Lopez-Serrano v. Rockmore, 132 F. Supp. 3d 390. 403 (E.D.N.Y. 2015) ("[T]he Court notes that the pleading standard applicable to overtime claims under the NYLL is analytically identical to its federal law counterpart under the FLSA."). The regulation under which Ortega claims relief confirms this point. N.Y. Comp. Codes R. & Regs., tit. 12, § 142-2.2 ("An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of . . . the Fair Labor Standards Act.")

day, amounting to 60 to 72 hours per week, from August 2014 to the present. (Ortega Compl.

¶ 36.). He also asserted that Uber never paid him overtime, in part because Uber considers its

drivers to be independent contractors and thus exempt from the overtime pay requirement. (See

Ortega Compl. ¶ 89.) While Ortega could have more easily cleared the bar for pleading

sufficiency if he had included more specificity, see, e.g., Lopez-Serrano, 132 F. Supp. 3d at 402

(alleging for specific weeks the times that plaintiff began and ended work), his existing

allegations are enough to state plausible overtime claims.[14]

The pleading standard is similar for claims that an employer failed to pay minimum wage

pursuant to New York law. To state a minimum wage claim, "it is sufficient for a plaintiff to

allege facts about her salary and working hours, such that a simple arithmetical calculation can

be used to determine the amount owed per pay period." Lopez-Serrano, 132 F. Supp. 3d at 402

(citations omitted). Additionally, courts will take into account work-related expenses if

deduction of the expenses from gross wages causes an employee's pay to fall below minimum

wages. Guan Ming Lin v. Benihana Nat'l Corp., 755 F. Supp. 2d 504, 511-12 (S.D.N.Y. 2010).

Applying these guidelines to the allegations in this case, the court finds that Mumin has

stated a minimum wage claim but Ortega has not. Mumin alleges that he earned approximately

$1,100 a week before taking into account weekly work-related expenses of about $766. (Mumin

Compl. ¶ 10.) Because he alleges that he worked an average of 55 hours a week, the court

calculates his hourly pay after expenses to be $6.07. (Id. ¶¶ 9, 10.) Uber complains that Mumin

---

[14] As to Ortega's overtime claim and both Ortega and Mumin's minimum wage claims, Uber argues that Plaintiffs failed to state that they were performing compensable work for Uber and faults Plaintiffs for failing to break down what they were allegedly doing during the hours worked. (Mumin MTD Mem. at 10; Ortega MTD Mem. at 8.) The court finds this argument unconvincing. Plaintiffs allege that they were Uber employees and that they worked for Uber during the hours specified in their respective Complaints. The court will not assume that when Plaintiffs allege that they were working for Uber, they actually meant "tending to personal pursuits [or] transporting his own clients." (Mumin MTD Mem. at 10; Ortega MTD Mem. at 8.)

failed to break down the work-related expenses by category. (Mumin MTD Mem. at 10.)

However, although Mumin did not break down his expenses by costs, he did allege the types of

work-related expenses he incurred that added up to $766 per week. (Mumin Compl. ¶ 10.)

These include gas, insurance, finance payments, cleaning, and car repairs. (Id.) Uber does not

explain why any of these expenses would not be reimbursable under New York law, (see Mumin

MTD Mem. at 10.), and so it is unclear why failing to state the specific amount of each cost

undermines the claim. Because the New York minimum wage was $7.25 an hour during the

time Mumin worked as an Uber driver, he has plausibly alleged that Uber failed to pay him a

minimum wage.[15]

Ortega's allegations, on the other hand, are insufficient because he fails to specify the

value of his work-related expenses. By his own estimate, he earned $600 to $1,000 a week while

working between 60 to 72 hours per week. (Ortega Compl. ¶¶ 36, 40.) This results in an hourly

pay range of $10 to $13.89. This rate could be reduced by accounting for work-related expenses,

but unlike Mumin, Ortega alleges only that he paid "hundreds of dollars each week" in expenses.

(Id. ¶ 43.) A plaintiff is required to supply sufficient facts such that "a simple arithmetical

calculation can be used to determine the amount owed per pay period." Lopez-Serrano, 132

F. Supp. 3d at 402. Absent specific allegations as to the amount and nature of costs incurred, the

court lacks any basis for concluding that Ortega's hourly wage fell below the New York

minimum wage. See N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.1 (the minimum wage was

---

[15] Uber also argues that the court should disregard Mumin's minimum wage allegations because in his prior complaint, Mumin alleged that his effective hourly wage was $8.26. (Mumin MTD Mem. at 8-9.) In response, Mumin filed a declaration explaining that the prior pleadings did not include all of his expenses. (Decl. of Manzoor Mumin (Dkt. 33 in No. 15-CV-6143) ¶ 1.) It is at the court's discretion whether to disregard inconsistent allegations in successive complaints where the court has reason to believe the later allegations are fabricated. See Green v. Niles, No. 11-CV-1349, 2012 WL 987473, at *5 (S.D.N.Y. Mar. 23, 2012). Based on Mumin's declaration, which included a specific breakdown of each expense that he attested to be true and correct under penalty of perjury, the court has no reason to believe that Mumin is now lying and therefore will not ignore these allegations.

between $8 and $9 an hour during the time that Ortega worked as an Uber driver).  Accordingly, his minimum wage claim is dismissed.[16],[17]

c. <em>Ortega's Unlawful Deductions Claim</em>

Ortega asserts an unlawful deductions claim pursuant to NYLL § 193 on two distinct grounds.  (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Ortega MTD Opp'n") (Dkt. 28 in No. 15-CV-7387) at 7.)  First, Ortega claims that Uber failed to reimburse him for "tools of the trade," such as costs related to his vehicle, fuel, and inspection costs, and that this failure constitutes an unlawful deduction.  (See id.)  Second, he argues that Uber penalized drivers for customer complaints and for taking inefficient routes by making direct deductions to his pay.  (Id.)  As to the first ground, the court need not decide whether Ortega's novel theory is a basis for a Section 193 claim because he has failed to show that his expenses are reimbursable.  Under New York law, an employer is not required to reimburse an employee for "tools of the trade" expenses unless failure to do so causes the employee's pay to fall below the minimum wage.  Guan Ming Lin, 755 F. Supp. 2d at 511-12.  For the reasons stated in the preceding section, Ortega has not shown that such expenses would reduce his effective wage to below the minimum wage required in New York.  Therefore, even if failure to reimburse does constitute an unlawful deduction, Ortega fails to properly allege an unlawful deduction here.  As to the second ground, Uber concedes in its reply that the unlawful deduction claim on this theory is sufficiently

---

[16] Ortega cites both N.Y. Lab. Law § 652 and N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.1, both of which concern minimum wage.  (See Ortega Compl. ¶ 110.)  His claims under both of these sections are dismissed.

[17] Ortega also makes a claim for "spread of hours" payments.  (Ortega Compl. ¶¶ 105, 111.)  Where an employee works a "spread of hours" in a day that covers more than 10 hours, they are entitled to receive one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage for the day.  N.Y. Comp. Codes R. & Regs. tit. 12 §142-2.4.  Defendants cite an opinion from this district holding that spread of hours claims are derivative of minimum wage claims and so do not apply to employees paid more than minimum wage.  See Sosnowy v. A. Perri Farms, Inc., 764 F. Supp. 2d 457, 474 (E.D.N.Y. 2011); see also Roach v. T.L. Cannon Corp., 889 F. Supp. 2d 364, 368-69 (N.D.N.Y. 2012) (collecting cases).  Plaintiff does not contest this point in their response.  The court agrees that the statute makes these claims derivative of minimum wage claims, and dismisses the spread of hours claim on the same basis as Ortega's minimum wage claim.

pleaded. (Reply in Supp. of Defs.' Mot. to Dismiss ("Ortega MTD Reply") (Dkt. 30 in No. 15-CV-7387) at 6 n.4.) Accordingly, Ortega's unlawful deduction claim is dismissed to the extent that it is premised on his incurred expenses.

### d.  Other Labor Law Violations

Plaintiffs Ortega and Mumin also assert claims under a handful of other sections of the New York Labor Laws. These claims may be summarily addressed.

Ortega claims that Uber's practices violate Section 191(3), pertaining to payment of wages on termination or resignation, and Section 195(3), pertaining to information that must be provided to employees in pay statements.[18] Ortega's Section 191 claim is dismissed on the basis that he admittedly continues to drive for Uber (Ortega Compl. ¶¶34-37) and fails to elaborate any other basis on which he could recover wages due on termination. However, Ortega's claim based on Uber's alleged failure to provide adequate payroll records may proceed. Uber argues that this claim is insufficient because Ortega fails to identify any inadequacy or deficiency in their payroll records. However, Ortega gives specific information as to the information that must be provided to employees (Ortega Compl. ¶ 107) and states that he has not received this information (id. ¶ 83-84). Ortega's pleading is sufficient as to this claim. See Kone v. Joy Const. Corp., No. 15-CV-1328, 2016 WL 866349, at *6 (S.D.N.Y. Mar. 3, 2016) (finding a claim that tracked the statutory language to be sufficiently pleaded).

Mumin likewise raises a claim under Section 195; however, his claim is based on Uber's alleged failure "maintain payroll records for Driver employees." (Mumin Compl. ¶¶ 48,63) This

---

[18] While Ortega does not state which specific subsections of the cited statutes provide the basis for these claims, the court intuits the proper subsections based on the substance of Ortega's claims. (Ortega Compl. ¶ 110 (Plaintiffs . . . seeks damages against the defendants pursuant to . . . New York Labor Law § 195 (for failure by Defendants to keep required payroll records) [and] New York Labor Law § 191 (for failure to provide prompt payment of wages to driver employees upon termination and resignation)").)

claim appears to be based in subsection 4 of Section 195, which specifies the information that employers must maintain in their payroll records.  Unlike Ortega's claims, which seek information in payment records sent to employees, Mumin's claim based on Uber's failure to maintain payroll records must be dismissed, as "nothing in the NYLL authorizes an independent cause of action based on a violation of § 195(4)." Carter v. Tuttnaeuer U.S.A. Co., Ltd., 78 F. Supp. 2d 564, 570-71 (E.D.N.Y. 2015).

### 3.    Tortious Interference with Business Relations

Uber next argues that Plaintiffs failed to state a claim for tortious interference with business relations.  To state a claim under New York law, "four conditions must be met: '(i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship.'" Scutti Enters., LLC. v. Park Place Entm't Corp., 322 F.3d 211, 215 (2d Cir. 2003) (quoting Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 214 (2d Cir. 2002)).  Those claims are limited to alleged interference with existing relationships, "as opposed to Plaintiffs' hypothetical relationships with future [customers] . . . ." Galland v. Johnson, No. 14-CV-4411 (RJS), 2015 WL 1290775, at *7 n.6 (S.D.N.Y. Mar. 19, 2015) (limiting claim to plaintiffs' relationship with named third party, exclusive of "future renters").  Furthermore, to survive a motion to dismiss, a plaintiff must "adequately allege[] specific business relationships with which Defendant allegedly interfered." Plasticware, LLC v. Flint Hills Res., 852 F. Supp. 2d 398, 402 (S.D.N.Y. 2012).

Here, Plaintiffs allege that Uber interfered with the business relations between Plaintiffs and their riders by discouraging the riders from tipping. (Mumin Compl. ¶¶ 65-77; Ortega Compl. ¶¶ 118-22.)  However, neither Complaint identifies any "specific business relationship[] with which [Uber] allegedly interfered," other than the generic reference to riders or customers.

Plasticware, LLC, 852 F. Supp. 2d at 402 (emphasis in original) (dismissing claim where plaintiff "d[id] not identify any specific third-parties with which it has business relations, but merely refer[red] to 'existing customers,' and 'major companies' with which it has 'strong business relationship[s]'"); see also id. at 402-03 (collecting cases). This pleading deficiency is fatal to both Mumin's and Ortega's claims of tortious interference with business relations, and they are accordingly dismissed.

4.   Breach of contract

Both Complaints assert claims for breach of contract. Mumin alleges that Uber entered into an implied-in-fact contract with its customers to pay gratuities to its drivers, but breached that contract in its failure to remit tips. (Mumin Compl. ¶80.) Ortega, on the other hand, argues that Uber has breached the terms of an express contract with him by artificially inflating the fees charged to drivers and failing to pay gratuities. (Ortega Compl. ¶¶124-144). The court finds that both Plaintiffs' claims for breach of contract fail to plead a basis for recovery and so dismisses them in their entirety.

a.   Mumin's Implied-In-Fact Contract Theory

Mumin alleges that he is a third-party beneficiary of an implied-in-fact contract between Uber and its riders. (See Mumin Compl. ¶¶ 79-80.) In New York, "[a]n implied-in-fact contract would arise from a mutual agreement and an 'intent to promise, when the agreement and promise have simply not been expressed in words.'" Maas v. Cornell Univ., 721 N.E.2d 966, 969 (N.Y. 1999) (citation omitted). Importantly, the party asserting the existence of an implied-in-fact contract must supply "in nonconclusory language, the essential terms of the parties' contract, including those specific provisions of the contract upon which liability is predicated . . . ." Lapine v. Seinfeld, 918 N.Y.S.2d 313, 318 (N.Y. Sup. Ct. 2011) (alterations omitted) (quoting Caniglia v. Chi. Tribune-N.Y. News Syndicate, Inc., 612 N.Y.S.2d 146, 147 (N.Y. App.

Div. 1994)).  An agreement whose material terms are not reasonably certain is not a legally enforceable contract.  Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 548 N.E.2d 203, 206 (N.Y. 1989).

Here, Mumin relies solely on allegations that Uber represented to riders that "tip is included."  (See Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Mumin MTD Opp'n") (Dkt. 31 in No. 15-CV-6143) at 8.)  However, even if this was sufficient to create an obligation for Uber to remit a gratuity to Mumin, there is no allegation as to an agreement between Uber and riders as to the amount of tip—arguably the most important term of the alleged implied-in-fact contract.  Accordingly, no implied-in-fact contract was formed between Uber and riders as to gratuity.  See Fink v. Time Warner Cable, 810 F. Supp. 2d 633, 645 (S.D.N.Y. 2011) (dismissing implied-in-fact contract claim reliant on advertisements to supply the material terms because the advertisements "do not contain sufficient specific, concrete, factual representations").[19]

                b.      *Ortega's Express Contractual Breach Theory*

Ortega alleges a breach of the express contractual terms between Uber and Ortega.  To plead a claim for breach of contract under New York law, a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach [] by the defendant, and (4) damages."  Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348

---

[19] Mumin also appears to have initially asserted a breach of contract claim based on a theory that Mumin and Uber had an implied-in-fact contract regarding gratuity.  (Mumin Compl. ¶ 79.)  Uber moved to dismiss the claim, arguing there was no implied-in-fact contract between Mumin and Uber.  (Mumin MTD Mem. at 13-14.)  Because Mumin failed to respond to this argument (Mumin MTD Opp'n at 7-8), it is deemed waived.  Gorfinekl v. Ralf Vayntrub, Invar Consulting Ltd., No. 13-CV-3093 (PKC), 2014 WL 4175914 (E.D.N.Y. Aug. 20, 2014).  Even if were not waived, the claim would fail for the same aforementioned reason: there is no allegation as to the material term of the supposed contract, i.e., the amount of gratuity due to Mumin.

(2d Cir. 1996)). "In pleading these elements, a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue." Wolff v. Rare Medium, Inc., 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001).

The court finds that Ortega fails to plausibly allege a breach as to any of the various contractual provisions he identifies. Ortega first argues that Uber breached their contract by "inflat[ing] the service fee [] in breach of the agreements." (Ortega MTD Opp'n at 9.) Specifically, Uber charges Ortega a "Service Fee" to use its mobile application to connect with riders, which is calculated as a percentage of the "Fare" charged to the rider. (See Ortega Compl. ¶ 92.) Uber allegedly breached its contracts with Ortega by improperly incorporating "taxes and other ancillary charges" in the Fare. (Ortega MTD Opp'n at 9.) The higher the Fare, the higher Uber's Service Fee. (Id.) However, Ortega fails to point to any contractual provision that supports his claim. He first relies on the June 2014 Agreement, which defined "Fare" as "including applicable taxes and fees." (June 2014 Agreement § 1.12.) The Service Fee is then defined as "a percentage of each Fare." (Id. § 5.2.1.) Nowhere does the June 2014 Agreement prohibit Uber from charging a Service Fee that is a percentage of a Fare that includes "taxes and fees;" indeed, Ortega agreed to this contract knowing of this express definition of Service Fee. Ortega next cites the November 2014 Agreement. There, Fare is defined to exclude taxes and fees. (November 2014 Agreement § 4.1.) The Service Fee is again defined as a percentage of the Fare. (Id. § 4.4.) There is no indication that taxes or fees were included in the Fare under the November 2014 Agreement. Ortega seems to argue that because Fare in the June 2014 Agreement was defined to include taxes and fees, Fare in the November 2014 Agreement must also include taxes and fees, notwithstanding the fact that these are differently defined terms in

different agreements. (See Ortega MTD Opp'n at 9.) His argument is thus pure speculation, and his breach of contract claim on this basis is dismissed.

Ortega additionally argues that Uber's failure to remit gratuities is a breach of the parties' contract. However, he cites no contractual provision—and the court finds none—that Uber is obligated to collect and remit gratuities to Ortega. The only contractual provision that discusses gratuity is Section 5.1.3 of the June 2014 Agreement, which states: "[Ortega] understands that the aim of advertising and marketing to the effect that there is no need to leave a tip is ultimately to increase the number of trip requests [Ortega] receive[s and] does not entitle [him] to any payment beyond the payment of Fares . . . as provided in this Agreement." (June 2014 Agreement § 5.1.3.) As Ortega failed to identify any provision of a contract that Uber allegedly breached, his claim also fails.

Accordingly, Ortega's breach of contract claim is dismissed in its entirety.

### 5. Conversion

Both Plaintiffs assert claims of conversion relating to the allegedly withheld gratuities. (Mumin Compl. ¶¶ 88-92; Ortega Compl. ¶¶ 135-143.) To state a claim for conversion, "a plaintiff must allege: '(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question . . . to the exclusion of the plaintiff's rights." Alzheimer's Disease Res. Ctr., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc., 981 F. Supp. 2d 153, 163 (E.D.N.Y. 2013) (emphasis added). Where money is at issue, the allegedly converted money must be "capable of being described or identified in the same manner as a specific chattel." Id. at 163-64 (quoting High View Fund, L.P. v. Hall, 27 F. Supp. 2d 420, 429 (S.D.N.Y. 1998)). At minimum, a claim for conversion must seek the "recovery of a particular and definite sum of money." Bryant v. Comm'r of Soc.

Sec., No. 14-CV-5764 (LTS) (JCF), 2015 WL 6758094, at *22 (S.D.N.Y. Nov. 5, 2015) (quoting

Newbro v. Freed, 409 F. Supp. 2d 386, 394 (S.D.N.Y. 2006)).

Here, Plaintiffs have not alleged that they had ownership, possession, or control of their

gratuities before their alleged conversion by Uber. Any gratuity paid by a rider went directly to

Uber, not Plaintiffs. Moreover, the allegedly converted gratuities are not capable of being

identified as if they were specific chattel. Plaintiffs merely allege that some unspecified portion

of each fare paid by riders to Uber was gratuity. Plaintiffs therefore have failed to state a claim

of conversion.[20]

### 6.    Mumin's Additional Common Law Claims

Mumin raises common law claims for promissory estoppel, unjust enrichment, and fraud

and misrepresentation. The theory underlying Mumin's additional claims is that Uber made a

promise to current and potential drivers to remit gratuities, and subsequently benefitted from its

failure to honor that promise. (See Mumin Compl. ¶¶ 100, 105, 84-86, 94.) As with Mumin's

Labor Law claims, these common-law claims evidently assume Uber's fare includes gratuities

that can be remitted. (See, e.g., Mumin Compl. ¶¶ 100, 105). However, as to these three claims,

Mumin further alleges that Uber misrepresented to its drivers that they would remit those

gratuities to them (Id. ¶¶ 101, 84-85, 94), impliedly to spur recruitment—in other words, that

Uber defrauded their potential and current drivers. This theory implicates the Second Circuit's

guidance that courts should look to the conduct alleged, not the styling of a claim, in deciding

whether a complaint contains an "averment of fraud" under Rule 9(b). See Rombach,

---

[20] Ortega's conversion claim based on unreimbursed expenses fails for separate but similar reason. He does not allege that he had possession of a "specific identifiable thing" over which Uber later "exercised an unauthorized dominion." Alzheimer's Disease Res. Ctr., Inc., 981 F. Supp. 2d at 163. Ortega is simply asserting an obligation on the part of Uber to pay him money, i.e., reimburse him for his expenses. This is not a viable conversion claim. Kirschner v. Bennett, 648 F. Supp. 2d 525, 540 (S.D.N.Y. 2009) ("[A]n action of conversion does not lie to enforce a mere obligation to pay money.").

355 F.3d at 170-171; Levy, 103 F. Supp. 3d at 443 ("Courts have found non-fraud claims to sound in fraud where . . . the other party has attempted to induce action through misrepresentations or material omissions."); see generally supra Section III.B.1.

Accordingly, Mumin's remaining common law claims are evaluated under Rule 9(b), requiring him to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see also Rombach, 355 F.3d at 170 ("[A] complaint [governed by Rule 9(b)] must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" (quoting Mills, 12 F.3d at 1175). None of these claims satisfy this standard, and all are accordingly dismissed..

> a.    *Promissory Estoppel*

Mumin claims that Uber falsely promised to remit gratuities[21] to its drivers and that, as a result of this promise, Mumin continued driving for the company and did not solicit gratuities from passengers. (Mumin Compl. ¶¶ 100-102.) Claims based on promissory estoppel under New York law "must allege (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) an injury sustained in reliance on that promise." Fleet Bank v. Pine Knoll Corp., 736 N.Y.S.2d 737, 742 (N.Y. App. Div. 2002) (quoting Rogers v. Town of Islip, 646 N.Y.S.2d 158, 158 (N.Y. App. Div. 1996)). Additionally, Rule 9(b) requires that Mumin plead the "circumstances constituting fraud" with particularity.

Mumin's claim does not meet these heightened pleading requirements, as he fails to identify with particularity the statements alleged to constitute fraudulent promises to remit

---

[21] Mumin's promissory estoppel claim also mentions "hourly wages, cancellation fees, and other payments" that Uber allegedly promised to pay; however, the remaining allegations do not mention these additional items. The court construes this claim as based solely on Uber's alleged promise to pay gratuities and failure to do so.

gratuities or the circumstances under which they were made. The Complaint lists several public-facing statements on Uber's website that were apparently directed to its customers. (Mumin Compl. ¶¶ 37, 69-71). However, Mumin's theory of promissory estoppel is based on claimed misrepresentations to the drivers, not the public at large. Neither the Complaint nor Mumin's opposition papers clarify whether the public-facing statements are alleged to be the "clear and unambiguous promises" upon which this claim is based and, if they are, the circumstances under which Mumin received them.[22] Moreover, in the absence of further pleading particularity, the court cannot draw any inference as to the reasonableness or foreseeability of the drivers' purported reliance on Uber's statements. Mumin's promissory estoppel claim is dismissed.

### b.    Unjust Enrichment

Mumin asserts an unjust enrichment claim based on Uber's alleged retention of gratuities promised to drivers. "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006) (quoting Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)).

As with Mumin's promissory estoppel claim, the unjust enrichment claim is based on an allegation that Uber falsely promised Plaintiffs gratuities, which Uber in fact collected but failed to remit. (See Mumin Compl. ¶¶ 84-85 ("Defendants unlawfully retained gratuities promised to Plaintiffs and other drivers . . . [and] obtained [the gratuities] from drivers by making material

---

[22] Indeed, Mumin's statement that Uber made "express promises to [Mumin and other drivers] that Uber would collect the tip as part of the fare" (Mumin MTD Opp'n at 11) appears to suggest a separate, more direct statement to drivers.

misrepresentations and taking advantage of them.")  Again, Mumin's claim fails to clear the additional hurdle placed before averments of fraud under Rule 9(b).  The court concludes that the Complaint fails to provide sufficient clarity as to the statements alleged to constitute the "promises" (id. ¶ 84) or "material misrepresentations" (id. ¶ 85) that form the basis for the unjust enrichment claim.  Stripped of these conclusory assertions, the unjust enrichment claim fails to satisfy the pleading standard and must be dismissed.

c.      *Fraud and Misrepresentation*

Mumin asserts that Uber engaged in "fraud and/or intentional or negligent misrepresentation" by representing that drivers would receive gratuities, surge fares, and cancellation fees. (Mumin Compl. ¶ 94.)[23]  "The elements of common-law fraud and intentional misrepresentation under New York law are the same." B&M Linen Corp. v. Kannegiesser, USA Corp., 679 F. Supp. 2d 474, 480 (S.D.N.Y. 2010) (citing Indep. Order of Foresters v. Donald, Lufkin, & Jenrette, Inc., 157 F.3d 933, 940 (2d Cir. 1998)).  Plaintiffs asserting such claims "must show that '(1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied on the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance.'" Id. (quoting Cent. Pacific, Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 218 (S.D.N.Y. 2007)).  Plaintiffs do not dispute that these claims are properly evaluated under Rule 9(b)'s heightened particularity requirement. (Mumin MTD Opp'n at 10.)

As with the previous two claims, Mumin's fraudulent misrepresentation claim fails because Mumin fails to identify the allegedly fraudulent statements at issue or the circumstances

---

[23] While the Complaint presents alternate theories that Uber's representations were knowing or reckless, Mumin's subsequent submission clarifies his intent to proceed on a theory of fraudulent misrepresentation. (Mumin MTD Opp'n at 10.)  Accordingly, the court evaluates only the claim that Uber engaged in fraudulent and intentional misrepresentations to Mumin and other drivers.

45

under which they were made to him. Mumin alleges that "Uber intentionally misrepresents to the public how it compensates its drivers" (Mumin Compl. ¶ 5) and points to customer-oriented statements that "there is no need to tip" (Id. ¶ 39). However, for Mumin's claim to succeed on the theory he has put forth, it is not sufficient to show that Uber made false representations to the public. Rather, Mumin must show that Uber made fraudulent representations to him and its other drivers. (Id. ¶ 94.) At no point in his Complaint does Mumin explain the circumstances of any fraudulent representations that were made to him. Without any such facts, the court cannot draw any reasonable inference as to whether Uber intended to defraud its drivers and whether Mumin and other drivers were justified in relying on the statement. Accordingly, Mumin's claim for fraud and intentional misrepresentation is dismissed.

### 7. Ortega's False Advertising Claim

Ortega asserts a claim of false advertising related to Uber's allegedly false advertisements "guaranteeing" drivers' first month's compensation.[24] (Ortega Compl. ¶¶ 144-53). The relevant statute prohibits "[f]alse advertising in the context of any business, trade, or commerce or in the furnishing of any services in this state." N.Y. Gen. Bus. Law § 350. In order to state a claim under that section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading, and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Orlander v. Staples, Inc., 802 F.3d 289, 300

---

[24] While the court's reasoning as to Mumin's claims could be interpreted to require Ortega to plead in accordance with Rule 9(b), district courts in the Second Circuit have not required Section 350 claims to meet that standard. See, e.g., Garcia v. Chrysler Grp LLC, 127 F. Supp. 3d 212, 239 (S.D.N.Y. 2015) (citing Pelman ex rel. Pelman v. McDonald's Corp., 396 F.3d 508, 511 (2d Cir. 2005), for the proposition that Section 349 claims need not be pleaded with heightened particularity and noting that the New York Court of Appeals held that the "standard for recovery under []Section 350 . . . is [] identical to section 349"). The court finds this interpretation of the case law persuasive.

(2d Cir. 2015) (citing Koch v. Acker, Merrall & Condit Co., 18 N.Y.3d 940, 944 (N.Y. 2012)).[25]
The statute explicitly includes advertisements as to the "kind, character, terms or conditions of
any employment opportunity." N.Y. Gen. Bus. Law § 350-a.

Uber argues that the false advertising claim is deficient because Ortega fails to allege that
he personally relied on any of the specific advertisements cited in the Complaint, and cites
several cases in support of its concention that failure to cite a specific advertisement is fatal to a
claim under Section 350. (Ortega MTD Reply at 21.) However, those cases do not state any
such requirement and are best read to support the proposition that failure to cite any
advertisement whatsoever would be fatal. See Richman v. National Grid, No. 12-CV-1319
(DLI) (VMS), 2013 WL 1338870, at *3 (E.D.N.Y. Mar. 29, 2013); Szymczak v. Nissan N. Am.,
Inc., No. 10-CV-7493 (VB), 2011 WL 7095432, at *15 (S.D.N.Y. Dec. 16, 2011). Regardless,
Ortega's subsequent submission clarifies that he claims to have relied on the particular
advertisement included in the Complaint. (Compare Ortega Compl. ¶ 147 ("Below is an example
of one of these advertisements.") (emphasis added) with Ortega MTD Opp'n 16 ("An Uber
advertisement alleged to be false by Plaintiffs and relied on by Plaintiffs is set forth in paragraph
147 of the first Amended Complaint.")).[26]

---

[25] The New York Court of Appeals recently made clear that justifiable reliance on the allegedly false advertising—
stated by some opinions to be a pleading requirement under § 350—is not required in fraudulent advertising claims
and need not be included in the complaint. See Koch, 18 N.Y.3d at 941.

[26] Defendants also argue that Ortega "fails to allege facts that suggest the advertising was misleading or deceptive"
and point to Ortega's admission that any terms or conditions were only included in "small and inconspicuous print."
(Ortega MTD Mem. at 21-22.) In order to be actionable, the allegedly false advertisements must be "likely to
mislead a reasonable consumer under the circumstances" based on an objective standard. Oswego Laborers' Local
214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20 (N.Y. 1995) (discussing the requirement in the
context of Section 349; see also New World Solutions v. NameMedia Inc., 150 F. Supp. 3d 287, 329-30 (S.D.N.Y.
2015) (applying Oswego Laborers' Local 214 to claims under Section 350). In the particular context of employment
advertisements, the statutory definition offered by Section 350-a states that such advertisements are "misleading in a
material respect" where they "either fail to reveal whether the employment available or being offered requires or is
conditioned upon the purchasing or lending of supplies, material, equipment, or other property." N.Y. Gen. Bus.
Law § 350-a(1). While existing case law does not address the relationship between this statutory language and the
general "reasonable customer" standard, the court concludes that the statute states a specific standard of
reasonableness for employment advertisement and finds that Ortega satisfies this requirement, (see Ortega

47

Accordingly, Uber's motion to dismiss Ortega's false advertising claim is denied.

## IV.    CONCLUSION

For the foregoing reasons,

- Defendants' motions to compel Plaintiff Victor Mallh (Dkt. 28 in 15-CV-6143 ) and Plaintiff Joce Martinez (Dkt. 19 in 15-CV-7387) to arbitrate their claims on an individual basis are GRANTED.  See supra Section II.A.

- Defendants' motion to dismiss Plaintiff Manzour Mumin's claims (Dkt. 26 in 15-CV-6143) is GRANTED in part and DENIED in part.  See supra Sections III.B.1-5.  Specifically, Plaintiff Mumin's claims for violation of New York Labor Law § 195, tortious interference with business relations, breach of contract, conversion, promissory estoppel, unjust enrichment, and fraud and intentional misrepresentation are DISMISSED.  Uber's motion to dismiss is DENIED as to Plaintiff Mumin's claims for violations of New York Labor Law §§ 196-d and 652.

- Defendants' motion to dismiss Plaintiff Jose Ortega's claims (Dkt. 22 in-15-CV-7387) is GRANTED in part and DENIED in part.  See supra Sections III.B.1-4, 6.  Specifically, Plaintiff Ortega's claims for violations of New York Labor Law §§ 191 and 652, violations of N.Y. Comp. Codes R. & Regs. tit. 12, §§ 142-2.1 and 142-2.4, tortious interference with business relations, breach of contract, and conversion are DISMISSED.  Plaintiff Ortega's claim for violations of New York Labor Law § 193 is DISMISSED to the extent that it is premised on his incurred expenses.  Uber's motion to dismiss is DENIED as to Plaintiff Ortega's claims for violations of New York Labor Law §§ 195 and 196-d, N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2, and false advertising.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      March 7 , 2017

NICHOLAS G. GARAUFIS
United States District Judge

---

Compl. ¶¶ 97-100, 145).  Uber claims that reference to its website visible on the advertisement cited by Ortega is sufficient to clearly condition their statement.  (Ortega MTD Mem. at 21-22.)  However, Uber offers no indication that the website either clarifies the offer or that this conditioning is legally sufficient, and the court finds no support for this position.