UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSE ORTEGA and JOCE MARTINEZ, on their own behalf, and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>UBER TECHNOLOGIES INC., RASIER LLC, UBER USA, LLC, UBER NEW YORK LLC, UBER TRANSPORTATION LLC, JOHN DOE "UBER AFFILIATES," fictitious name used to identify presently unknown entities,<br><br>Defendants. | No. 1:15-cv-7387 (NGG) (JO)<br><br>**CLASS ACTION SETTLEMENT<br>AGREEMENT AND RELEASE** |

This Class Action Settlement Agreement and Release (the "Agreement") is entered into between Plaintiff Jose Ortega, on his own behalf and on behalf of all Settlement Class Members as defined herein, Plaintiff Joce Martinez, on his own behalf, and Defendants Uber Technologies, Inc., Rasier, LLC, and Uber USA, LLC (collectively, "Defendants"), and is subject to the terms and conditions set forth herein, and the final approval of the U.S. District Court for the Eastern District of New York.

## BACKGROUND

1.     Plaintiffs Ortega and Martinez, who provided transportation services arranged through Uber Technologies, Inc.'s ("Uber") software application (the "Uber App") as independent third-party transportation providers ("drivers"), filed the putative class action complaint in this matter on December 29, 2015.  The case is currently pending in the U.S. District Court for the Eastern District of New York, designated as *Ortega v. Uber Technologies, Inc.*, Case No. 1:15-cv-7387 (NGG) (JO) (the "Action").  On April 25, 2016, Plaintiffs filed the first amended complaint, asserting wage and hour claims under the New York Labor Law, common law claims for breach of contract, tortious interference with business relations, and conversion, and a claim for false advertising pursuant to New York General Business Law § 350 *et seq*.

2.     Defendants moved to compel Plaintiff Martinez to submit his claims to individual arbitration, and to dismiss Plaintiff Ortega's claims, as averred in Plaintiffs' first amended complaint, pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).

3.     On March 7, 2017, the Court (i) granted Defendants' motion to compel Plaintiff Martinez to submit his claims to individual arbitration, and dismissed his claims, and (ii) granted in part and denied in part Defendants' motion to dismiss Plaintiff Ortega's claims pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).  Specifically, the Court dismissed Plaintiff Ortega's minimum

1

wage, tortious interference, breach of contract, and conversion claims. The Court also dismissed the portion of Plaintiff Ortega's unlawful deductions claim based upon Defendants' alleged failure to reimburse him for business expenses. Plaintiff Ortega's claims for false advertising, unlawfully retained gratuities, failure to provide accurate wage statements, and failure to pay overtime, and the portion of his claim for unlawful deductions based upon Defendants' alleged deductions for inefficient routes and customer complaints, were not dismissed.

4. Plaintiff Ortega subsequently requested a pre-motion conference with the Court to address his anticipated motion for reconsideration of the decision dismissing his breach of contract claim, and/or leave to amend the first amended complaint to supplement the allegations relating to his claim.

5. Defendants have defended, and vigorously contest, each and every claim in the Action, and they deny all material allegations of the Action, as to which numerous meritorious defenses exist. Defendants, without admitting any wrongdoing or liability, nevertheless have agreed to enter into this Agreement to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, and to be completely free of any further controversy with respect to the claims settled by this Agreement.

6. Plaintiffs' Counsel has analyzed and evaluated the merits of the claims made against Defendants. Based upon Plaintiffs' Counsel's analysis and evaluation of a number of factors, and recognizing the substantial risks of continued litigation, including the possibility that the Action, if not settled now, might result in no recovery whatsoever, or might result in a recovery that is less favorable and that would not occur for several years, Plaintiffs' Counsel is satisfied that the terms and conditions of this Agreement are fair, reasonable and adequate, and that this Agreement is in the best interests of Plaintiffs and putative Class Members.

7. Plaintiffs and Defendants, by and through their respective counsel, have engaged in extensive in-person and telephonic settlement discussions, including private mediation with experienced mediator Al Feliu, in connection with the potential resolution of the Action. Plaintiffs, the Settlement Class (as defined below), and Defendants – subject to the approval of the Court – have elected to settle the Action pursuant to the terms set forth in this Agreement, which shall be submitted to the Court for approval through the mechanisms set forth below.

**NOW THEREFORE,** in consideration of the mutual covenants and promises set forth in this Agreement, as well as the good and valuable consideration provided for herein, the Parties agree to a full and complete settlement of the Action on the following terms and conditions:

## <u>DEFINITIONS</u>

8. <u>Agreement</u>. "Agreement" shall refer to the instant Class Action Settlement Agreement and Release.

9. <u>Bar Date</u>. "Bar Date" means the date by which any Settlement Class Member who wishes to opt-out of the Settlement, or to object to the Settlement, must submit his or her opt-out request or objections. The Bar Date shall be no later than thirty (30) calendar days after the date on which the Settlement Administrator sends the Settlement Notice to the Settlement Class Members by electronic mail.

10.     Settlement Administrator. "Settlement Administrator" means the settlement administration firm agreed upon by the Parties, who will perform all of the administrative duties assigned below in Paragraphs 44-46, and 50-51. The Settlement Administrator is designated by the Parties to be Garden City Group.

11.     Class Counsel.  "Class Counsel" or "Plaintiffs' Counsel" means: Jonathan Greenbaum, Coburn & Greenbaum, PLLC, and Philip M. Hines, Marc J. Held, and Scott B. Richman, Held & Hines LLP.

12.     Class Counsel's Costs. "Class Counsel's Costs" means the total amount of Class Counsel's attorney's costs and expenses, including but not limited to, postage, filing fees, copying, and other litigation costs, to be approved by the Court upon application by Class Counsel. This amount is included in the Gross Settlement Sum.

13.     Class Counsel's Fees. "Class Counsel's Fees" means the total amount of Class Counsel's attorney's fees to be approved by the Court upon application by Class Counsel, in an amount not to exceed one-third of the Gross Settlement Sum, which amount is to be paid from, and is included in, the Gross Settlement Sum. Defendants agree not to oppose any fee application for an amount up to and including one-third of the Gross Settlement Sum, but reserve the right to object to any fee application in excess of that amount.

14.     The Court. The "Court" refers to the United States District Court for the Eastern District of New York, the Honorable Nicholas G. Garaufis, U.S.D.J., presiding.

15.     Defendants. "Defendants" means Uber Technologies, Inc., Rasier, LLC, and Uber USA, LLC.

16.     Defendants' Counsel. "Defendants' Counsel" means David M. Wirtz, Andrew M. Spurchise, Kevin R. Vozzo, and Maayan Deker, Littler Mendelson, P.C.

17.     Final Approval Order. "Final Approval Order" refers to the Order entered and filed by the Court after the Final Fairness Hearing that finally approves the Agreement's terms and conditions, directs consummation of its terms and provisions, and (i) dismisses all the individual claims asserted in the Action with prejudice, (ii) dismisses the class claims for breach of contract and false advertising asserted in the Action with prejudice as to all Settlement Class Members (other than those who validly and timely opt-out as provided herein), and (iii) dismisses the remaining class claims asserted in the Action without prejudice.

18.     Final Effective Date.  "Final Effective Date" refers to the first date after all of the following events and conditions have been met or have occurred: (i) this Agreement has been signed by the Parties, Class Counsel and Defendants' Counsel; (ii) the Court has entered the Preliminary Approval Order, and authorized Settlement Notice of the proposed Settlement and Final Fairness Hearing; (iii) the Court-approved Settlement Notice has been mailed to Settlement Class Members as ordered by the Court, and the Bar Date has passed; (iv) the Final Fairness Hearing has occurred; (v) the Court has entered the Final Approval Order and Final Judgment, approving the Agreement's terms and conditions, directing consummation of its terms and provisions, and dismissing all the individual claims asserted in the Action with prejudice, dismissing the class claims for breach of contract and false advertising asserted in the Action

3

with prejudice as to all Settlement Class Members (other than those who validly and timely opt-out as provided herein), and dismissing the remaining class claims asserted in the Action without prejudice; (vi) the deadline has passed without action by Defendants to terminate the Agreement; and (vii) the time to appeal from the Final Approval Order and Final Judgment has expired and no Notice of Appeal has been filed, or in the event that an appeal is filed, the appellate process is exhausted and the Final Approval Order and Final Judgment has remained intact in all material respects. The Parties agree the Court shall retain jurisdiction to enforce the terms of the Agreement unless specifically set forth otherwise herein.

19. <u>Final Fairness Hearing</u>. "Final Fairness Hearing" means the hearing contemplated by the Parties, at which the Court will approve, in final, the Agreement, and make such other final rulings as are contemplated by this Agreement, including the Final Judgment. The date of the Final Fairness Hearing shall be set by the Court and notice of such hearing shall be provided to the Settlement Class Members in the Settlement Notice, although such hearing may be continued by the Court without further notice to Settlement Class Members, other than those who are Objectors. To allow for all the events set forth in this Agreement to occur, the Parties shall request the Court schedule the Final Fairness Hearing no sooner than one hundred (100) days after entering the Preliminary Approval Order.

20. <u>Final Judgment</u>. "Final Judgment" refers to the judgment entered by the Court in conjunction with the Final Approval Order (i) dismissing all the individual claims asserted in the Action with prejudice, (ii) dismissing the class claims for breach of contract and false advertising asserted in the Action with prejudice as to all Settlement Class Members (other than those who validly and timely opt-out as provided herein), and (iii) dismissing the remaining class claims asserted in the Action without prejudice. The Parties shall submit a proposed order of Final Judgment setting forth the terms of this Agreement, by incorporation or otherwise, for execution and entry by the Court at the time of the Final Fairness Hearing, or at such other time as the Court deems appropriate.

21. <u>Gross Settlement Sum or GSS</u>. The "Gross Settlement Sum" (or "GSS") is three-million dollars ($3,000,000.00) and represents the maximum total amount that Defendants will pay in full and complete settlement of this Action under this Agreement, inclusive of Settlement Payments, Named Plaintiffs' Settlement Payments, Class Counsel's Fees, Class Counsel's Costs, Service Payment, and Settlement Expenses, subject to Defendants' right to terminate the Agreement as set forth below.

22. <u>Named Plaintiffs' Settlement Payments</u>. "Named Plaintiffs' Settlement Payments" means the gross amount to be approved by the Court for payment to Plaintiffs Martinez and Ortega in exchange for their general release of claims. The Named Plaintiffs' Settlement Payments shall be taken exclusively from and be deducted from the Gross Settlement Sum and include a gross amount of three-thousand five-hundred dollars ($3,500.00) to be paid out to Plaintiffs Ortega and Martinez as follows: two-thousand five-hundred dollars ($2,500.00) to be paid to Plaintiff Martinez, and one-thousand dollars ($1,000.00) to be paid to Plaintiff Ortega. To be eligible to receive the Named Plaintiffs' Settlement Payments, Plaintiffs Ortega and Martinez shall execute a copy of this Agreement and submit a completed IRS Form W-9 within fourteen (14) calendar days of their execution of this Agreement. Class Counsel shall secure the

4

execution of this Agreement by Plaintiffs, and if, the Court requires revisions to the Agreement, then again prior to the date of submission of the revised Agreement

23.   <u>Net Settlement Sum or NSS</u>.   "Net Settlement Sum" or "NSS" means the Gross Settlement Sum less the amounts awarded to Class Counsel, Settlement Expenses, Named Plaintiffs' Settlement Payments, and the Service Payment to Plaintiff Ortega.

24.   <u>Objector</u>.   "Objector" means an individual who timely and correctly files an objection to this Agreement, and does not include any individual who opts out of this Settlement.

25.   <u>Parties</u>.   "Parties" refers to the Plaintiffs and Defendants and, in the singular, refers to any of them, as the context makes apparent.

26.   <u>Plaintiffs</u>.   "Plaintiffs" refers to Plaintiff Jose Ortega and Plaintiff Joce Martinez.

27.   <u>Preliminary Approval Order</u>.   "Preliminary Approval Order" is the Order entered and filed by the Court that: (i) certifies the Settlement Class for settlement purposes only; (ii) preliminarily approves the Agreement's terms and conditions, including the manner and content of providing Settlement Notice to the Settlement Class; (iii) directs the timing of providing Settlement Notice; and (iv) sets the dates and deadlines for effectuating settlement, including the date for the mailing of Settlement Notice, and the Final Fairness Hearing date.

28.   <u>Released Parties</u>.   "Released Parties" refers to Defendants, all affiliated entities, and their past, present, and future parent companies, affiliates, subsidiaries, divisions, predecessors, successors, partners, owners, joint ventures, affiliated organizations, shareholders, insurers, reinsurers and assigns, and each of its/their past, present and future officers, investors, executives, directors, trustees, agents, employees, attorneys, contractors (other than driver partners), representatives, plan fiduciaries and/or administrators, benefits plan sponsored or administered by Defendants or affiliated entities, or divisions, units, branches, and any other persons or entities acting on their behalf, including any party that was or could have been named as a defendant in the Action.

29.   <u>Service Payment</u>.   "Service Payment" means the gross amount to be approved by the Court for payment to Plaintiff Ortega in recognition of his efforts on behalf of the Settlement Class in the Action.   The Service Payment shall include a gross amount of two-thousand dollars ($2,000.00) to be paid out to Plaintiff Ortega and shall be taken exclusively from and be deducted from the Gross Settlement Sum.   This award reflects the work Plaintiff Ortega performed in assisting Class Counsel with this litigation and pursuing this litigation, including in-person and telephonic conferences with Class Counsel, and assisting with drafting the complaint and first amended complaint in this matter.   The Service Payment shall be in addition to any amount to which Plaintiff Ortega may be entitled to receive under this Agreement as a Settlement Class Member.   To be eligible for a Service Payment, Plaintiff Ortega shall execute a copy of this Agreement and submit a completed IRS Form W-9 within fourteen (14) calendar days of his execution of this Agreement.   Class Counsel shall secure the execution of this Agreement by Plaintiffs, and if, the Court requires revisions to the Agreement, then again prior to the date of submission of the revised Agreement.

30.     Settlement.  "Settlement" shall refer to the agreement of the Parties to settle the claims as set forth and embodied in this Agreement.

31.     Settlement Checks.  "Settlement Checks" means checks issued to Settlement Class Members for their share of the NSS.

32.     Settlement Class Members' Settled Claims.  "Settled Claims" means any and all claims, causes of action, assertions of injury or harm, damages, debts, liabilities, demands, obligations, guarantees, liquidated damages, costs (including, but not limited to, settlement administration costs), entitlement to restitution or injunctive or declaratory relief, right to direct or indirect recovery of compensation, expenses, interest, and/or attorneys' fees, whether suspected or unsuspected, known or unknown, that Plaintiffs or any Settlement Class Members have had, now have, or may have in the future against Defendants, the Released Parties or any of them, for acts occurring at any time up to and including the date on which the Court enters the Preliminary Approval Order: (i) arising from or related to the claim that Defendants or any of the Released Parties failed to remit all monies, including, without limitation, sales tax, Black Car Fund fees, gratuities, and fares, due to Plaintiffs or Settlement Class Members, withheld payments due to Plaintiffs or Settlement Class Members, or otherwise miscalculated the share of the fares or other amounts paid by riders to which Defendants, the Released Parties, and/or Settlement Class Members were entitled, pursuant to any express or implied agreement(s), contract(s), promise(s), or covenant(s), including any and all claims, whether alleged under federal, state or local law, regulation or ordinance, common law or tort, for breach of contract (whether oral, written, implied, express or otherwise), breach of the implied covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, unlawful deductions under the New York Labor Law (including any related claims for liquidated damages), or otherwise based on the same or similar facts, allegations and/or theories asserted or that could have been asserted in the Action.  This includes any and all claims based on similar theories that are or could be asserted in *Haider v. Uber Technologies, Inc., et al.*, S.D.N.Y. Case No. 16-cv-4098-AKH ("*Haider*"). This does not include claims asserted in *Haider* based on Uber's "upfront pricing" program, or any other claim for unlawful deductions under the New York Labor Law not described above, including based on the theories that Uber unlawfully deducted amounts for vehicle payments and/or other alleged "tools of the trade," or the service fee drivers pay in exchange for the lead generation services provided to them through the Uber App. This also does not include any claim that, as a result of alleged misclassification of drivers as independent contractors, Defendants or the Released Parties unlawfully failed to provide minimum wage, overtime, or spread-of-hours pay to drivers; and (ii) arising from or related to the claim that Defendants or any of the Released Parties engaged in false or misleading advertising, or deceptive business practices, in connection with advertisements and communications regarding drivers' use of the Uber App, driver earnings, and earnings "guarantees," whether arising under federal, state, or local law, including, without limitation, claims under New York General Business Law § 349 *et seq.*, and § 350 *et seq.*

33.     Settlement Class, Settlement Class Members, or Class Members. For purposes of this Agreement, the "Settlement Class" shall be defined as follows: all individuals who (i) have provided transportation services arranged using the Uber App within the State of New York at any time between December 29, 2009 and the date on which the Court enters the Preliminary Approval Order, and (ii) purported to opt-out of arbitration, or whose most recent agreement

with Defendants and/or the Released Parties otherwise does not contain an arbitration provision, as determined by Defendants' records. The Settlement Class does not include individuals who exclusively provided transportation services arranged using Uber's "uberTAXI" product.

34.     Settlement Expenses. "Settlement Expenses" means the reasonable fees, costs, and expenses incurred by the Settlement Administrator in performing the services authorized in this Agreement, which shall be paid from the Gross Settlement Sum directly to the Settlement Administrator. Under no circumstances shall Defendants or any Released Party be responsible for the payment of Settlement Expenses other than the amounts paid to the Settlement Administrator from the Gross Settlement Sum.

35.     Settlement Notice. "Settlement Notice" refers to the notice substantially in the form of **Exhibit A** to be directed to Settlement Class Members and to explain the Settlement and Settlement Class Members' options sent to Settlement Class Members following preliminary approval, which shall be mutually agreed upon by the Parties, and shall be used to notify the Settlement Class of the Settlement.

36.     Settlement Payment. "Settlement Payment" means the award to which each Settlement Class Member will be entitled under the terms of this Agreement as described below in Paragraph 42.

## TERMS AND CONDITIONS

37.     Non-Admission Of Liability. The Parties enter into this Agreement to resolve the dispute that has arisen between them and to avoid the burden, expense and risk of continued litigation. In entering into this Agreement, Defendants do not admit, and specifically deny, that they have: violated any federal, state, or local law; violated any regulations or guidelines promulgated pursuant to any statute or any other applicable laws, regulations or legal requirements; breached any contract; violated or breached any duty; engaged in false advertising, or any misrepresentation or deception; or engaged in any other unlawful conduct with respect to Plaintiffs and Settlement Class Members. Neither this Agreement, nor any of its terms or provisions, nor any of the negotiations connected with it, shall be construed as an admission or concession by Defendants of any such violation(s) or failure(s) to comply with any applicable law, or an admission or concession regarding the propriety of certifying a litigation class or the pursuit of class relief in the Action or any other proceeding. Except as necessary in a proceeding to enforce the terms of this Agreement, this Agreement and its terms and provisions shall not be offered or received as evidence in any action or proceeding to establish any liability or admission on the part of Defendants or to establish the existence of any condition constituting a violation of, or noncompliance with, federal, state, local or other applicable law. In addition, the Parties intend this Settlement to be contingent upon the preliminary and final approval of this Agreement; and the Parties do not waive, and instead expressly reserve, their respective rights to prosecute and defend this Action as if this Agreement never existed in the event that the Settlement is not fully and finally approved as set forth herein. There has been no final determination by any court as to the merits of the claims asserted by Plaintiffs, nor has there been any final determination as to whether a class should be certified, other than for settlement purposes only.

38.  <u>Release Of Claims</u>.

a.  As of the date of filing and entry of the Final Approval Order and Final Judgment, Plaintiffs and all Settlement Class Members shall be deemed to have forever and fully released the Settled Claims, as defined in Paragraph 32, and Plaintiffs shall be deemed to have also forever and fully released the claims described in Paragraph 39.  Settlement Class Members who have timely and validly opted-out of this Settlement will not have, by operation of the Final Approval Order, released their Settled Claims, if any.

b.  The Parties agree for settlement purposes only that, because the Settlement Class is so numerous, it is impossible or impracticable to have each Settlement Class Member execute this Agreement.  Accordingly, the Settlement Notice will advise all Settlement Class Members of the binding nature of the release, and such notice shall have the same force and effect as if each Settlement Class Member executed the Agreement.

c.  Plaintiffs and Class Counsel represent, covenant, and warrant they have not directly or indirectly assigned, transferred, encumbered or purported to assign, transfer, or encumber to any person or entity any portion of any liability, claim, demand, action, cause of action, or rights herein released and discharged, except as set forth herein.

39.  <u>Full Release By Plaintiffs</u>. Plaintiffs fully release and discharge Defendants and the other Released Parties from any and all past, present, and future claims, actions, demands, causes of action, suits, debts, obligations, damages, rights or liabilities, of any nature and description whatsoever, known or unknown, existing or potential, recognized now or hereafter, expected or unexpected, pursuant to any theory of recovery (including but not limited to those based in contract or tort, common law or equity, federal, state, or local law, statute, ordinance, or regulation), and for claims for injunctive relief, declaratory relief, compensatory, consequential, punitive or exemplary damages, statutory damages, restitution, penalties, interest, attorneys' fees, costs or disbursements, or any other form of monetary or non-monetary relief, that Plaintiffs now have or claim to have, or which Plaintiffs at any time heretofore had or claimed to have, or which Plaintiffs at any time hereafter may have or claim to have, arising out of or related to any act, omission, event, fact or other thing that existed or occurred from the beginning of time up through and including the date of the Final Effective Date.  Without limiting the generality of the foregoing, and in addition to the foregoing, Plaintiffs specifically and expressly release to the maximum extent permitted by law any claims against Defendants and the Released Parties that existed or occurred on or before the Final Effective Date of this Agreement arising out of or related to: violations of any federal, state, or city wage and hour law, including the New York Labor Law and the federal Fair Labor Standards Act; claims based on alleged independent contractor misclassification; violations of any federal, state, or city human rights, civil rights, or employment discrimination laws, including Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Civil Rights Act of 1991, the federal Family and Medical Leave Act, the Age Discrimination in Employment Act, the Americans With Disabilities Act, the National Labor Relations Act, the Equal Pay Act, the Employee Retirement Income Security Act of 1974, Sections 1981 through 1988 of Title 42 of the United States Code, the Older Workers Benefit Protection Act, the Genetic Information Non-Discrimination Act, the Immigration Reform and Control Act, Sections 503 and 504 of the Rehabilitation Act of 1973, the Fair Credit Reporting Act, the New York State Human Rights Law, and the New York City Human Rights Law;

breach of contract; breach of the implied covenant of good faith and fair dealing; unjust enrichment; promissory estoppel; tortious interference; fraud; misrepresentation; common law claims; unfair competition; unfair business practices; negligence; defamation; infliction of emotional distress; invasion of privacy; assault; battery; false imprisonment; wrongful termination; and any other local, state, or federal law, ordinance, rule, or regulation, whether statutory or pursuant to common law.

40.    Arbitration Of Disputes. In exchange for the promises contained herein, Plaintiffs agree to arbitrate any disputes they have with Uber and/or any of the Released Parties arising after the Final Effective Date, and to do so only on an individual (not on a class, collective, or representative) basis, pursuant to the terms set forth in Section 15.3 ("Arbitration") of the December 10, 2015 Uber USA, LLC Technology Services Agreement (the "December 2015 Agreement"), which Plaintiffs previously accepted in connection with their use of the Uber App, and which is attached hereto as **Exhibit B**.  Plaintiffs acknowledge and agree that they are and shall forever be bound to arbitrate any such disputes pursuant to the arbitration provision contained in the December 2015 Agreement, regardless of whether modified agreements are issued and accepted by Plaintiffs in the future.  Plaintiffs further acknowledge and agree that they may not opt-out of the arbitration provision contained in the December 2015 Agreement, or any future arbitration agreement issued by Uber or any of the Released Parties, and that any attempt to do so will be invalid.  Plaintiffs also acknowledge and agree that to the extent they previously attempted to opt-out of the arbitration provision contained in the December 2015 Agreement, or any other agreement with Uber or any of the Released Parties, any such attempt is extinguished by virtue of this Agreement.  The Parties agree that this Settlement does not impact the enforceability of any of the arbitration agreements Plaintiffs or Settlement Class Members entered into with Uber, its subsidiaries, or any of the Released Parties.

41.    Settlement Payments, Counsel Fees, Counsel Costs, Service Awards, And Named Plaintiffs' Settlement Payments. Subject to the terms of the Final Approval Order and the conditions specified in this Agreement, and in consideration of the mutual covenants and promises set forth herein, Defendants agree to pay the maximum amount of three million dollars ($3,000,000.00) (*i.e.,* the Gross Settlement Sum or GSS).  The GSS includes payments to be made to Settlement Class Members in the form of Settlement Payments, Class Counsel's Fees and Costs, a Service Payment to Plaintiff Ortega, Named Plaintiffs' Settlement Payments, and the Settlement Expenses.  Defendants shall not be required to pay any amounts in addition to the GSS under this Agreement.  The Parties agree, subject to Court approval, that the GSS shall be apportioned as follows:

a.    Class Counsel will apply to the Court at the Final Fairness Hearing for an award of Counsel Fees of no more than one-third of the Gross Settlement Sum.  Counsel Fees shall exclusively come from and be deducted from the GSS.  Defendants will not oppose such application.  Class Counsel will also apply to the Court for an award of Counsel Costs. Defendants will not oppose a request for up to twenty-nine thousand fifty-five dollars ($29,055.00) in Counsel Costs, which shall be taken exclusively from and be deducted from the GSS.  Subject to the Court's discretion, the merits of Class Counsel's application for Counsel Fees and Costs is to be considered separately from the Court's consideration of the fairness, reasonableness, adequacy, and good faith of the settlement of the Action.  The outcome of any proceeding related to Class Counsel's application for Fees and Costs shall be severable from the

remainder of this Agreement, shall not terminate this Agreement, and shall not otherwise affect the Court's ruling on the application for Final Approval.

b.      At the Final Fairness Hearing, Class Counsel will apply to the Court for a Service Payment in an amount not to exceed the gross amount of two-thousand dollars ($2,000.00) to be paid to Plaintiff Ortega.  Defendants will not oppose such application.  The Service Payment is included in, and exclusively shall be taken from and be deducted from, the GSS.  Subject to the Court's discretion, the merits of the application for a Service Award is to be considered separately from the Court's consideration of the fairness, reasonableness, adequacy, and good faith of the settlement of the Action.  The outcome of the Court's ruling on the application for a Service Award shall be severable from the remainder of this Agreement, shall not terminate this Agreement, and shall not otherwise affect the Court's ruling on the application for Final Approval.

c.      Class Counsel will apply to the Court for Named Plaintiffs' Settlement Payments in an amount not to exceed the gross amount of three-thousand five-hundred dollars ($3,500.00) to be paid to Plaintiffs Ortega and Martinez as follows: two-thousand five-hundred dollars ($2,500.00) to be paid to Plaintiff Martinez, and one-thousand dollars ($1,000.00) to be paid to Plaintiff Ortega, in exchange for their general release of claims.  Defendants will not oppose such application.  The Named Plaintiffs' Settlement Payments are included in, and exclusively shall come from and be deducted from, the GSS.  Subject to the Court's discretion, the merits of the application for Named Plaintiffs' Settlement Payments is to be considered separately from the Court's consideration of the fairness, reasonableness, adequacy, and good faith of the settlement of the Action.  Payment of the Named Plaintiffs' Settlement Payments is contingent upon the Settlement becoming final and binding.

42.     Calculation Of Claims.  The  individual Settlement Payment for each Settlement Class Member shall be determined by: (i) allocating to any Settlement Class Member who completed a trip and/or received payment for a completed trip in New York State at any time between December 29, 2012, through the date on which the Court enters the Preliminary Approval Order (which coincides with the statute of limitations period applicable to Plaintiffs' false advertising claim), as determined by Defendants' records, a flat amount of one-hundred dollars ($100.00), which shall be taken from the NSS; and then (ii) taking (a) the remaining amount of the NSS, (b) divided by the total amount of New York State sales tax and Black Car fund fees charged for rides for which all Settlement Class Members received payment at any time from December 29, 2009, through the date on which the Court enters the Preliminary Approval Order, as determined by Defendants' records, (c) multiplied by the amount of New York State sales tax and Black Car Fund fees charged for rides for which each Settlement Class Member received payment during this time period, as determined by Defendants' records, and allocating those amounts accordingly. The Parties acknowledge this formula was devised as a practical, fair, and logical tool to simplify the claims process.

43.     Tax Treatment Of Service Payments And Settlement Payments.  Plaintiffs will be issued an IRS Form 1099 for all payments received in connection with this Agreement, and Settlement Class Members will be issued an IRS Form 1099 for the individual Settlement Payments they receive under the terms of this Agreement.

10

a.  All Parties represent that they have not received, and shall not rely on, advice or representations from other parties or their agents regarding the tax treatment of payments under federal, state, or local law.  In this regard, Defendants make no representations regarding the taxability of the Settlement Payments, and Settlement Class Members agree to indemnify Defendants against any action or proceeding arising from the tax treatment of the Settlement Payments.

b.  Except as provided in Paragraph 41(a), each Party shall bear his, her, or its own attorneys' fees, costs, and expenses incurred in the prosecution, defense, or settlement of the Action.  Class Counsel agree that any allocation of fees among the Class Counsel and any other attorney that may be representing Plaintiffs or the Class shall be the sole responsibility of Class Counsel, and Class Counsel agree to indemnify and hold harmless Defendants from any claims or liability by any other Party claiming or seeking to claim any attorneys' fees or costs.

44.   Notice Procedure.

a.  The Settlement Administrator shall distribute the Settlement Notices and the Settlement Payments.

b.  Within ten (10) calendar days of the Court entering the Preliminary Approval Order, Defendants shall provide to the Settlement Administrator a list of Settlement Class Members that identifies for each Settlement Class Member (i) his/her last known e-mail address and mailing address that Defendants have in their possession, and Social Security Number or Federal Employer Identification Number, (ii) confirmation that each Settlement Class member did or did not complete a trip or receive payment for a completed trip in New York State at any time between December 29, 2012 and the date on which the Court enters the Preliminary Approval Order, and (iii) the total amount of New York State sales tax and Black Car Fund fees charged for rides for which each Settlement Class Member received payment at any time from December 29, 2009, through the date on which the Court enters the Preliminary Approval Order. The Settlement Administrator will keep the list strictly confidential, use it only for the purposes described herein, take adequate safeguards to protect confidential or private information and return or certify the destruction of the information upon completion of the Settlement Administration process.

c.  Within twenty (20) calendar days of the Court entering the Preliminary Approval Order and subject to Defendants providing the information required under Paragraph 44(b), the Settlement Administrator shall circulate to Defendants and Class Counsel for their approval the total number of Settlement Class Members to whom it intends to send the Settlement Notice, and the amount of each Settlement Class Member's individual Settlement Payment.

d.  Within thirty (30) calendar days of the Court entering the Preliminary Approval Order and subject to the Parties providing their approval set forth under Paragraph 44(c), the Settlement Administrator shall send a copy of the Settlement Notice to each Settlement Class Member by electronic mail.  The Settlement Administrator shall maintain a log detailing the instances Settlement Notices are returned as undeliverable.  Defendants' Counsel, Class Counsel and the Settlement Administrator collectively may correct immaterial errors on the

Settlement Notice or other mailed materials without approval from the Court provided the changes do not alter the preliminary approval by the Court.

e. Settlement Class Members will have thirty (30) calendar days from the initial electronic mailing of the Settlement Notice by the Settlement Administrator to opt-out of the Settlement, with proof of submission date being the postmark date. Settlement Class Members will also have thirty (30) calendar days to object to the Settlement by mailing any objection to the Settlement Administrator, with proof of submission date being the postmark date.

f. If any e-mails transmitting the Settlement Notice are returned as undeliverable, the Settlement Administrator shall send a copy of the Settlement Notice to the Settlement Class Member by mail within seven (7) calendar days. That Settlement Class Member will then have until the Bar Date or ten (10) calendar days after the Settlement Notice is sent by mail to opt-out or object to the Settlement, whichever is later. The Settlement Administrator shall then re-mail any Settlement Notice returned by the Post Office with a forwarding address. That Settlement Class Member will then have until the Bar Date or ten (10) calendar days after the Settlement Notice is re-mailed to opt-out or object to the Settlement, whichever is later. It shall be conclusively presumed that those Settlement Class Members whose re-mailed Settlement Notice is not returned to the Settlement Administrator as undeliverable within ten (10) calendar days after re-mailing, actually received the Settlement Notice. Within seven (7) calendar days of receiving any undelivered envelopes, the Settlement Administrator will perform one skip trace using Social Security Numbers provided by Defendants, as needed, to verify the accuracy of the addresses provided and re-mail the Settlement Notice for those forms returned to sender. That Settlement Class Member will then have until the Bar Date or ten (10) calendar days after the Settlement Notice is re-mailed to opt-out or object to the Settlement, whichever is later.

g. Within seven (7) calendar days of the Court adjourning the Final Fairness Hearing, or sooner if necessary and practicable, to the extent it happens, the Settlement Administrator shall mail a notice of the new date and time to any Settlement Class Member who submitted a timely and valid objection.

h. Within twenty (20) days prior to the Final Fairness Hearing, the Settlement Administrator shall provide Class Counsel and Defendants' Counsel with an Excel spreadsheet that designates each Settlement Class Member, his/her allocated share, and the appropriate totals and calculations. The Settlement Administrator shall also maintain lists of all Settlement Class Members who (i) object to the Settlement, and (ii) opt-out of the Settlement, which shall also be provided to Class Counsel and Defendants' Counsel at that time.

i. The Settlement Administrator shall provide to the Court, at or before the Final Fairness Hearing, a declaration confirming that the Settlement Notice was mailed to all Class Members as required by this Agreement.

45. Objections.

a. Class Members who do not opt-out of the Settlement and wish to present objections at the Final Fairness Hearing must first do so in writing by the Bar Date.

b. To be considered, the written objection must be mailed to the Settlement Administrator via United States First Class Mail, postage prepaid, and be postmarked by the United States Postal Service on or before the Bar Date.

c. The written objection must reference "*Ortega v. Uber Technologies, Inc.*, Case No. 1:15-cv-7387 (NGG) (JO)," and must include all reasons for the objection. The written objection must also include the name, address, and telephone number of the Class Member making the objection, and must bear his or her signature. The Settlement Administrator shall stamp the date received on the original and send copies of the objection and supporting documentation, along with the Settlement Notice mailed to the Objector, to Class Counsel and Defendants' Counsel by email and overnight delivery no later than three (3) days after receipt thereof. Class Counsel shall promptly file the date-stamped originals of any and all objections with the Court. The Parties may file with the Court written responses to any filed objections no later than three (3) days before the Final Fairness Hearing. It is the responsibility of any Objector to retain a copy of the objection and proof of timely mailing hereunder.

d. A valid Objector has the right to appear at the Final Fairness Hearing either in person or through counsel retained by the Objector. An Objector may withdraw his or her objections at any time.

46. <u>Opt-Out Procedure / Binding Nature Of This Agreement</u>.

a. Unless a Settlement Class Member opts-out of the Settlement described in this Agreement, he/she shall be bound by the terms and conditions of this Agreement, and shall also be bound by the Court's Order enjoining all Settlement Class Members from pursuing, or seeking to reopen, any of the Settled Claims against the Released Parties, regardless of whether he or she received actual or constructive notice of the Settlement. A Settlement Class Member will not be entitled to opt-out of the Settlement established by this Agreement unless he or she (i) makes a proper written request to opt-out of the Settlement, which request shall include words to the effect of "I elect to exclude myself from the settlement in *Ortega v. Uber Technologies, Inc.*, Case No. 1:15-cv-7387 (NGG) (JO)," as well as the Class Member's name, address, and telephone number, and shall bear the Class Member's signature, and (ii) returns the opt-out request to the Settlement Administrator so that it is received or postmarked on or before the Bar Date. Plaintiffs Ortega and Martinez may not opt-out of the Agreement.

b. The Settlement Administrator shall stamp the date received on the original and send copies of all opt-out requests to Class Counsel and Defendants' Counsel by email and overnight delivery within three (3) calendar days of receipt thereof.

c. Upon receipt of any opt-out request, the Settlement Administrator, Class Counsel and Defendants' Counsel shall review the request to verify the information contained therein, and to confirm that the request complies with the requirements of this Agreement. Upon receipt of a deficient or incomplete opt-out request, the Settlement Administrator will promptly notify the Settlement Class Member of the defect or deficiency and permit the Settlement Class Member to cure the defect within ten (10) calendar days or the Bar Date, whichever is later. Any opt-out request that is cured after the ten (10) calendar-day period or the Bar Date will be considered ineffective as measured by the postmark on the revised request.

      d.   Any Settlement Class Member who fails to submit a timely, complete and valid request to opt-out of the Settlement shall be barred from opting-out of this Agreement or the Settlement.  The Settlement Administrator shall not review or consider any opt-out request postmarked after the Bar Date (unless the ten-day cure period applies).  It shall be conclusively presumed that, if an opt-out request is not postmarked on or before the Bar Date (unless the ten-day cure period applies), the Settlement Class Member did not make the request in a timely manner.

      e.   If twenty-five (25) or more of the Class Members timely and validly opt-out of the Settlement, Defendants shall have the sole and absolute discretion to withdraw from this Agreement within fifteen (15) calendar days after receipt from the Settlement Administrator of the total number of timely opt-outs received.  Defendants shall provide written notice of such withdrawal to Class Counsel.  In the event that Defendants elect to so withdraw, the Agreement shall become null and void and have no further force or effect.

      47.   <u>Preliminary Approval Of Settlement</u>.   Upon execution of this Agreement, Plaintiffs shall promptly file a motion in the Action requesting that the Court enter the Preliminary Approval Order:

      a.   Preliminarily approving the proposed Settlement and this Agreement;

      b.   Approving the form of the Settlement Notice, and requiring that the Settlement Notice be sent to Settlement Class Members;

      c.   Scheduling the Final Fairness Hearing for consideration of class certification for settlement purposes and final approval of this Agreement no earlier than one hundred (100) days after the Court enters the Preliminary Approval Order;

      d.   Approving the procedure for Settlement Class Members to opt-out of the Settlement and approving the Bar Date as the date after which no Settlement Class Members shall be allowed to opt-out; and

      e.   Approving the procedure for Settlement Class Members to object to the Settlement, and setting the Bar Date as the date after which no Settlement Class Members shall be allowed to object.

      f.   Defendants shall not oppose Class Counsel's motion for preliminary approval of the Settlement so long as the motion and supporting papers are consistent with the terms of this Agreement.  Class Counsel shall provide Defendants with a reasonable opportunity to review, provide comments to, and approve the motion for preliminary approval of the Settlement before the motion and supporting papers are filed with the Court.  Notwithstanding the foregoing, Defendants may, without opposing the motion for preliminary approval, advise the Court if Defendants disagree with any of the factual statements included by Plaintiffs in the motion and supporting papers.

      48.   <u>Final Approval</u>.   Not later than fifteen (15) days before the Final Fairness Hearing, Plaintiffs shall submit a motion in the Action seeking final approval and judgment.  Class Counsel shall provide Defendants with a reasonable opportunity to review, provide

comments to, and approve the motion.

49.    Final Order.  Plaintiffs will request, and Defendants will concur in said request, that the Court enter, after the Final Fairness Hearing approving this Agreement, a Final Order drafted by Plaintiffs in the form that is consistent with this Agreement and subject to prior review and approval by Defendants.  Plaintiffs will request that the Court find that this Agreement and Settlement is fair, just, equitable, reasonable, adequate and in the best interests of the Settlement Class; permanently enjoin all Settlement Class Members from pursuing, or seeking to reopen, Settled Claims against the Released Parties; require the Parties to carry out the provisions of this Agreement; and dismiss all the individual claims asserted in the Action with prejudice, dismiss the class claims for breach of contract and false advertising asserted in the Action with prejudice as to all Settlement Class Members, and dismiss the remaining class claims asserted in the Action without prejudice.

50.    Distribution Of Settlement Payments, Counsel Fees, Counsel Costs, And Service Payments.  Twenty (20) calendar days after the Final Effective Date, Defendants shall remit the Gross Settlement Sum to the Settlement Administrator for distribution.  Within thirty (30) calendar days of this payment by Defendants, the Settlement Administrator shall mail Settlement Checks to Settlement Class Members, and distribute Counsel Fees, Counsel Costs, and the Service Payments.  Settlement Class Members shall have ninety (90) calendar days from the date of mailing to cash or deposit their Settlement Checks (the "Initial Check Cashing Period").  The Settlement Administrator shall notify the Parties in writing of the date the Settlement Checks shall be sent at least two business days before transmission. Settlement Checks not cashed within ninety (90) calendar days will be void.   Any amounts attributable to void and uncashed Settlement Checks from the Initial Check Cashing Period shall be redistributed to Settlement Class Members who have already cashed or deposited their Settlement Checks, based on their pro rata share of the NSS.  The Settlement Administrator shall notify the Parties in writing of the date the additional Settlement Checks shall be sent at least two business days before transmission.  Those Settlement Class Members will then have an additional sixty (60) calendar days (the "Additional Check Cashing Period") to cash or deposit the additional Settlement Checks.  Additional Settlement Checks not cashed within the Additional Check Cashing Period will be void, and any amounts attributable to those Settlement Checks shall revert to Defendants, and shall be returned to Defendants within fifteen (15) calendar days following the end of the Additional Check Cashing Period.   Settlement Class Members who do not redeem their Settlement Checks shall remain bound by this Settlement.  The provisions of any unclaimed property statute or law do not apply to this Action or this Agreement.  Defendants shall not be obligated to make any payments contemplated by this Agreement prior to the Final Effective Date, and no amounts will be owed or payable until all appeals or other collateral attacks have lapsed or have been favorably resolved in favor of the Settlement and no further challenge to the Settlement is possible.

51.    Automatic Voiding Of Agreement If Settlement Not Finalized.  If for any reason the Settlement does not become final, including if Defendants exercise their right to withdraw from this Agreement as set forth in Paragraph 46(e), the Settlement shall be null and void; the orders, judgment, and dismissal to be entered under this Agreement shall be vacated; and the Parties will be returned to the *status quo* prior to entering into this Agreement with respect to the Action, as if the Parties had never entered into this Agreement.  In addition, in such event, the

Agreement and all negotiations, Court orders and proceedings relating thereto shall be without prejudice to the rights of any and all Parties hereto, and evidence relating to the Agreement and all negotiations shall not be admissible or discoverable in the Action or otherwise.

a. If the Agreement is terminated after Settlement Notice is sent to Settlement Class Members, the Settlement Administrator shall notify Settlement Class Members that the settlement was voided, that as a result, no payments will be made under the Agreement, and that the Action will continue, along with any additional information jointly agreed to by Class Counsel and Defendants. The costs associated with mailing such notice, as well as all prior costs incurred by the Settlement Administrator, shall be split equally between Plaintiffs and Defendants.

b. If the class has already been certified for settlement purposes, the class that was certified as part of this Agreement shall be decertified and the Parties shall jointly move as soon as practicable to obtain an order granting decertification, and the fact of certification shall not be cited to, used, or admissible in any judicial, administrative, or arbitral proceeding for any purpose or with respect to any issue, substantive or procedural.

52. <u>Non-Interference With Claims Procedure</u>. The Parties and their counsel agree that they shall not seek to solicit or otherwise encourage Settlement Class Members to submit opt-outs or objections to the Settlement or to appeal from the Final Order and Final Judgment.

53. <u>Waiver Of Appeal</u>. Subject to preliminary and final approval of this Settlement, each Party expressly waives its right to appeal.

54. <u>Stipulated Second Amended Complaint</u>. In connection with the Settlement, and as a condition of the Settlement becoming final, Defendants hereby stipulate to the filing of the Stipulated Second Amended Complaint, attached as **Exhibit <u>C</u>** to this Agreement. As discussed above, if for any reason the Settlement does not become final, including if Defendants exercise their right to withdraw from this Agreement as set forth in Paragraph 46(e), the Settlement shall become null and void, and the Parties will be returned to the *status quo* prior to entering into this Agreement with respect to the Action. Accordingly, if the Settlement does not become final, the Parties' stipulation regarding the filing of the Second Amended Complaint shall also become null and void, and Plaintiff Ortega would be required to move forward with the pre-motion conference regarding his contemplated motion for reconsideration of the Court's order dismissing the claim, and/or for leave to amend, should he wish to pursue his currently dismissed claim for breach of contract.

55. <u>Entry Of Final Judgment</u>. At the Final Fairness Hearing, Plaintiffs will request that the Court enter a Final Judgment, and Defendants will concur in said request.

56. <u>Non-Disparagement / No Statements To The Press</u>.

a. Plaintiffs and Class Counsel agree not to make any negative or disparaging statements about Defendants, or to intentionally do anything that damages Defendants' reputation, financial status, or business relationships.

b. Prior to the filing of any motion for preliminary approval of this Settlement,

Plaintiffs and their counsel shall not: (i) issue a press release, or disclose to or otherwise notify the media about the terms of the proposed Settlement; and/or (ii) advertise any of the terms of the proposed Settlement through written, recorded or electronic communications.  To the extent Plaintiffs and/or their counsel are contacted by the media about the Settlement, they shall be permitted to respond to such inquiries only by stating that the Parties have reached a tentative settlement subject to court approval, which they believe to be a fair and reasonable settlement of the disputed claims.  Plaintiffs and their counsel may not disclose any of the specific terms of the Agreement to anyone other than their clients and any Settlement Class Members.  Any press release will be negotiated and agreed upon by the Parties.

      c.  After the filing of any motion for preliminary approval of this Settlement, Plaintiffs and/or their counsel are not permitted to make a statement to the press about the Settlement other than language that is mutually agreed upon by the Parties.

57.    <u>Notices</u>.  Except as otherwise specifically stated herein, all notices, requests, demands and other communications required or permitted to be given under this Agreement shall be in writing, and shall be delivered personally or by first class mail or by email to the attorneys listed in the caption above and to the Settlement Administrator.

58.    <u>Modification In Writing</u>.  This Agreement may be altered, amended, modified or waived, in whole or in part, only in a writing signed by all signatories to this Agreement.  This Agreement may not be amended, altered, modified or waived, in whole or in part, orally.

59.    <u>Ongoing Cooperation</u>.  Plaintiffs and Defendants and each of their respective counsel shall execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

60.    <u>Binding On Successors</u>.  This Agreement shall be binding and shall inure to the benefit of the Parties and their respective successors, assigns, executors, administrators, heirs and legal representatives.

61.    <u>Entire Agreement</u>.  This Agreement constitutes the full, complete and entire understanding, agreement and arrangement between Plaintiffs and the Settlement Class Members on the one hand, and Defendants on the other hand, with respect to the settlement of the Action and the Settled Claims against the Released Parties.  This Agreement supersedes any and all prior oral or written understandings, agreements and arrangements between the Parties with respect to the settlement of the Action and the Settled Claims against the Released Parties.  Except those set forth expressly in this Agreement, there are no other agreements, covenants, promises, representations or arrangements between the Parties with respect to the settlement of the Action and the Settled Claims against the Released Parties.

62.    <u>Execution In Counterparts</u>.  This Agreement may be signed in one or more counterparts.  All executed copies of this Agreement, and photocopies thereof (including facsimile and/or electronic copies of the signature pages), shall have the same force and effect and shall be as legally binding and enforceable as the original.

63.    <u>Facsimile and Email Signatures</u>.  Any signature made and transmitted by facsimile or email for the purpose of executing this Agreement shall be deemed an original

signature for purposes of this Agreement and shall be binding upon the party whose counsel transmits the signature page by facsimile or email.

64.   Captions.  The captions and paragraph numbers in this Agreement are inserted for the reader's convenience, and in no way define, limit, construe, or describe the scope or intent of the provisions of this Agreement.

65.   Governing Law.  This Agreement shall be interpreted, construed, enforced, and administered in accordance with the laws of the State of New York, without regard to conflict of law rules.

66.   Reservation Of Jurisdiction.  Notwithstanding the dismissal of this Action and entry and filing of Final Judgment, the Court shall retain jurisdiction for purposes of interpreting and enforcing the terms of this Agreement.

67.   Mutual Preparation.  The Parties have had a full opportunity to negotiate the terms and conditions of this Agreement.  Accordingly, this Agreement shall not be construed more strictly against one Party than another merely by virtue of the fact that it may have been prepared by counsel for one of the Parties, it being recognized that, because of the arm's-length negotiations between the Parties, all Parties have contributed to the preparation of this Agreement.

68.   Warranties And Representations.  With respect to themselves, each of the Parties to this Agreement and/or their agents or counsel represent, covenant and warrant that (a) they have full power and authority to enter into and consummate all transactions contemplated by this Agreement and have duly authorized the execution, delivery and performance of this Agreement, and (b) the person executing this Agreement has the full right, power and authority to enter into this Agreement on behalf of the Party for whom he/she has executed this Agreement, and the full right, power and authority to execute any and all necessary instruments in connection herewith, and to fully bind such Party to the terms and obligations of this Agreement.

69.   Representation By Counsel.  The Parties acknowledge that they have been represented by counsel throughout all negotiations that preceded the execution of this Agreement, and that this Agreement has been executed with the consent and advice of counsel. Further, Plaintiffs and Class Counsel warrant and represent that there are no liens on the Agreement, and that after entry by the Court of the Final Judgment, Defendants may distribute funds to Settlement Class Members, Class Counsel, and Plaintiffs as provided by this Agreement.

70.   Arms' Length Transaction; Materiality Of Terms.  The Parties have negotiated all the terms and conditions of this Agreement at arms' length.  All terms and conditions of this Agreement in the exact form set forth in this Agreement are material to this Agreement and have been relied upon by the Parties in entering into this Agreement, unless otherwise expressly stated.

71.   CAFA Notice. Defendants shall timely provide notice as required by the Class Action Fairness Act ("CAFA"). Nothing in this Agreement is intended to or does restrict or limit cooperation with or provision of information to any federal, state or local government agency.

72.    <u>Authorization By Plaintiffs</u>.  Plaintiffs' Counsel warrant and represent that they have consulted with Plaintiffs and have full authority to enter into this Agreement on behalf of Plaintiffs and the Settlement Class.  Plaintiffs further agree not to request to be excluded from the Settlement Class and not to object to any terms of this Agreement.  Any such request for exclusion or objection shall therefore be void and of no force or effect.

73.    <u>Acknowledgements / ADEA</u>.  To the extent applicable, Plaintiffs specifically understand and hereby acknowledge that they are releasing and waiving any and all claims that they may have under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, *et seq.*, as amended ("ADEA"), and by executing this Agreement represent that:

a.    Plaintiffs were afforded a full twenty-one (21) days within which to consider this Agreement before executing it, and if executed in less than twenty-one (21) days, the decision to do so was entirely voluntary on Plaintiffs' part and not the result of duress or coercion;

b.    Plaintiffs have carefully read and fully understand all of the provisions of this Agreement;

c.    Plaintiffs are, through this Agreement, releasing Defendants and the Released Parties from any and all claims Plaintiffs may have against Defendants and the Released Parties;

d.    Plaintiffs are knowingly and voluntarily agreeing to all of the terms set forth in this Agreement and to be bound by the same;

e.    Plaintiffs were advised and hereby are advised in writing to carefully consider the terms of this Agreement and consult with an attorney of Plaintiffs' choice prior to executing this Agreement;

f.    Plaintiffs have a full seven (7) days following the execution of this Agreement to revoke the Agreement and have been and hereby are advised in writing that this Agreement shall not become effective or enforceable until the seven (7) day revocation period has expired;

g.    For revocation to be effective, notice of revocation must be submitted in writing, signed by Plaintiffs, and timely delivered by first class mail to Defendants' Counsel, attention: Andrew M. Spurchise, Littler Mendelson PC, 900 3rd Avenue, 8th Floor, New York, NY 10022; and

h.    Plaintiffs understand that rights or claims under the ADEA that may arise after the date this Agreement is executed are not waived.

Dated:  January __, 2018
            _____, New York

                                          _____
                                          JOSE ORTEGA
                                          Plaintiff/Class Representative

Dated:  January __, 2018
            _____, New York

                                            _____
                                          JOCE MARTINEZ
                                          Plaintiff

Dated:  January __, 2018
            San Francisco, California

                                          _____
                                          Tony West (On Behalf of) UBER
                                          TECHNOLOGIES, INC.
                                          Defendant

Dated:  January __, 2018
            San Francisco, California

                                          _____
                                          Todd Hamblet (On Behalf of) UBER USA,
                                          LLC, RASIER, LLC
                                          Defendants

Dated:  January __, 2018                       COBURN & GREENBAUM, PLLC
            Washington, D.C.

                                          _____
                                          Jonathan Greenbaum
                                          *Attorneys for Plaintiffs*

Dated:  January __, 2018                    HELD & HINES LLP
        New York, New York


                                                 _____
                                                 Philip M. Hines
                                                 Marc J. Held
                                                 Scott B. Richman
                                                 *Attorneys for Plaintiffs*


Dated:  January __, 2018                    LITTLER MENDELSON, P.C.
        New York, New York


                                                 _____
                                                 Andrew M. Spurchise
                                                 Kevin R. Vozzo
                                                 Maayan Deker
                                                 *Attorneys for Defendants*
                                                 (Approved As To Form Only)

Dated: January _5th_, 2018
       _New York_ , New York

_____
JOSE ORTEGA
Plaintiff/Class Representative


Dated: January _5th_, 2018
       _New York_ , New York

_____
JOCE MARTINEZ
Plaintiff


Dated: January ___, 2018
       San Francisco, California

_____
Tony West (On Behalf of) UBER
TECHNOLOGIES, INC.
Defendant


Dated: January ___, 2018
       San Francisco, California

_____
Todd Hamblet (On Behalf of) UBER USA,
LLC, RASIER, LLC
Defendants


Dated: January ___, 2018
       Washington, D.C.

COBURN & GREENBAUM, PLLC


_____
Jonathan Greenbaum
_Attorneys for Plaintiffs_

20

Dated: January ___, 2018
        _____, New York


                                _____
                                JOSE ORTEGA
                                Plaintiff/Class Representative


Dated: January ___, 2018
        _____, New York


                                _____
                                JOCE MARTINEZ
                                Plaintiff


Dated: January 5, 2018
        San Francisco, California


                                _____
                                Tony West (On Behalf of) UBER
                                TECHNOLOGIES, INC.
                                Defendant


Dated: January 5, 2018
        San Francisco, California


                                _____
                                Todd Hamblet (On Behalf of) UBER USA,
                                LLC, RASIER, LLC
                                Defendants


Dated: January ___, 2018
        Washington, D.C.
                                COBURN & GREENBAUM, PLLC


                                _____
                                Jonathan Greenbaum
                                *Attorneys for Plaintiffs*

20

Dated: January 5, 2018
      New York, New York

HELD & HINES LLP

_____

Philip M. Hines
Marc J. Held
Scott B. Richman
*Attorneys for Plaintiffs*

Dated: January __, 2018
      New York, New York

LITTLER MENDELSON, P.C.

_____

Andrew M. Spurchise
Kevin R. Vozzo
Maayan Deker
*Attorneys for Defendants*
(Approved As To Form Only)

21

Dated: January __, 2018           HELD & HINES LLP
     New York, New York

_____

Philip M. Hines
Marc J. Held
Scott B. Richman
*Attorneys for Plaintiffs*


Dated: January _8_, 2018          LITTLER MENDELSON, P.C.
     New York, New York

_____

Andrew M. Spurchise
Kevin R. Vozzo
Maayan Deker
*Attorneys for Defendants*
(Approved As To Form Only)

Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| JOSE ORTEGA and JOCE MARTINEZ, on their own behalf, and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>UBER TECHNOLOGIES INC., RASIER LLC, UBER USA, LLC, UBER NEW YORK LLC, UBER TRANSPORTATION LLC, JOHN DOE "UBER AFFILIATES," fictitious name used to identify presently unknown entities,<br><br>Defendants. | No. 1:15-cv-7387 (NGG) (JO) |

---

## NOTICE OF PROPOSED CLASS ACTION LAWSUIT SETTLEMENT AND FINAL FAIRNESS HEARING

**TO:    ALL INDIVIDUALS WHO HAVE PROVIDED TRANSPORTATION SERVICES ARRANGED USING THE UBER APP WITHIN THE STATE OF NEW YORK AT ANY TIME BETWEEN DECEMBER 29, 2009, AND [DATE OF PRELIMINARY APPROVAL], AND WHO PURPORTED TO OPT-OUT OF ARBITRATION, OR WHOSE MOST RECENT AGREEMENT WITH DEFENDANTS AND/OR THE RELEASED PARTIES OTHERWISE DOES NOT CONTAIN AN ARBITRATION PROVISION, EXCLUDING INDIVIDUALS WHO EXCLUSIVELY PROVIDED TRANSPORTATION SERVICES ARRANGED USING UBER'S "UBERTAXI" PRODUCT.**

Uber Technologies, Inc. ("Uber"), Uber USA, LLC, and Rasier, LLC's records (collectively "Defendants") indicate that you provided transportation services arranged using Uber's software application (the "Uber App") within the State of New York between December 29, 2009, and [DATE OF PRELIMINARY APPROVAL], and are eligible to participate in the proposed settlement of the case captioned *Ortega v. Uber Technologies, Inc.*, Case No. 1:15-cv-7387 (NGG) (JO) (U.S. District Court, Eastern District of New York) (the "Action").

**PLEASE READ THIS NOTICE CAREFULLY.**  It contains important information about your rights concerning the settlement of the Action.  If the Court approves the settlement, you will be bound by its terms unless you affirmatively opt-out of the settlement.

1

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT INCLUDE THE FOLLOWING: | |
| --- | --- |
| DO NOTHING | If you do nothing, you will automatically participate in the settlement and receive a settlement payment. |
| EXCLUDE YOURSELF | <u>Get no payment</u>.  This is the only option that allows you to maintain your claims and, if you wish, to file your own lawsuit against Defendants for the claims released by the settlement. |
| OBJECT | If you choose, you may object to the settlement. The Court may or may not agree with your objection. Objecting to the settlement will not exclude you from the settlement. |

## 1.     WHAT IS THE PURPOSE OF THIS NOTICE?

You are receiving this notice because you have a right to know about a proposed settlement of a class action lawsuit, and about all of your options, before the Court decides whether to approve the settlement. You have the ability to participate in the settlement, or you may decline to do so.

This notice explains the process required for informing the attorneys and the Court of your decision. The notice also explains the process the Court has put in place for deciding whether to approve the settlement, and for administering the settlement if it is approved.

## 2.     WHAT IS THIS CASE ABOUT?

Plaintiffs Jose Ortega and Joce Martinez ("Plaintiffs"), who provided transportation services arranged using the Uber App, filed a putative class action lawsuit against Defendants, asserting, among other things, wage and hour claims under the New York Labor Law, common law claims for breach of contract, and a claim for false advertising, on behalf of themselves and other transportation providers in New York State ("drivers").

Plaintiffs premised their breach of contract claim on the theory that Defendants allegedly (i) inflated the service fee charged to drivers by: including sales tax and Black Car Fund fees "in the fare instead of calculating the fare net of such charges," allegedly causing drivers to pay an inflated service fee contrary to their agreements with Defendants; (ii) failed to remit taxes and fees, including sales tax and Black Car Fund fees to drivers; and (iii) failed to remit to drivers "the total proceeds of all gratuities" received.

Plaintiffs premised their false advertising claim on the theory that some of Defendants' advertising materials have been misleading insofar as they allegedly "offer[] guaranteed compensation without disclosing the actual conditions imposed," and that Defendants allegedly failed to remit "guaranteed payments promised" in the advertisements.

Defendants strenuously deny Plaintiffs' allegations, and maintain that they did not violate any laws with respect to Plaintiffs or Class Members.

The Court did not decide which side was right.  Both sides agreed to a settlement to resolve the Action, and to avoid further disputes, inconvenience, and expense.  The settlement is not to be construed as or deemed an admission of liability, culpability, negligence, or wrongdoing on the part of Defendants.

Defendants do not discourage your participation in the settlement, and will not take any retaliatory action against you for participating or not participating in the settlement.

## 3.      WHO IS INCLUDED IN THE SETTLEMENT?

All  individuals who (i) have provided transportation services arranged using the Uber App within the State of New York at any time between December 29, 2009, and [DATE OF PRELIMINARY APPROVAL], and (ii) purported to opt-out of arbitration, or whose most recent agreement with Defendants and/or the Released Parties otherwise does not contain an arbitration provision, as determined by Defendants' records, excluding individuals who exclusively provided transportation services arranged using Uber's "uberTAXI" product.

## 4.      WHAT ARE THE TERMS OF THE SETTLEMENT AGREEMENT?   HOW WILL MY SHARE OF THE SETTLEMENT BE CALCULATED?

Defendants have agreed to create a settlement fund of three-million dollars ($3,000,000.00). Before Class Members are paid, however, the following amounts may be removed from the settlement fund:

- Attorneys' Fees and Costs: Class Counsel will apply to the Court for recovery of fees not to exceed one third of the settlement fund, and costs not to exceed twenty-nine thousand fifty-five dollars ($29,055.00).

- Service Payment: The gross amount of two-thousand dollars ($2,000.00) will be paid to Plaintiff Ortega, in recognition of the services he contributed on behalf of the Settlement Class.

- Named Plaintiffs' Settlement Payments:  The gross amount of three-thousand five-hundred dollars ($3,500.00) will be paid to Plaintiffs Ortega and Martinez, in exchange for their general release of claims, as follows: two-thousand five-hundred dollars ($2,500.00) to be paid to Plaintiff Martinez, and one-thousand dollars ($1,000.00) to be paid to Plaintiff Ortega.

- Settlement Expenses: The cost of administering this settlement (sending this notice, re-sending it, sending the checks, etc.) is estimated to be twenty-five thousand dollars ($25,000.00).

If the Court approves all of these fees and payments, approximately _____ dollars ($\_\_\_\_\_) would remain in the settlement fund to pay Class Members based on the following formula. The individual Settlement Payment for each Settlement Class Member shall be determined by: (i) allocating to any Settlement Class Member who completed a trip and/or

3

received payment for a completed trip in New York State at any time between December 29, 2012, through [DATE OF PRELIMINARY APPROVAL] (which coincides with the statute of limitations period applicable to Plaintiffs' false advertising claim), as determined by Defendants' records, a flat amount of one hundred dollars ($100.00); and then (ii) taking (a) the remaining amount of the settlement fund, (b) divided by the total amount of New York State sales tax and Black Car fund fees charged for rides for which all Settlement Class Members received payment at any time from December 29, 2009, through [DATE OF PRELIMINARY APPROVAL], as determined by Defendants' records, (c) multiplied by the amount of New York State sales tax and Black Car Fund fees charged for rides for which each Settlement Class Member received payment during this time period, as determined by Defendants' records, and allocating those amounts accordingly.

Defendants' records indicate that $_____ in New York State sales tax and Black Car Fund fees were charged for rides for which you received payment from December 29, 2009, through [DATE OF PRELIMINARY APPROVAL]. Defendants' records also indicate that you [DID / DID NOT] complete a trip or receive payment for a completed trip in New York State between December 29, 2012, through [DATE OF PRELIMINARY APPROVAL]. Your estimated claim at this point is approximately _____ dollars ($_____).

If you believe these figures are incorrect and wish to dispute them, you must contact the Settlement Administrator, and provide any documentation and/or information supporting your contention, no later than [BAR DATE]. In the event of a dispute, Defendants' records will be presumed determinative, but the Parties will evaluate any information and evidence you timely submit to the Settlement Administrator, and then reach a final determination.

The payments made to you from the settlement fund shall be treated as non-wage income and reported on an IRS Form 1099.

**5.    WHAT IS THE LEGAL EFFECT OF THE SETTLEMENT?**

Unless you exclude yourself from the settlement, you will release Defendants from any claims premised on the theory that Defendants unlawfully failed to remit, withheld, or improperly calculated, all monies, fares, sales tax, Black Car Fund fees, and gratuities allegedly due to you per any contract or agreement between you and Defendants.

You will also release Defendants from any claims for false advertising based on advertisements related to drivers' use of the Uber App, driver earnings, and earnings "guarantees."

Specifically, unless you exclude yourself from the settlement, you will fully release Defendants and all affiliated entities, and their past, present, and future parent companies, affiliates, subsidiaries, divisions, predecessors, successors, partners, owners, joint ventures, affiliated organizations, shareholders, insurers, reinsurers and assigns, and each of its/their past, present and future officers, investors, executives, directors, trustees, agents, employees, attorneys, contractors (other than driver partners), representatives, plan fiduciaries and/or administrators, benefits plan sponsored or administered by Defendants or affiliated entities, or divisions, units, branches, and any other persons or entities acting on their behalf, including any party that was or

4

could have been named as a defendant in the Action (the "Released Parties") from any and all claims, causes of action, assertions of injury or harm, damages, debts, liabilities, demands, obligations, guarantees, liquidated damages, costs (including, but not limited to, settlement administration costs), entitlement to restitution or injunctive or declaratory relief, right to direct or indirect recovery of compensation, expenses, interest, and/or attorneys' fees, whether suspected or unsuspected, known or unknown, that you have had, now have, or may have in the future against Defendants, the Released Parties or any of them, for acts occurring at any time up to and including [DATE OF PRELIMINARY APPROVAL]: (i) arising from or related to the claim that Defendants or any of the Released Parties failed to remit all monies, including, without limitation, sales tax, Black Car Fund fees, gratuities, and fares, due to you, withheld payments due to you, or otherwise miscalculated the share of the fares or other amounts paid by riders to which Defendants, the Released Parties, and/or you were entitled, pursuant to any express or implied agreement(s), contract(s), promise(s), or covenant(s), including any and all claims, whether alleged under federal, state or local law, regulation or ordinance, common law or tort, for breach of contract (whether oral, written, implied, express or otherwise), breach of the implied covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, unlawful deductions under the New York Labor Law (including any related claims for liquidated damages), or otherwise based on the same or similar facts, allegations and/or theories asserted or that could have been asserted in the Action.  This includes any and all claims based on similar theories that are or could be asserted in *Haider v. Uber Technologies, Inc., et al.*, S.D.N.Y. Case No. 16-cv-4098-AKH ("*Haider*").  This does not include claims asserted in *Haider* based on Uber's "upfront pricing" program, or any other claim for unlawful deductions under the New York Labor Law not described above, including based on the theories that Uber unlawfully deducted amounts for vehicle payments and/or other alleged "tools of the trade," or the service fee drivers pay in exchange for the lead generation services provided to them through the Uber App. This also does not include any claim that, as a result of alleged misclassification of drivers as independent contractors,  Defendants or the Released Parties unlawfully failed to provide minimum wage, overtime, or spread-of-hours pay to drivers; and (ii) arising from or related to the claim that Defendants or any of the Released Parties engaged in false or misleading advertising, or deceptive business practices, in connection with advertisements and communications regarding drivers' use of the Uber App, driver earnings, and earnings "guarantees," whether arising under federal, state, or local law, including, without limitation, claims under New York General Business Law § 349 *et seq.*, and § 350 *et seq.*

**6.    DO I HAVE A LAWYER IN THIS CASE?**

The Court has decided that Jonathan Greenbaum, of Coburn & Greenbaum, PLLC, and Philip M. Hines, Marc J. Held, and Scott B. Richman, of Held & Hines LLP, are qualified to represent you and all other Class Members. These attorneys are called "Class Counsel." You do not need to hire your own attorney because Class Counsel is working on your behalf.  If you want to be represented by your own lawyer, you may hire one at your own expense.

If you have questions or desire additional details, you may call, email or correspond with Class Counsel. Here is the contact information for Class Counsel:

Jonathan Greenbaum                    Philip M. Hines
Coburn & Greenbaum, PLLC              Marc J. Held
1710 Rhode Island Avenue NW           Scott B. Richman
2nd Floor                             Held & Hines LLP
Washington, D.C. 20036                2004 Ralph Ave.
202.657.4490                          Brooklyn, N.Y. 11234
                                      718.531.9700

## 7.    HOW DO I OPT-OUT OF THE SETTLEMENT?

You have the option of opting-out of the settlement if you do not want to participate.  If you do not opt-out, you will be bound by the terms of the settlement, including the release described above.  To opt-out, you must mail a written opt-out request that includes words to the effect of "I elect to exclude myself from the settlement in *Ortega v. Uber Technologies, Inc.*, Case No. 1:15-cv-7387 (NGG) (JO)" to the Settlement Administrator by [INSERT BAR DATE].  The opt-out request must also state your name, address, and telephone number, bear your signature, and be postmarked no later than [INSERT BAR DATE].  If you choose to opt-out, send your opt-out request to: [INSERT SETTLEMENT ADMINISTRATOR ADDRESS].

If you exclude yourself from the settlement by opting-out, you will not get any settlement payment, and you cannot object to the settlement.

## 8.    WHAT IF I HAVE AN OBJECTION TO THE SETTLEMENT?

If you wish to present objections to the proposed settlement at the Final Fairness Hearing, you must first do so in writing by [INSERT BAR DATE].  Written objections must be mailed to the Settlement Administrator at the address listed above in Paragraph 7, and must be postmarked on or before [INSERT BAR DATE].  The Settlement Administrator will provide a copy of your objection to Class Counsel and Defendants' Counsel, and Class Counsel will file a copy with the Court.

Written objections must include reference to "*Ortega v. Uber Technologies, Inc.*, Case No. 1:15-cv-7387 (NGG) (JO)," and must include all reasons for the objection.  The written objection must also include your name, address, and telephone number, and it must bear your signature.

If you object to the settlement, you must include with your written objection an explanation of the basis for the objection, and any supporting documents.  If you do not comply with the foregoing procedures and deadlines for submitting written comments, you will <u>not</u> be entitled to contest or appeal from approval of the settlement or any award of attorneys' fees or expenses, or contest or appeal from any other orders or judgments of the Court entered in connection with the settlement.  The Parties may file with the Court written responses to any filed objections.

You cannot both object to the settlement and opt-out of the settlement.  If you opt-out, you have no basis to object because the case no longer affects you.

6

**9.**     **WHEN IS THE FINAL FAIRNESS HEARING?**

A hearing before the Honorable Nicholas G. Garaufis, U.S.D.J., will be held on _____ at _____, at the United States District Court, Eastern District of New York, 225 Cadman Plaza East, Brooklyn, New York 11201 (the "Final Fairness Hearing").  The purpose of this hearing will be for the Court to determine whether the settlement is fair, adequate, and reasonable, and whether it should be approved by the Court.  The Court will take into account any comments or objections you have submitted in accordance with the procedures described above.

**10.**     **HOW CAN I GET MORE INFORMATION?**

This notice does not contain all of the terms of the proposed settlement, or all of the details of these proceedings.  For more detailed information, you are advised to refer to the underlying documents and papers on file with the Court, including the Class Action Settlement Agreement and Release.  In addition, if you have questions about this notice or need additional information, you can contact the Settlement Administrator or Class Counsel.

Exhibit B

**UBER USA, LLC**

**TECHNOLOGY SERVICES AGREEMENT**

Last update: December 11, 2015

This Technology Services Agreement ("*Agreement*") constitutes a legal agreement between an independent company in the business of providing transportation services ("*Customer*" or "*You*") and Uber USA, LLC, a limited liability company ("*Uber*").

Uber provides the Uber Services (as defined below) for the purpose of providing lead generation to transportation services providers. The Uber Services enable an authorized transportation provider to seek, receive and fulfill requests for transportation services from an authorized user of Uber's mobile application.

Customer is authorized to provide transportation services in the state(s) and jurisdiction(s) in which it operates, and it desires to enter into this Agreement for the purpose of accessing and using the Uber Services to enhance its transportation business.

**Customer acknowledges and agrees that Uber is a technology services provider that does not provide transportation services, function as a transportation carrier, nor operate as a broker for the transportation of passengers.**

In order to use the Uber Services, Customer must agree to the terms and conditions that are set forth below. Upon Customer's execution (electronic or otherwise) of this Agreement, Customer and Uber shall be bound by the terms and conditions set forth herein.

**IMPORTANT: PLEASE NOTE THAT TO USE THE UBER SERVICES AND THE ASSOCIATED SOFTWARE, YOU MUST AGREE TO THE TERMS AND CONDITIONS SET FORTH BELOW. PLEASE REVIEW THE ARBITRATION PROVISION SET FORTH BELOW IN SECTION 15.3 CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH UBER ON AN INDIVIDUAL BASIS, EXCEPT AS PROVIDED IN SECTION 15.3, THROUGH FINAL AND BINDING ARBITRATION UNLESS YOU CHOOSE TO OPT OUT OF THE ARBITRATION PROVISION.  BY VIRTUE OF YOUR ELECTRONIC EXECUTION OF THIS AGREEMENT, YOU WILL BE ACKNOWLEDGING THAT YOU HAVE READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT (INCLUDING SECTION 15.3) AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT BUSINESS DECISION.  IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION, YOU MAY OPT OUT OF THE ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS PROVIDED IN SECTION 15.3 BELOW.**

1. **Definitions**

1.1.   "*Affiliate*" means an entity that, directly or indirectly, controls, is under the control of, or is under common control with a party, where control means having more than fifty percent (50%) of the voting stock or other ownership interest or the majority of the voting rights of such entity.

1.2.   "*City Addendum*" means an addendum to this Agreement or supplemental information setting forth additional Territory-specific terms, as made available and as updated by Uber from time to time.

1.3.   "*Device*" means an Uber Device or Driver-Provided Device, as the case may be.

1.4.   "*Driver*" means a principal, employee or contractor of Customer:  (a) who meets the then-current Uber requirements to be an active driver using the Uber Services; (b) whom Uber authorizes to access the Uber Services to provide Transportation Services on behalf of Customer; and (c) who has entered into the Driver Addendum.

1.5.   "*Driver Addendum*" means the terms and conditions that Customer is required to enter into with a Driver prior to such Driver providing Transportation Services on behalf of Customer (as may be updated by Uber from time to time).

1.6.   "*Driver App*" means Uber's mobile application that enables transportation providers to access the Uber Services for the purpose of seeking, receiving and fulfilling on-demand requests for transportation services by Users, as may be updated or modified by Uber at its discretion from time to time.

1.7.   "*Driver ID*" means the identification and password key assigned by Uber to a Driver that enables a Driver to use and access the Driver App.

1.8.   "*Driver-Provided Device*" means a mobile device owned or controlled by Customer or a Driver: (a) that meets the then-current Uber specifications for mobile devices as set forth at www.uber.com/byod-devices; and (b) on which the Driver App has been installed as authorized by Uber solely for the purpose of providing Transportation Services.

1.9.   "*Fare*" has the meaning set forth in Section 4.1.

1.10.   "*Service Fee*" has the meaning set forth in Section 4.4.

1.11.   "*Taxi Services*" has the meaning set forth in Section 3.1.

1.12.   "*Territory*" means the city or metro areas in the United States in which Customer and its Drivers are enabled by the Driver App to receive requests for Transportation Services.

1.13.   "*Tolls*" means any applicable road, bridge, ferry, tunnel and airport charges and fees, including inner-city congestion, environmental or similar charges as reasonably determined by the Uber Services based on available information.

1.14.   "*Transportation Services*" means the provision of passenger transportation services to Users via the Uber Services in the Territory by Customer and its Drivers using the Vehicles.

1.15.   "*Uber Data*" means all data related to the access and use of the Uber Services hereunder, including all data related to Users (including User Information), all data related to the provision of Transportation Services via the Uber Services and the Driver App, and the Driver ID.

1.16.   "*Uber Device*" means a mobile device owned or controlled by Uber that is provided to Customer or a Driver for the sole purpose of such Driver using the Driver App to provide Transportation Services.

1.17.   "*Uber Services*" mean Uber's on-demand lead generation and related services that enable transportation providers to seek, receive and fulfill on-demand requests for transportation services by Users seeking transportation services; such Uber Services include access to the Driver App and Uber's software, websites, payment services as described in Section 4 below, and related support services systems, as may be updated or modified by Uber at its discretion from time to time.

1.18.   "*User*" means an end user authorized by Uber to use Uber's mobile application for the purpose of obtaining Transportation Services offered by Uber's transportation provider customers.

1.19.   "*User Information*" means information about a User made available to Customer or a Driver in connection with such User's request for and use of Transportation Services, which may include the User's name, pick-up location, contact information and photo.

1.20.   "*Vehicle*" means any vehicle of Customer that:  (a) meets the then-current Uber requirements for a vehicle on the Uber Services; and (b) Uber authorizes for use by a Driver for the purpose of providing Transportation Services on behalf of Customer.

2.   **Use of the Uber Services**

2.1.   **Driver IDs**. Uber will issue Customer a Driver ID for each Driver providing Transportation Services to enable Customer and each Driver to access and use the Driver App on a Device in accordance with the Driver Addendum and this Agreement. Uber reserves the right to deactivate the Driver ID of those Drivers who have not fulfilled a request for Transportation Services using the Driver App at least once a month. **Customer agrees that it will, and that it will ensure that its Drivers will, maintain Driver IDs in confidence and not share Driver IDs with any third party other than the Driver associated with such Driver ID for the purpose of providing Transportation Services. Customer will immediately notify Uber of any actual or suspected breach or improper use or disclosure of a Driver ID or the Driver App.**

2.2.   **Provision of Transportation Services**. When the Driver App is active, User requests for Transportation Services may appear to a Driver via the Driver App if the Driver is available and in the vicinity of the User. If a Driver accepts a User's request for Transportation Services, the Uber Services will provide certain User Information to such Driver via the Driver App, including the User's first name and pickup location. In order to enhance User satisfaction with the Uber mobile application and a Driver's Transportation Services, it is recommended that Driver waits at least ten (10) minutes for a User to show up at the requested pick-up location. The Driver will obtain the destination from the User, either in person upon pickup or from the Driver App if the User elects to enter such destination via Uber's mobile application. Customer acknowledges and agrees that once a Driver has accepted a User's request for Transportation Services, Uber's mobile application may provide certain information about the Driver to the User, including the Driver's first name, contact information, Customer entity name, photo and location, and the Driver's Vehicle's make and license plate number. Customer shall not, and shall ensure that all Drivers do not, contact any Users or use any User's personal data for any reason other than for the purposes of fulfilling Transportation Services. As between Uber and Customer, Customer acknowledges and agrees that:  (a) Customer and its Drivers are solely responsible for determining the most effective, efficient and safe manner to perform each instance of Transportation Services; and (b) except for the Uber Services or any Uber Devices (if applicable), Customer shall provide all necessary equipment, tools and other materials, at Customer's own expense, necessary to perform Transportation Services. Customer understands and agrees that Customer and each Driver have a legal obligation under the Americans with Disabilities Act and

similar state laws to transport Users with Service Animals (as defined by applicable state and federal law), including guide dogs for the blind and visually impaired Users, and there is no exception to this obligation for allergies or religious objections. Customer's or any Driver's knowing failure to transport a User with a Service Animal shall constitute a material breach of this Agreement. Customer agrees that a "knowing failure" to comply with this legal obligation shall constitute either: (1) a denial of a ride where the Customer/Driver states the denial was due to a Service Animal; or (2) there is more than one (1) instance in which a User or the companion of a User alleges that the Customer/Driver cancelled or refused a ride on the basis of a Service Animal.

2.3.    **Customer's Relationship with Users**. Customer acknowledges and agrees that Customer's provision of Transportation Services to Users creates a direct business relationship between Customer and the User. Uber is not responsible or liable for the actions or inactions of a User in relation to Customer or any Driver, the activities of Customer, a Driver or any Vehicle. Customer shall have the sole responsibility for any obligations or liabilities to Users or third parties that arise from its provision of Transportation Services. Customer acknowledges and agrees that it and each Driver are solely responsible for taking such precautions as may be reasonable and proper (including maintaining adequate insurance that meets the requirements of all applicable laws including motor vehicle financial responsibility) regarding any acts or omissions of a User or third party. Customer acknowledges and agrees that Uber may release the contact and/or insurance information of Customer and/or a Driver to a User upon such User's reasonable request. Customer acknowledges and agrees that, unless specifically consented to by a User, neither Customer nor Driver may transport or allow inside any Vehicle individuals other than a User and any individuals authorized by such User during the performance of Transportation Services for such User. Customer acknowledges and agrees, and shall ensure that its Drivers agree, that all Users should be transported directly to their specified destination, as directed by the applicable User, without unauthorized interruption or unauthorized stops.

2.4.    **Customer's Relationship with Uber**. Customer acknowledges and agrees that Uber's provision to Customer of the Driver App and the Uber Services creates a direct business relationship between Uber and Customer. Uber does not, and shall not be deemed to, direct or control Customer or its Drivers generally or in their performance under this Agreement specifically, including in connection with the operation of Customer's business, the provision of Transportation Services, the acts or omissions of Drivers, or the operation and maintenance of any Vehicles. Customer and its Drivers retain the sole right to determine when, where, and for how long each of them will utilize the Driver App or the Uber Services. Customer and its Drivers retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Uber's then-current cancellation policies. With the exception of any signage required by local law or permit/license requirements, Uber shall have no right to require Customer or any Driver to:  (a) display Uber's or any of its Affiliates' names, logos or colors on any Vehicle(s); or (b) wear a uniform or any other clothing displaying Uber's or any of its Affiliates' names, logos or colors. Customer acknowledges and agrees that it has complete discretion to operate its independent business and direct its Drivers at its own discretion, including the ability to provide services at any time to any third party separate and apart from Transportation Services. For the sake of clarity, Customer understands that Customer retains the complete right to provide transportation services to its existing customers and to use other software application services in addition to the Uber Services. Uber retains the right to deactivate or otherwise restrict Customer or any Driver from accessing or

using the Driver App or the Uber Services in the event of a violation or alleged violation of this Agreement, a violation or alleged violation of a Driver Addendum, Customer's or any Driver's disparagement of Uber or any of its Affiliates, Customer's or any Driver's act or omission that causes harm to Uber's or its Affiliates' brand, reputation or business as determined by Uber in its sole discretion.

2.5.     **Customer's Relationship with Drivers**. Customer shall have the sole responsibility for any obligations or liabilities to Drivers that arise from its relationship with its Drivers (including provision of Transportation Services). Customer acknowledges and agrees that it exercises sole control over the Drivers and will comply with all applicable laws (including tax, social security and employment laws) governing or otherwise applicable to its relationship with its Drivers. Notwithstanding Customer's right, if applicable, to take recourse against a Driver, Customer acknowledges and agrees that it is at all times responsible and liable for the acts and omissions of its Drivers vis-à-vis Users and Uber, even where such vicarious liability may not be mandated under applicable law. Customer shall require each Driver to enter into a Driver Addendum (as may be updated from time to time) and shall provide a copy of each executed Driver Addendum to Uber. Customer acknowledges and agrees that Uber is a third party beneficiary of each Driver Addendum, and that, upon a Driver's acceptance of the terms and conditions of the Driver Addendum, Uber will have the right (and will be deemed to have accepted the right) to enforce the Driver Addendum against the Driver as a third party beneficiary thereof.

2.6.     **Ratings**.

2.6.1.     Customer acknowledges and agrees that:  (a) after receiving Transportation Services, a User will be prompted by Uber's mobile application to provide a rating of such Transportation Services and Driver and, optionally, to provide comments or feedback about such Transportation Services and Driver; and (b) after providing Transportation Services, the Driver will be prompted by the Driver App to provide a rating of the User and, optionally, to provide comments or feedback about the User. Customer shall instruct all Drivers to provide ratings and feedback in good faith.

2.6.2.     Customer acknowledges that Uber desires that Users have access to high-quality services via Uber's mobile application. In order to continue to receive access to the Driver App and the Uber Services, each Driver must maintain an average rating by Users that exceeds the minimum average acceptable rating established by Uber for the Territory, as may be updated from time to time by Uber in its sole discretion ("*Minimum Average Rating*"). A Driver's average rating is intended to reflect Users' satisfaction with the Driver's Transportation Services rather than any such Driver's compliance with any of Uber's policies or recommendations. In the event a Driver's average rating falls below the Minimum Average Rating, Uber will notify Customer and may provide the Driver in Uber's discretion, a limited period of time to raise his or her average rating above the Minimum Average Rating. If such Driver does not increase his or her average rating above the Minimum Average Rating within the time period allowed (if any), Uber reserves the right to deactivate such Driver's access to the Driver App and the Uber Services. Additionally, Customer acknowledges and agrees that repeated failure by a Driver to accept User requests for Transportation Services while such Driver is logged in to the Driver App creates a negative experience for Users of Uber's mobile application. Accordingly, Customer agrees and shall ensure that if a Driver does not wish to accept User requests for Transportation Services for a period of time, such Driver will log off of the Driver App.

2.6.3.   Uber and its Affiliates reserve the right to use, share and display Driver and User ratings and comments in any manner in connection with the business of Uber and its Affiliates without attribution to or approval of Customer or the applicable Driver. Customer acknowledges that Uber and its Affiliates are distributors (without any obligation to verify) and not publishers of Driver and User ratings and comments, provided that Uber and its Affiliates reserve the right to edit or remove comments in the event that such comments include obscenities or other objectionable content, include an individual's name or other personal information, or violate any privacy laws, other applicable laws or Uber's or its Affiliates' content policies.

2.7.   **Devices**.

2.7.1.   Uber encourages Customer to use Driver-Provided Devices in providing Transportation Services.  Otherwise, if Customer elects to use any Uber Devices, Uber will supply Uber Devices upon request to each authorized Driver and provide the necessary wireless data plan for such Devices, provided that Uber will require reimbursement from Customer for the costs associated with the wireless data plan of each Uber Device and/or request a deposit for each Uber Device. Customer acknowledges and agrees that: (a) Uber Devices may only be used for the purpose of enabling Driver access to the Uber Services; and (b) Uber Devices may not be transferred, loaned, sold or otherwise provided in any manner to any party other than the Driver assigned to use such Uber Device. Uber Devices shall at all times remain the property of Uber, and upon termination of this Agreement or the termination or deactivation of a Driver, Customer agrees to return to Uber the applicable Uber Devices within ten (10) days. Customer acknowledges and agrees that failure to timely return any Uber Devices, or damage to Uber Devices outside of "normal wear and tear," will result in the forfeiture of related deposits.

2.7.2.   If Customer elects to use any Driver-Provided Devices:  (i) Customer and/or its Drivers are responsible for the acquisition, cost and maintenance of such Driver-Provided Devices as well as any necessary wireless data plan; and (ii) Uber shall make available the Driver App for installation on such Driver-Provided Devices. Uber hereby grants the authorized user of any Driver-Provided Device a personal, non-exclusive, non-transferable license to install and use the Driver App on a Driver-Provided Device solely for the purpose of providing Transportation Services. Customer agrees to not, and shall cause each applicable Driver to not, provide, distribute or share, or enable the provision, distribution or sharing of, the Driver App (or any data associated therewith) with any third party. The foregoing license grant shall immediately terminate and Driver will delete and fully remove the Driver App from the Driver-Provided Device in the event that Customer and/or the applicable Driver ceases to provide Transportation Services using the Driver-Provided Device. Customer agrees, and shall inform each applicable Driver that: (i) use of the Driver App on a Driver-Provided Device requires an active data plan with a wireless carrier associated with the Driver-Provided Device, which data plan will be provided by either Customer or the applicable Driver at their own expense; and (ii) use of the Driver App on a Driver-Provided Device as an interface with the Uber Services may consume very large amounts of data through the data plan. **UBER ADVISES THAT DRIVER-PROVIDED DEVICES ONLY BE USED UNDER A DATA PLAN WITH UNLIMITED OR VERY HIGH DATA USAGE LIMITS, AND UBER SHALL NOT BE RESPONSIBLE**

**OR LIABLE FOR ANY FEES, COSTS, OR OVERAGE CHARGES ASSOCIATED WITH ANY DATA PLAN.**

2.8. **Location Based Services**. Customer acknowledges and agrees that each Driver's geo-location information must be provided to the Uber Services via a Device in order to provide Transportation Services. Customer acknowledges and agrees, and shall inform and obtain the consent of each Driver, that:  (a) the Driver's geo-location information may be obtained by the Uber Services while the Driver App is running; and (b) the approximate location of the Driver's Vehicle will be displayed to the User before and during the provision of Transportation Services to such User. In addition, Company and its Affiliates may monitor, track and share with third parties Driver's geo-location information obtained by the Driver App and Device for safety and security purposes.

3. **Drivers and Vehicles**

3.1. **Driver Requirements**. Customer acknowledges and agrees that each Driver shall at all times:  (a) hold and maintain (i) a valid driver's license with the appropriate level of certification to operate the Vehicle assigned to such Driver, and (ii) all licenses, permits, approvals and authority applicable to Customer and/or Driver that are necessary to provide passenger transportation services to third parties in the Territory; (b) possess the appropriate and current level of training, expertise and experience to provide Transportation Services in a professional manner with due skill, care and diligence; and (c) maintain high standards of professionalism, service and courtesy. Customer acknowledges and agrees that each Driver may be subject to certain background and driving record checks from time to time in order for such Driver to qualify to provide, and remain eligible to provide, Transportation Services. In addition if Customer and/or Driver are using the Uber App to provide Transportation Services in conjunction with operating a taxi ("*Taxi Services*"), such Customer and/or Driver shall comply with all applicable laws with respect thereto. Customer acknowledges and agrees that Uber reserves the right, at any time in Uber's sole discretion, to deactivate or otherwise restrict a Driver from accessing or using the Driver App or the Uber Services if Customer or such Driver fails to meet the requirements set forth in this Agreement or the Driver Addendum.

3.2. **Vehicle Requirements**. Customer acknowledges and agrees that each Vehicle shall at all times be:  (a) properly registered and licensed to operate as a passenger transportation vehicle in the Territory; (b) owned or leased by Customer, or otherwise in Customer's lawful possession; (c) suitable for performing the passenger transportation services contemplated by this Agreement; and (d) maintained in good operating condition, consistent with industry safety and maintenance standards for a Vehicle of its kind and any additional standards or requirements in the applicable Territory, and in a clean and sanitary condition.

3.3. **Documentation**. To ensure Customer's and each of its Drivers' compliance with all requirements in Sections 3.1 and 3.2 above, Customer must provide Uber with written copies of all such licenses, permits, approvals, authority, registrations and certifications prior to Customer's and the applicable Drivers' provision of any Transportation Services.  Thereafter, Customer must submit to Uber written evidence of all such licenses, permits, approvals, authority, registrations and certifications as they are renewed. Uber shall, upon request, be entitled to review such licenses, permits, approvals, authority, registrations and certifications from time to time, and Customer's failure to provide or maintain any of the foregoing shall constitute a material breach of this Agreement. Uber reserves the right to independently verify Customer's and any Driver's documentation from time to time in any way Uber deems appropriate in its reasonable discretion.

4.   **Financial Terms**

4.1.   **Fare Calculation and Customer Payment**. Customer is entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services (*"Fare"*), where such Fare is calculated based upon a base fare amount plus distance (as determined by Uber using location-based services enabled through the Device) and/or time amounts, as detailed at www.uber.com/cities for the applicable Territory ("*Fare Calculation*"). Customer acknowledges and agrees that the Fare provided under the Fare Calculation is the only payment Customer will receive in connection with the provision of Transportation Services, and that neither the Fare nor the Fare Calculation includes any gratuity. Customer is also entitled to charge User for any Tolls, taxes or fees incurred during the provision of Transportation Services, and, if applicable. Customer:  (i) appoints Uber as Customer's limited payment collection agent solely for the purpose of accepting the Fare, applicable Tolls and, depending on the region and/or if requested by Customer, applicable taxes and fees from the User on behalf of the Customer via the payment processing functionality facilitated by the Uber Services; and (ii) agrees that payment made by User to Uber (or to an Affiliate of Uber acting as an agent of Uber) shall be considered the same as payment made directly by User to Customer. In addition, the parties acknowledge and agree that as between Customer and Uber, the Fare is a recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event Customer does not negotiate a different amount. Customer shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at Customer's request, a Fare that is lower than the pre-arranged Fare (each of (i) and (ii) herein, a "*Negotiated Fare*"). Uber shall consider all such requests from Customer in good faith. Uber agrees to remit, or cause to be remitted, to Customer on at least a weekly basis:  (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending on the region, certain taxes and ancillary fees. If Customer has separately agreed that other amounts may be deducted from the Fare prior to remittance to Customer (*e.g.*, vehicle financing payments, lease payments, mobile device usage charges, etc.), the order of any such deductions from the Fare shall be determined exclusively by Uber (as between Customer and Uber).  Notwithstanding anything to the contrary in this Section 4.1, if Customer is providing Taxi Services, the following shall apply: (x) the Fare is calculated pursuant to local taxi regulations in the Territory; (y) Customer or Driver agrees to enter the exact Fare amount (as indicated by the official taxi meter in the Vehicle) into the Driver App upon completion of an instance of Transportation Services; and (z) in some jurisdictions, Users will pay such Customer or Driver directly rather than through Uber's mobile application (Uber will notify Customer if (z) is applicable in its Territory).

4.2.   **Changes to Fare Calculation**. Uber reserves the right to change the Fare Calculation at any time in Uber's discretion based upon local market factors, and Uber will provide notice to Customer in the event of changes to the base fare, per mile, and/or per minute amounts that would result in a change in the recommended Fare for each instance of completed Transportation Services. Continued use of the Uber Services after any such change in the Fare Calculation shall constitute Customer's consent to such change.

4.3.   **Fare Adjustment**. Uber reserves the right to:  (i) adjust the Fare for a particular instance of Transportation Services (*e.g.*, Driver took an inefficient route, Driver failed to properly end a particular instance of Transportation Services in the Driver App, technical error in the Uber Services, etc.); or (ii) cancel the Fare for a particular instance of Transportation Services (*e.g.*, a User is charged for Transportation Services that were not provided, in the event of a User

complaint, fraud, etc.). Uber's decision to reduce or cancel the Fare in any such manner shall be exercised in a reasonable manner.

4.4. **Service Fee**. In consideration of Uber's provision of the Driver App and the Uber Services for the use and benefit of Customer and its Drivers hereunder, Customer agrees to pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare), as provided to Customer and/or a Driver via email or otherwise made available electronically by Uber from time to time for the applicable Territory ("*Service Fee*"). In the event regulations applicable to Customer's Territory require taxes to be calculated on the Fare, Uber shall calculate the Service Fee based on the Fare net of such taxes. Uber reserves the right to change the Service Fee at any time in Uber's discretion based upon local market factors, and Uber will provide notice to Customer in the event of such change. Continued use of the Uber Services after any such change in the Service Fee calculation shall constitute Customer's consent to such change. In addition, with respect to Taxi Services in the applicable Territory, Customer agrees to pay Uber a booking fee in consideration of Uber's provision of the Driver App and the Uber Services.

4.5. **Cancellation Charges**. Customer acknowledges and agrees that Users may elect to cancel requests for Transportation Services that have been accepted by a Driver via the Driver App at any time prior to the Driver's arrival. In the event that a User cancels an accepted request for Transportation Services, Uber may charge the User a cancellation fee on behalf of the Customer. If charged, this cancellation fee shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to Customer hereunder ("*Cancellation Fee*"). The parties acknowledge and agree that as between Customer and Uber, this Cancellation Fee is a recommended amount, and the primary purpose of such Cancellation Fee is to act as a default amount in the event Customer does not negotiate a different amount. Customer shall always have the right to:  (i) charge a cancellation fee that is less than the Cancellation Fee; or (ii) negotiate, at your request, a cancellation fee that is lower than the Cancellation Fee (each of (i) and (ii) herein, a "*Negotiated Cancellation Fee*"). If charged, the Cancellation Fee (regardless of any Negotiated Cancellation Fee) shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to Customer hereunder.

4.6. **Receipts**. As part of the Uber Services, Uber provides Customer a system for the delivery of receipts to Users for Transportation Services rendered. Upon the completion of Transportation Services for a User by a Driver, Uber prepares an applicable receipt and issues such receipt to the User via email on behalf of the Customer and applicable Driver. Such receipts are also provided via email or the online portal available to Customer through the Uber Services. Receipts include the breakdown of amounts charged to the User for Transportation Services and may include specific information about the Customer and applicable Driver, including the Customer's entity name and contact information and the Driver's name and photo, as well as a map of the route taken by the Driver. Customer shall inform Drivers that any corrections to a User's receipt for Transportation Services must be submitted to Uber in writing within three (3) business days after the completion of such Transportation Services. Absent such a notice, Uber shall not be liable for any mistakes in or corrections to the receipt or for recalculation or disbursement of the Fare.

4.7. **No Additional Amounts**. Customer acknowledges and agrees that, for the mutual benefit of the parties, through advertising and marketing, Uber and its Affiliates may seek to attract new Users to Uber and to increase existing Users' use of Uber's mobile application. Customer

acknowledges and agrees such advertising or marketing does not entitle Customer to any additional monetary amounts beyond the amounts expressly set forth in this Agreement.

4.8.    **Taxes**. Customer acknowledges and agrees that it is required to:  (a) complete all tax registration obligations and calculate and remit all tax liabilities related to its and its Drivers' provision of Transportation Services as required by applicable law; and (b) provide Uber with all relevant tax information. Customer further acknowledges and agrees that it is responsible for taxes on its own income (and that of its Drivers) arising from the performance of Transportation Services. Notwithstanding anything to the contrary in this Agreement, Uber may in its reasonable discretion based on applicable tax and regulatory considerations, collect and remit taxes resulting from its or its Drivers' provision of Transportation Services and/or provide any of the relevant tax information provided by Customer or any Driver pursuant to the foregoing requirements in this Section 4.8 directly to the applicable governmental tax authorities on your behalf or otherwise.

5.    **Proprietary Rights; License**

5.1.    **License Grant**. Subject to the terms and conditions of this Agreement, Uber hereby grants Customer a non-exclusive, non-transferable, non-sublicensable, non-assignable license, during the term of this Agreement, to use (and allows its Drivers to use) the Uber Services (including the Driver App on a Device) solely for the purpose of providing Transportation Services to Users and tracking resulting Fares and Fees. All rights not expressly granted to Customer are reserved by Uber, its Affiliates and their respective licensors.

5.2.    **Restrictions**. Customer shall not, and shall not allow any other party to:  (a) license, sublicense, sell, resell, transfer, assign, distribute or otherwise provide or make available to any other party the Uber Services, Driver App or any Uber Device in any way; (b) modify or make derivative works based upon the Uber Services or Driver App; (c) improperly use the Uber Services or Driver App, including creating Internet "links" to any part of the Uber Services or Driver App, "framing" or "mirroring" any part of the Uber Services or Driver App on any other websites or systems, or "scraping" or otherwise improperly obtaining data from the Uber Services or Driver App; (d) reverse engineer, decompile, modify, or disassemble the Uber Services or Driver App, except as allowed under applicable law; or (e) send spam or otherwise duplicative or unsolicited messages. In addition, Customer shall not, and shall not allow any other party to, access or use the Uber Services or Driver App to:  (i) design or develop a competitive or substantially similar product or service; (ii) copy or extract any features, functionality, or content thereof; (iii) launch or cause to be launched on or in connection with the Uber Services an automated program or script, including web spiders, crawlers, robots, indexers, bots, viruses or worms, or any program which may make multiple server requests per second, or unduly burden or hinder the operation and/or performance of the Uber Services; or (iv) attempt to gain unauthorized access to the Uber Services or its related systems or networks.

5.3.    **Ownership**. The Uber Services, Driver App and Uber Data, including all intellectual property rights therein, and the Uber Devices are and shall remain the property of Uber, its Affiliates or their respective licensors. Neither this Agreement nor Customer's use of the Uber Services, Driver App or Uber Data conveys or grants to Customer any rights in or related to the Uber Services, Driver App or Uber Data, except for the limited license granted above. Customer is not permitted to use or reference in any manner Uber's, its Affiliates', or their respective licensors' company names, logos, product and service names, trademarks, service marks or other indicia of ownership, alone or in combination with other letters, punctuation, words, symbols and/or designs (the "*UBER Marks and Names*"). Customer will not try to register or otherwise claim

ownership in any of the UBER Marks and Names, alone or in combination with other letters, punctuation, words, symbols and/or designs or in any confusingly similar mark or name.

6.  **Confidentiality**

6.1.   Each party acknowledges and agrees that in the performance of this Agreement it may have access to or may be exposed to, directly or indirectly, confidential information of the other party ("*Confidential Information*"). Confidential Information includes Uber Data, Driver IDs, User Information, and the transaction volume, marketing and business plans, business, financial, technical, operational and such other non-public information of each party (whether disclosed in writing or verbally) that such party designates as being proprietary or confidential or of which the other party should reasonably know that it should be treated as confidential.

6.2.   Each party acknowledges and agrees that:  (a) all Confidential Information shall remain the exclusive property of the disclosing party; (b) it shall not use Confidential Information of the other party for any purpose except in furtherance of this Agreement; (c) it shall not disclose Confidential Information of the other party to any third party, except to its employees, officers, contractors, agents and service providers ("*Permitted Persons*") as necessary to perform under this Agreement, provided Permitted Persons are bound in writing to obligations of confidentiality and non-use of Confidential Information no less protective than the terms hereof; and (d) it shall return or destroy all Confidential Information of the disclosing party, upon the termination of this Agreement or at the request of the other party (subject to applicable law and, with respect to Uber, its internal record-keeping requirements).

6.3.   Notwithstanding the foregoing, Confidential Information shall not include any information to the extent it:  (a) is or becomes part of the public domain through no act or omission on the part of the receiving party; (b) was possessed by the receiving party prior to the date of this Agreement without an obligation of confidentiality; (c) is disclosed to the receiving party by a third party having no obligation of confidentiality with respect thereto; or (d) is required to be disclosed pursuant to law, court order, subpoena or governmental authority, provided the receiving party notifies the disclosing party thereof and provides the disclosing party a reasonable opportunity to contest or limit such required disclosure.

7.  **Privacy**

7.1.   **Disclosure of Customer or Driver Information**. Subject to applicable law and regulation, Uber may, but shall not be required to, provide to Customer, a Driver, a User, an insurance company and/or relevant authorities and/or regulatory agencies any information (including personal information (*e.g.*, information obtained about a Driver through any background check) and any Uber Data) about Customer, a Driver, or any Transportation Services provided hereunder if:  (a) there is a complaint, dispute or conflict, including an accident, between Customer or a Driver on the one hand and a User on the other hand; (b) it is necessary to enforce the terms of this Agreement; (c) it is required, in Uber's or any Affiliate's sole discretion, by applicable law or regulatory requirements (*e.g.*, Uber or its Affiliate receives a subpoena, warrant, or other legal process for information); (d) it is necessary, in Uber's or any Affiliate's sole discretion, to (1) protect the safety, rights, property or security of Uber or its Affiliates, the Uber Services or any third party; (2) protect the safety of the public for any reason including the facilitation of insurance claims related to the Uber Services; (3) detect, prevent or otherwise address fraud, security or technical issues; and/or (4) prevent or stop activity Uber or its Affiliates, in their sole discretion, may consider to be, or to pose a risk of being, an illegal, unethical, or legally actionable activity); or (e) it is required or necessary, in Uber's or any of its Affiliate's sole

discretion, for insurance or other purposes related to Customer's or any Driver's ability to qualify, or remain qualified, to use the Uber Services. Customer understands that Uber may retain and its Drivers' personal data for legal, regulatory, safety and other necessary purposes after this Agreement is terminated.

7.2.    Uber and its Affiliates may collect personal data from Customer or a Driver during the course of Customer's or such Driver's application for, and use of, the Uber Services, or obtain information about Customer or any Drivers from third parties. Such information may be stored, processed, transferred, and accessed by Uber and its Affiliates,  third parties and service providers, for business purposes, including for marketing, lead generation, service development and improvement, analytics, industry and market research, and such other purposes consistent with Uber's and its Affiliates' legitimate business needs. Customer (or Driver, through the Driver Addendum) expressly consents to such use of personal data.

## 8.   Insurance

8.1.    Customer agrees to maintain during the term of this Agreement on all Vehicles operated by Customer or its Drivers commercial automobile liability insurance that provides protection against bodily injury and property damage to third parties at levels of coverage that satisfy all applicable laws in the Territory. This coverage must also include any no-fault coverage required by law in the Territory that may not be waived by an insured. Customer agrees to provide Uber and its Affiliates a copy of the insurance policy, policy declarations, proof of insurance identification card and proof of premium payment for the insurance policy required in this Section 8.1 upon request. Furthermore, Customer must provide Uber with written notice of cancellation of any insurance policy required by Uber. Uber shall have no right to control Customer's selection or maintenance of Customer's policy.

8.2.    Customer agrees to maintain during the term of this Agreement commercial general liability insurance that provides protection against personal injury, advertising injury and property damage to third parties at levels of coverage required by all applicable laws in the Territory.

8.3.    **Customer agrees to maintain during the term of this Agreement workers' compensation insurance for itself and any of its subcontractors as required by all applicable laws in the Territory. If permitted by applicable law, Customer may choose to insure itself against industrial injuries by maintaining occupational accident insurance in place of workers' compensation insurance. Customer's subcontractors may also, to the extent permitted by applicable law, maintain occupational accident insurance in place of workers' compensation insurance.  Furthermore, if permitted by applicable law, Customer may choose not to insure itself against industrial injuries at all, but does so at its own risk.**

8.4.    Customer shall add Uber (or any Affiliate which may be designated by Uber from time to time) to Customer's insurance policies required in Sections 8.1 and 8.2 above as an additional insured, and shall, upon Uber's request, provide Uber with a copy of such insurance certificate(s) within seven (7) days of such request.

## 9.   Representations and Warranties; Disclaimers

9.1.    **By Customer**. Customer hereby represents and warrants that:  (a) it has full power and authority to enter into this Agreement and perform its obligations hereunder; (b) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its origin; (c) it has not entered into, and during the term will not enter into, any agreement that would prevent it from complying with this Agreement; (d) it will comply with all applicable laws in its performance of

this Agreement, including holding and complying with all permits, licenses, registrations and other governmental authorizations necessary to provide (i) Transportation Services using the Drivers and Vehicles pursuant to this Agreement, and (ii) passenger transportation services to third parties in the Territory generally; and (e) it shall require all Drivers to comply with the Driver Addendum, the applicable terms and conditions set forth in this Agreement and all applicable laws.

9.2.    **Disclaimer of Warranties**.  UBER PROVIDES, AND CUSTOMER ACCEPTS, THE UBER SERVICES, DRIVER APP AND THE UBER DEVICES ON AN "AS IS" AND "AS AVAILABLE" BASIS. UBER DOES NOT REPRESENT, WARRANT OR GUARANTEE THAT CUSTOMER'S OR ANY DRIVER'S ACCESS TO OR USE OF THE UBER SERVICES, DRIVER APP OR THE UBER DEVICES:  (A) WILL BE UNINTERRUPTED OR ERROR FREE; OR (B) WILL RESULT IN ANY REQUESTS FOR TRANSPORTATION SERVICES. UBER FUNCTIONS AS AN ON-DEMAND LEAD GENERATION AND RELATED SERVICE ONLY AND MAKES NO REPRESENTATIONS, WARRANTIES OR GUARANTEES AS TO THE ACTIONS OR INACTIONS OF THE USERS WHO MAY REQUEST OR RECEIVE TRANSPORTATION SERVICES FROM CUSTOMER OR ANY DRIVER HEREUNDER, AND UBER DOES NOT SCREEN OR OTHERWISE EVALUATE USERS. BY USING THE UBER SERVICES AND DRIVER APP, CUSTOMER ACKNOWLEDGES AND AGREES THAT CUSTOMER OR A DRIVER MAY BE INTRODUCED TO A THIRD PARTY THAT MAY POSE HARM OR RISK TO CUSTOMER, A DRIVER OR OTHER THIRD PARTIES. CUSTOMER AND DRIVERS ARE ADVISED TO TAKE REASONABLE PRECAUTIONS WITH RESPECT TO INTERACTIONS WITH THIRD PARTIES ENCOUNTERED IN CONNECTION WITH THE USE OF THE UBER SERVICES OR DRIVER APP. NOTWITHSTANDING UBER'S APPOINTMENT AS THE LIMITED PAYMENT COLLECTION AGENT OF CUSTOMER FOR THE PURPOSE OF ACCEPTING PAYMENT FROM USERS ON BEHALF OF CUSTOMER AS SET FORTH IN SECTION 4 ABOVE, UBER EXPRESSLY DISCLAIMS ALL LIABILITY FOR ANY ACT OR OMISSION OF CUSTOMER, ANY USER OR OTHER THIRD PARTY.

9.3.    **No Service Guarantee**. UBER DOES NOT GUARANTEE THE AVAILABILITY OR UPTIME OF THE UBER SERVICES OR DRIVER APP. CUSTOMER ACKNOWLEDGES AND AGREES THAT THE UBER SERVICES OR DRIVER APP MAY BE UNAVAILABLE AT ANY TIME AND FOR ANY REASON (*e.g.*, DUE TO SCHEDULED MAINTENANCE OR NETWORK FAILURE). FURTHER, THE UBER SERVICES OR DRIVER APP MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS, AND UBER IS NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGES, LIABILITIES OR LOSSES RESULTING FROM SUCH PROBLEMS.

10.  **Indemnification**

10.1.    Customer shall indemnify, defend (at Uber's option) and hold harmless Uber and its Affiliates and their respective officers, directors, employees, agents, successors and assigns from and against any and all liabilities, expenses (including legal fees), damages, penalties, fines, social security contributions and taxes arising out of or related to:  (a) Customer's breach of its representations, warranties or obligations under this Agreement; or (b) a claim by a third party (including Users, regulators and governmental authorities) directly or indirectly related to Customer's provision of Transportation Services or use of the Uber Services. This indemnification provision shall not apply to Customer's or any Drivers' breach of any representations regarding their status as independent contractors.

10.2.    As between Customer and Uber, Customer is and shall be solely responsible for its Drivers' provision of Transportation Services. As such, Customer shall indemnify, defend (at Uber's option) and hold harmless Uber and its Affiliates and their respective officers, directors, employees, agents, successors and assigns from and against any and all liabilities, expenses

(including legal fees), damages, penalties, fines, social contributions and taxes directly or indirectly arising out of or related to its Drivers' provision of Transportation Services or use of the Uber Services.

11. **Limits of Liability**. UBER AND ITS AFFILIATES SHALL NOT BE LIABLE UNDER OR RELATED TO THIS AGREEMENT FOR ANY OF THE FOLLOWING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES:  (i) ANY INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY, CONSEQUENTIAL, OR OTHER INDIRECT DAMAGES OF ANY TYPE OR KIND; OR (ii) CUSTOMER'S OR ANY THIRD PARTY'S PROPERTY DAMAGE, OR LOSS OR INACCURACY OF DATA, OR LOSS OF BUSINESS, REVENUE, PROFITS, USE OR OTHER ECONOMIC ADVANTAGE. EXCEPT FOR UBER'S OBLIGATIONS TO PAY AMOUNTS DUE TO CUSTOMER PURSUANT TO SECTION 4 ABOVE, BUT SUBJECT TO ANY LIMITATIONS OR OTHER PROVISIONS CONTAINED IN THIS AGREEMENT WHICH ARE APPLICABLE THERETO, IN NO EVENT SHALL THE LIABILITY OF UBER OR ITS AFFILIATES UNDER THIS AGREEMENT EXCEED THE AMOUNT OF SERVICE FEES ACTUALLY PAID TO OR DUE TO UBER HEREUNDER IN THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM.

12. **Term and Termination**

12.1. **Term**. This Agreement shall commence on the date accepted by Customer and shall continue until terminated as set forth herein.

12.2. **Termination**. Either party may terminate this Agreement:  (a) without cause at any time upon seven (7) days prior written notice to the other party; (b) immediately, without notice, for the other party's material breach of this Agreement; or (c) immediately, without notice, in the event of the insolvency or bankruptcy of the other party, or upon the other party's filing or submission of request for suspension of payment (or similar action or event) against the terminating party. In addition, Uber may terminate this Agreement or deactivate Customer or a particular Driver immediately, without notice, with respect to Customer and/or any Driver in the event Customer and/or any Driver, as applicable, no longer qualifies, under applicable law or the standards and policies of Uber, to provide Transportation Services or to operate the Vehicle, or as otherwise set forth in this Agreement.

12.3. **Effect of Termination**. Upon termination of the Agreement, Customer and all Drivers, as applicable, shall:  (a) promptly return to Uber all Uber Devices; and (b) immediately delete and fully remove the Driver App from any applicable Driver-Provided Devices. Outstanding payment obligations and Sections 1, 2.3, 2.5, 2.6.3, 4.7, 4.8, 5.3, 6, 7, 9, 10, 11, 12.3, 13, 14 and 15 shall survive the termination of this Agreement.

13. **Relationship of the Parties**

13.1. **Except as otherwise expressly provided herein with respect to Uber acting as the limited payment collection agent solely for the purpose of collecting payment from Users on behalf of Customer, the relationship between the parties under this Agreement is solely that of independent contracting parties. The parties expressly agree that:  (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Uber and Customer or Uber and any Driver; and (b) no joint venture, partnership, or agency relationship exists between Uber and Customer or Uber and any Driver**.

13.2. Customer has no authority to bind Uber and undertakes not to hold itself out, and to ensure that each Driver does not hold himself or herself out, as an employee, agent or authorized

representative of Uber or its Affiliates. Where, by implication of mandatory law or otherwise, Customer or any Driver may be deemed an agent or representative of Uber, Customer undertakes and agrees to indemnify, defend (at Uber's option) and hold Uber and its Affiliates harmless from and against any claims by any person or entity based on such implied agency or representative relationship.

14. **Miscellaneous Terms**

14.1.   **Modification**. In the event Uber modifies the terms and conditions of this Agreement or Driver Addendum at any time, such modifications shall be binding on Customer only upon Customer's acceptance of the modified Agreement and/or Driver Addendum.  Uber reserves the right to modify any information referenced at hyperlinks from this Agreement from time to time. Customer hereby acknowledges and agrees that, by using the Uber Services, or downloading, installing or using the Driver App, Customer is bound by any future amendments and additions to information referenced at hyperlinks herein, or documents incorporated herein, including with respect to Fare Calculations.  Continued use of the Uber Services or Driver App after any such changes shall constitute Customer's consent to such changes. Unless changes are made to the arbitration provisions herein, Customer agrees that modification of this Agreement does not create a renewed opportunity to opt out of arbitration.

14.2.   **Supplemental Terms**. Supplemental terms may apply to Customer's and Driver's use of the Uber Services, such as use policies or terms related to certain features and functionality, which may be modified from time to time ("*Supplemental Terms*"). Customer may be presented with certain Supplemental Terms from time to time. Supplemental Terms are in addition to, and shall be deemed a part of, this Agreement. Supplemental Terms shall prevail over this Agreement in the event of a conflict.

14.3.   **Severability**. If any provision of this Agreement is or becomes invalid or non-binding, the parties shall remain bound by all other provisions hereof. In that event, the parties shall replace the invalid or non-binding provision with provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement.

14.4.   **Assignment**. Neither party shall assign or transfer this Agreement or any of its rights or obligations hereunder, in whole or in part, without the prior written consent of the other party; provided that Uber may assign or transfer this Agreement or any or all of its rights or obligations under this Agreement from time to time without consent:  (a) to an Affiliate; or (b) to an acquirer of all or substantially all of Uber's business, equity or assets.

14.5.   **Entire Agreement**. This Agreement, including all Supplemental Terms, constitutes the entire agreement and understanding of the parties with respect to its subject matter and replaces and supersedes all prior or contemporaneous agreements or undertakings regarding such subject matter. In this Agreement, the words "including" and "include" mean "including, but not limited to." The recitals form a part of this Agreement.

14.6.   **No Third Party Beneficiaries**. There are no third party beneficiaries to this Agreement, except as expressly set forth in the Arbitration Provision in Section 15.3. Nothing contained in this Agreement is intended to or shall be interpreted to create any third party beneficiary claims.

14.7.   **Notices**. Any notice delivered by Uber to Customer under this Agreement will be delivered by email to the email address associated with Customer's account or by posting on the Customer portal available on the Uber Services. Any notice delivered by Customer to Uber under this

Agreement will be delivered by contacting Uber at http://partners.uber.com in the "Contact Us" section. Additional Territory-specific notices may be required from time to time.

15. **Governing Law; Arbitration**

15.1      The choice of law provisions contained in this Section 15.1 do not apply to the arbitration clause contained in Section 15.3, such arbitration clause being governed by the Federal Arbitration Act. Accordingly, and except as otherwise stated in Section 15.3, the interpretation of this Agreement shall be governed by California law, without regard to the choice or conflicts of law provisions of any jurisdiction. Any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services that are not subject to the arbitration clause contained in this Section 15.3 shall be subject to the exclusive jurisdiction of the state and federal courts located in the City and County of San Francisco, California. However, neither the choice of law provision regarding the interpretation of this Agreement nor the forum selection provision is intended to create any other substantive right to non-Californians to assert claims under California law whether that be by statute, common law, or otherwise. These provisions, and except as otherwise provided in Section 15.3, are only intended to specify the use of California law to interpret this Agreement and the forum for disputes asserting a breach of this Agreement, and these provisions shall not be interpreted as generally extending California law to Customer if Customer does not otherwise operate its business in California. The foregoing choice of law and forum selection provisions do not apply to the arbitration clause in Section 15.3 or to any arbitrable disputes as defined therein. Instead, as described in Section 15.3, the Federal Arbitration Act shall apply to any such dispute. The failure of Uber to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless acknowledged and agreed to by Uber in writing.

15.2      Other than disputes regarding the intellectual property rights of the parties and other claims identified in Section 15.3.ii, any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services shall be subject to arbitration pursuant to Section 15.3.

**15.3      Arbitration.**

Important Note Regarding this Section 15.3:

- Except as provided below, arbitration does not limit or affect the legal claims you may bring against Uber.  Agreeing to arbitration only affects where any such claims may be brought and how they will be resolved.

- Arbitration is a process of private dispute resolution that does not involve the civil courts, a civil judge, or a jury.  Instead, the parties' dispute is decided by a private arbitrator selected by the parties using the process set forth herein.  Other arbitration rules and procedures are also set forth herein.

- Unless the law requires otherwise, as determined by the Arbitrator based upon the circumstances presented, you will be required to split the cost of any arbitration with Uber.

● IMPORTANT: This Arbitration Provision will require you to resolve any claim that you may have against Uber on an individual basis, except as provided below, pursuant to the terms of the Agreement unless you choose to opt out of the Arbitration Provision.  Except as provided below, this provision will preclude you from bringing any class, collective, or representative action (other than actions under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 *et seq.* ("PAGA")) against Uber, and also precludes you from participating in or recovering relief under any current or future class, collective, or representative (non-PAGA) action brought against Uber by someone else.

  o ***Cases have been filed against Uber and may be filed in the future involving claims by users of Uber Services and Software, including by drivers.  You should assume that there are now, and may be in the future, lawsuits against Uber alleging class, collective, and/or representative (non-PAGA) claims on your behalf, including but not limited to claims for tips, reimbursement of expenses, and employment status. Such claims, if successful, could result in some monetary recovery to you.  (THESE CASES NOW INCLUDE, FOR EXAMPLE, YUCESOY ET AL. V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. 3:15-CV-00262 (NORTHERN DISTRICT OF CALIFORNIA);  IN RE UBER FCRA LITIGATION, CASE NO. 14-CV-05200-EMC (NORTHERN DISTRICT OF CALIFORNIA); AND O'CONNOR  V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. CV 13-03826-EMC (NORTHERN DISTRICT OF CALIFORNIA). The contact information for counsel in the O'Connor matter is as follows: Shannon Liss-Riordan, Lichten & Liss-Riordan, P.C., 100 Cambridge Street, 20th Floor, Boston, MA 02114, Telephone: (617) 994-5800, Fax: (617) 994-5801, email: sliss@llrlaw.com.)***

  o **The mere existence of such class, collective, and/or representative lawsuits, however, does not mean that such lawsuits will ultimately succeed.  But if you do agree to arbitration with Uber, you are agreeing in advance, except as otherwise provided, that you will not participate in and,**

**therefore, will not seek to recover monetary or other relief under any such class, collective, and/or representative (non-PAGA) lawsuit.**

o **However, as discussed above and except as provided below, if you agree to arbitration, you will not be precluded from bringing your claims against Uber in an individual arbitration proceeding. If successful on such claims, you could be awarded money or other relief by an arbitrator (subject to splitting the cost of arbitration as mentioned above).**

**WHETHER TO AGREE TO ARBITRATION IS AN IMPORTANT BUSINESS DECISION. IT IS YOUR DECISION TO MAKE, AND YOU SHOULD NOT RELY SOLELY UPON THE INFORMATION PROVIDED IN THIS AGREEMENT AS IT IS NOT INTENDED TO CONTAIN A COMPLETE EXPLANATION OF THE CONSEQUENCES OF ARBITRATION.  YOU SHOULD TAKE REASONABLE STEPS TO CONDUCT FURTHER RESEARCH AND TO CONSULT WITH OTHERS — INCLUDING BUT NOT LIMITED TO AN ATTORNEY — REGARDING THE CONSEQUENCES OF YOUR DECISION, JUST AS YOU WOULD WHEN MAKING ANY OTHER IMPORTANT BUSINESS OR LIFE DECISION.**

      i.    <u>How This Arbitration Provision Applies</u>.

This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA") and evidences a transaction involving interstate commerce.  This Arbitration Provision applies to any dispute arising out of or related to this Agreement or termination of the Agreement and survives after the Agreement terminates.  Nothing contained in this Arbitration Provision shall be construed to prevent or excuse You from utilizing any informal procedure for resolution of complaints established in this Agreement (if any), and this Arbitration Provision is not intended to be a substitute for the utilization of such procedures.

**Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before any forum other than arbitration, with the exception of proceedings that must be exhausted under applicable law before pursuing a claim in a court of law or in any forum other than arbitration. Except as it otherwise provides, this Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration on an individual basis only and not by way of court or jury trial, or by way of class, collective, or representative (non-PAGA) action.**

Except as provided in Section 15.3(v), below, regarding the Class Action Waiver, such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration

Provision or any portion of the Arbitration Provision.  All such matters shall be decided by an Arbitrator and not by a court or judge. However, as set forth below, the preceding sentences shall not apply to disputes relating to the interpretation or application of the Class Action Waiver or PAGA Waiver below, including their enforceability, revocability or validity.

Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to all disputes between You and Uber, as well as all disputes between You and Uber's fiduciaries, administrators, affiliates, subsidiaries, parents, and all successors and assigns of any of them, including but not limited to any disputes arising out of or related to this Agreement and disputes arising out of or related to Your relationship with Uber, including termination of the relationship.  This Arbitration Provision also applies, without limitation, to disputes regarding any city, county, state or federal wage-hour law, trade secrets, unfair competition, compensation, breaks and rest periods, expense reimbursement, termination, harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for individual claims for employee benefits under any benefit plan sponsored by Uber and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other similar federal and state statutory and common law claims.

This Agreement is intended to require arbitration of every claim or dispute that lawfully can be arbitrated, except for those claims and disputes which by the terms of this Agreement are expressly excluded from the Arbitration Provision.

Uber Technologies, Inc. is an intended, third party beneficiary of this Agreement.

   ii.    <u>Limitations On How This Agreement Applies</u>.

The disputes and claims set forth below shall not be subject to arbitration and the requirement to arbitrate set forth in Section 15.3 of this Agreement shall not apply:

A representative action brought on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 *et seq.*, to the extent waiver of such a claim is deemed unenforceable by a court of competent jurisdiction;

Claims for workers compensation, state disability insurance and unemployment insurance benefits;

Regardless of any other terms of this Agreement, nothing prevents you from making a report to or filing a claim or charge with the Equal Employment Opportunity Commission, U.S. Department of Labor, Securities Exchange Commission, National Labor Relations Board, or Office of Federal Contract Compliance Programs, and nothing in this Agreement or Arbitration Provision prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Arbitration Provision.  Nothing in this Arbitration Provision shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration;

Disputes that may not be subject to a predispute arbitration agreement pursuant to applicable Federal law or Executive Order are excluded from the coverage of this Arbitration Provision;

Disputes regarding the Intellectual Property Rights of the parties;

This Arbitration Provision shall not be construed to require the arbitration of any claims against a contractor that may not be the subject of a mandatory arbitration agreement as provided by section 8116 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2010 (Pub. L. 111-118), section 8102 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2011 (Pub. L. 112-10, Division A), and their implementing regulations, or any successor DoD appropriations act addressing the arbitrability of claims.

iii.     <u>Selecting The Arbitrator and Location of the Arbitration</u>.

The Arbitrator shall be selected by mutual agreement of Uber and You.  Unless You and Uber mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be conducted.  If the Parties cannot agree on an Arbitrator, then an arbitrator will be selected using the alternate strike method from a list of five (5) neutral arbitrators provided by JAMS (Judicial Arbitration & Mediation Services).  You will have the option of making the first strike.  If a JAMS arbitrator is used, then the JAMS Streamlined Arbitration Rules & Procedures rules will apply; however, if there is a conflict between the JAMS Rules and this Agreement, this Agreement shall govern.  Those rules are available here:

http://www.jamsadr.com/rules-streamlined-arbitration/

The location of the arbitration proceeding shall be no more than 45 miles from the place where You last provided transportation services under this Agreement, unless each party to the arbitration agrees in writing otherwise.

iv.     <u>Starting The Arbitration</u>.

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the Parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to Uber shall be provided to General Counsel, Uber Technologies, Inc., 1455 Market St., Ste. 400, San Francisco CA 94103.  The Arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration.  A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

v.    How Arbitration Proceedings Are Conducted.

In arbitration, the Parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator.

**You and Uber agree to resolve any dispute that is in arbitration on an individual basis only, and not on a class or collective action basis ("Class Action Waiver"). The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on any basis other than an individual basis**. **The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on a class, collective, or representative basis.**  Notwithstanding any other provision of this Agreement, the Arbitration Provision or the JAMS Streamlined Arbitration Rules & Procedures, disputes regarding the enforceability, revocability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class, collective, or representative action and (2) there is a final judicial determination that all or part of the Class Action Waiver is unenforceable, the class, collective, and/or representative action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.

While Uber will not take any retaliatory action in response to any exercise of rights You may have under Section 7 of the National Labor Relations Act, if any, Uber shall not be precluded from moving to enforce its rights under the FAA to compel arbitration on the terms and conditions set forth in this Agreement.

**Private Attorneys General Act**.

Notwithstanding any other provision of this Agreement or the Arbitration Provision, to the extent permitted by law, (1) **You and Uber agree not to bring a representative action on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., in any court or in arbitration**, and (2) for any claim brought on a private attorney general basis—i.e., where you are seeking to pursue a claim on behalf of a government entity—both you and Uber agree that any such dispute shall be resolved in arbitration on an individual basis only (i.e., to resolve whether you have personally been aggrieved or subject to any violations of law), and that such an action may not be used to resolve the claims or rights of other individuals in a single or collective proceeding (i.e., to resolve whether other individuals have been aggrieved or subject to any violations of law) ("PAGA Waiver"). Notwithstanding any other provision of this Agreement or the Arbitration Provision, the validity of the PAGA Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. If any provision of the PAGA Waiver is found to be unenforceable or unlawful for any reason, (1) the unenforceable provision shall be severed from this Agreement; (2) severance of the unenforceable provision shall have no impact whatsoever on the Arbitration Provision or the Parties' attempt to arbitrate any remaining claims on an individual basis pursuant to the Arbitration Provision; and (3) any representative action brought under PAGA on behalf of others must be litigated in a civil court of competent jurisdiction and not in arbitration. To the extent that there are any claims to be litigated in a civil court of competent jurisdiction because a civil court of competent jurisdiction determines that the PAGA Waiver is unenforceable with respect

to those claims, the Parties agree that litigation of those claims shall be stayed pending the outcome of any individual claims in arbitration.

vi.   <u>Paying For The Arbitration</u>.

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law (i.e., a party prevails on a claim that provides for the award of reasonable attorney fees to the prevailing party).  In all cases where required by law, Uber will pay the Arbitrator's and arbitration fees. If under applicable law Uber is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned equally between the Parties or as otherwise required by applicable law. However, You will not be required to bear any type of fee or expense that You would not be required to bear if You had filed the action in a court of law. Any disputes in that regard will be resolved by the Arbitrator as soon as practicable after the Arbitrator is selected, and Uber shall bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute.

vii.   <u>The Arbitration Hearing And Award</u>.

The Parties will arbitrate their dispute before the Arbitrator, who shall confer with the Parties regarding the conduct of the hearing and resolve any disputes the Parties may have in that regard.  Within 30 days of the close of the arbitration hearing, or within a longer period of time as agreed to by the Parties or as ordered by the Arbitrator, any party will have the right to prepare, serve on the other party and file with the Arbitrator a brief.  The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Provision.  The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law.  A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.  The Arbitrator shall not have the power to commit errors of law or legal reasoning, and the award may be vacated or corrected on appeal to a court of competent jurisdiction for any such error.

viii.   **<u>Your Right To Opt Out Of Arbitration</u>.**

**Arbitration is not a mandatory condition of your contractual relationship with Uber.  If You do not want to be subject to this Arbitration Provision, You may opt out of this Arbitration Provision by notifying Uber in writing of Your desire to opt out of this Arbitration Provision, which writing must be dated, signed and delivered by electronic mail to <u>optout@uber.com</u>, by U.S. Mail, or by any nationally recognized delivery service (*e.g*, UPS, Federal Express, etc.), or by hand delivery to:**

**General Counsel**
**Uber Technologies, Inc.**
**1455 Market St., Ste. 400**
**San Francisco CA 94103**

**In order to be effective, the writing must clearly indicate Your intent to opt out of this Arbitration Provision and the envelope containing the signed writing must be received (if delivered by hand) or post-marked within 30 days of the date this Agreement is executed by You.  Your writing opting out of this Arbitration Provision will be filed with a copy of this Agreement and maintained by Uber.  Should You not opt out of this Arbitration Provision within the 30-day period, You and Uber shall be bound by the terms of this Arbitration Provision.  You have the right to consult with counsel of Your choice concerning this Arbitration Provision.  You understand that You will not be subject to retaliation if You exercise Your right to assert claims or opt-out of coverage under this Arbitration Provision.**

ix.  <u>Full And Complete Agreement Related To Formal Resolution Of Disputes; Enforcement Of This Agreement</u>.

This Arbitration Provision is the full and complete agreement relating to the formal resolution of disputes arising out of this Agreement.  Except as stated in subsection v, above, in the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable.


By clicking "I accept", Customer expressly acknowledge that Customer has read, understood, and taken steps to thoughtfully consider the consequences of this Agreement, that Customer agrees to be bound by the terms and conditions of the Agreement, and that Customer is legally competent to enter into this Agreement with Uber.

Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

JOSE ORTEGA, and JOCE MARTINEZ, on their own      Docket No. 15-CV-7387
behalf, and on behalf of those similarly situated,

                               Plaintiff,         **SECOND AMENDED**
                                                    **COMPLAINT**

    -against-                                   Jury Trial Demanded

UBER TECHNOLOGIES INC., RASIER LLC, UBER
USA LLC, UBER NEW YORK LLC, UBER
TRANSPORTATION LLC,  JOHN DOE "UBER
AFFILIATES," fictitious name used to identify presently
unknown entities,

                              Defendants.
---------------------------------------------------------------------X

Plaintiffs[1], complaining of the defendants, by their attorneys, **HELD & HINES, LLP**,

allege, upon information and belief, that:

## PRELIMINARY STATEMENT

1.     Plaintiffs commence this action on behalf of themselves and all other individuals

who have worked or are currently working as drivers for Defendants (hereinafter collectively

referred to as "UBER"), and any and all affiliate entities of UBER, as defined by UBER's Terms

and Conditions memorialized within their User Agreements.

2.     Plaintiffs are seeking compensatory, consequential, liquidated, statutory, and

punitive damages against the defendants on behalf of themselves and all other UBER drivers,

together with all other appropriate relief provided by state, federal and common law.

3.     Plaintiffs bring this action on behalf of themselves and all other UBER drivers

whom UBER has deceptively misclassified as independent contractors and as such, have

therefore been paying the expenses associated with operating the driven vehicles, including, but

not limited to, fuel, maintenance, registration, tolls, insurance, and other expenses and fees

---

[1] Plaintiff Martinez's claims were dismissed, and are subject to individual arbitration.

associated with the ownership, lease and/or operation of a vehicle for commercial passenger use.

4.      Specifically, Defendants' fraudulently structured their business model in a way that unlawfully shifts their costs of doing business onto Plaintiffs and members of this class.  To that end, Defendants' unlawfully require Plaintiffs and the class to assume costs associated with the tools of their trade.

5.      Defendants have also violated New York state law by failing to remit gratuities to the plaintiffs and class members which UBER riders believe they have paid as part of the quoted and charged fare.

## PARTIES

6.      At all times hereinafter mentioned, Plaintiff, JOSE ORTEGA, is a resident of the State of New York, County of Kings.

7.      At all times hereinafter mentioned, Plaintiff, JOCE MARTINEZ, is a resident of the State of New York, County of Bronx.

8.      Upon information and belief, Defendant, Uber Technologies, Inc., is a foreign corporation organized and existing by virtue of the laws of the State of Delaware, is authorized to transact business in the State of New York, with its principal place of business located in San Francisco, California.

9.      Upon information and belief, Defendant, Rasier, LLC, is a limited liability company organized and existing by virtue of the laws of the State of Delaware, is authorized to transact business in the State of New York, and is a subsidiary and/or affiliate of Uber Technologies, Inc.

10.     Upon information and belief, Defendant, Uber USA, LLC, is a limited liability company organized and existing by virtue of the laws of the State of Delaware, is authorized to transact business in the State of New York, and is a subsidiary and/or affiliate of Uber

Technologies, LLC.

11.     Upon information and belief, Defendant, Uber New York, LLC, is a limited liability company organized and existing by virtue of the laws of the State of New York, is authorized to transact business in the State of New York, and is a subsidiary and/or affiliate of Uber Technologies, LLC.

12.     Upon information and belief, Defendant, Uber Transportation, LLC, is a limited liability company organized and existing by virtue of the laws of the State of New York, is authorized to transact business in the State of New York, and is a subsidiary and/or affiliate of Uber Technologies, LLC.

13.     Upon information and belief, Defendants, "John Doe "Uber Affiliates," are business entities organized formed by or for the benefit of Uber Technologies, LLC, are authorized to transact business in the State of New York, and is a subsidiary and/or affiliate of Uber Technologies, LLC.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the state law claims asserted herein pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), since members of the putative Plaintiff class reside in states across the Country, including, but not limited to, New York; Defendants are entities incorporated within the States of California, Delaware, and New York; there are more than 100 putative class members; and the amount in controversy exceeds $5,000,000.00, exclusive of interests and costs.

15.     Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b)(2) because the plaintiff and putative class members reside in the geographic location within the Eastern District of New York, the defendants operate and advertise their business in the geographic location within the Eastern District of New York, and a substantial part of the events or omissions giving

rise to the claims occurred in the Eastern District of New York.

## CLASS ACTION ALLEGATIONS

16.     Plaintiffs have commenced this action as a class action on behalf of all UBER drivers, including, but not limited to, drivers of UBER's "Uber Black," "Uber SUV," and "Uber X" services in the State of New York.

17.     **Ascertainable class**: The proposed Class is ascertainable in that its members can be identified and located using information contained in Defendants' records kept in the ordinary course of their business, specifically payroll and personnel records.

18.     **Numerosity**: The potential number of persons in the Class is so numerous that joinder of all members would be unfeasible and impractical. The disposition of their claims through this class action will benefit both parties and this Court. The number of persons in this Class is unknown to Plaintiffs at this time; however, it is estimated that the number exceeds 40,000 individuals.

19.     **Typicality**: Plaintiffs' claims are typical of the claims of all of the other members of the Class because all of the plaintiffs sustained similar injuries and damages arising out of Defendants' common cause or course of conduct in violation of State and Federal laws and regulations and the injuries and damages of all the other members of the Class were caused by Defendants' wrongful conduct as described in this Complaint.

20.     **Adequacy**:  Plaintiffs are adequate representatives of the Class; will fairly protect the interests of the other members of the Class; have no interests antagonistic to the members of the Class; and will vigorously pursue this suit via attorneys who are competent, skilled and experienced in litigating matters of this type. There will be no difficulty in the management of this action as a class action.

21.  **Superiority**:   The nature of this action makes the use of the class action vehicle a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the other members of the Class for the wrongs alleged herein, as follows:

    a. This case involves a large corporate Defendant and its large affiliates and a large number of individuals with many relatively small claims and common issues of law and fact;

    b. If each individual member of the Class was required to file an individual lawsuit, Defendants would necessarily gain an unconscionable advantage because, with its vastly superior financial and legal resources, it would be able to exploit and overwhelm the limited resources of each individual member of the Class;

    c. Requiring each individual member of the Class to pursue an individual remedy would also discourage the assertion of lawful claims by members of the Class who would be disinclined to pursue an action against Defendants because of an appreciable and justifiable fear of retaliation;

    d. The Prosecution of separate actions by the individual members of the Class, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual members of the Class against Defendants; would establish potentially incompatible standards of conduct for Defendants, would result in legal determinations with respect to individual members of the Class which would, as a practical matter, be dispositive of the interest of the other members of the Class who are not parties to the adjudications; and/or would substantially impair or impede the ability of the members of the Class to protect their own interests;

    e. The claims of the individual members of the Class may not be sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses thereto;

    f. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or even impossible for individual member of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action; and

    g. The costs to the court system of adjudication of such individualized litigation would be substantial.

22.     **Existence of Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to members of the Class which predominate over questions affecting only individual members of the Class, including, but not limited to, the following:

**Common Questions of Fact and Law regarding UBER's Conduct with Respect to Gratuities and UBER's conduct with respect to its contracts with Members of the Class:**

a.   Whether reasonable customers believed that a gratuity was included in the fare Defendants' quoted and charged its customers;

b.   Whether Defendants' failed to distribute the proceeds of those gratuities, in their entirety, to the class members;

c.   What efforts Defendants' undertook to inform their customers and potential customers that gratuities for the plaintiff drivers were included in the quoted and charged fare and that it was therefore unnecessary to tip their drivers;

d.   Whether Defendants have led customers and potential customers to believe that the customary gratuity to the driver is included in the quoted and charged fare for the UBER service such that their riders did not tip their drivers on their own, thereby damaging the plaintiff class;

e.   Whether UBER breached its uniform contracts with Class Members by failing to remit all monies due Class Members and withholding payments due to Class Members and/or otherwise miscalculating UBER's share of the fares to the detriment of Class Members; and

f.   Whether UBER wrongfully applies taxes and ancillary charges, including sales tax and Black Car Fund fees, to the Class Members.

**Common Questions of Fact and Law regarding UBER's Conduct with Respect to Members of the Class who have been Misclassified as Independent Contractors:**

a.   Whether Defendants improperly classified the plaintiff class as independent contractors;

b.   Whether class members have been required by UBER to follow uniform procedures and policies regarding their work for UBER;

c.   Whether the work performed by class members – providing car service to UBER's customers – is within UBER's usual course of business, and whether such service is fully integrated into UBER's business;

d.  Whether Defendants placed the burden on the class members to incur the expenses associated with the tools of the trade, including, but not limited to, the costs of vehicle acquisition, fuel, maintenance, registration, tolls, and insurance.

**Common Questions Of Fact And Law Regarding UBER's False Advertising And Marketing To Drivers**

a.  Whether UBER's advertisements to prospective drivers and the general public promising guaranteed compensation are misleading;

b.  Whether UBER's prominent advertisements and marketing offering guaranteed compensation while at the same time relegating to small separate print or separate application the precise terms of what is offered is misleading and constitutes consumer fraud.

**Additional Questions of Fact and Law regarding UBER's Conduct:**

a.  Whether Defendants are liable for attorneys' fees and costs associated with this litigation.

23.  Plaintiffs intend to send notice to all members of the Class to the extent required by applicable law.

**STATEMENT OF FACTS**

24.  UBER compensates its drivers weekly.

25.  UBER transacts business with its customers (or "riders") via its mobile application (or "App") installed by its users on their mobile devices. Through UBER's App, a rider is able to input a pick-up location and destination, and is then connected with one or more of UBER's drivers (the plaintiff class) available to accept the fare at that time. If a fare is agreeable to a rider, they accept the cost and complete the transaction via the App, and UBER's driver (a member of the plaintiff class) is then dispatched to the pick-up location. The entire transaction occurs via the App and no money is provided to the driver.

26.  UBER expressly informs its riders that they should not tip the driver as the gratuity is included in the cost of the fare. UBER intends and promotes that no money be

exchanged between its riders and drivers and that its service is 100% cashless, such that all exchanges of money are through its App.

27.     Of the total fare paid to UBER by a rider, UBER remits a percentage of the fare to the driver. While the gratuity due specifically to the driver is not segregated, as required by law, from the gross fare when calculating a driver's earnings per fare, UBER does reduce the gross fare by $1.00 as its "safe ride" fee and, therefore, artificially reduces the gross when calculating the amount due to the driver.

28.     UBER justifies its "safe ride" fee by claiming that the purpose of the safe ride fee is to pay for drivers' background checks, driver safety education, and the development of safety features in UBER's mobile application. Accordingly, the putative plaintiff class is being forced to bear UBER's costs of operation, while at the same time bear their own costs of operation. Meanwhile, UBER contributes nothing to the cost of the putative class's operation and, instead, requires its drivers to incur all expenses associated with the ownership, operation, maintenance and use of the driven vehicle, including, but are not limited to, fuel, tolls, liability insurance, workers' compensation insurance, maintenance and repair costs, inspection and registration costs, and all purchase, finance and/or lease payments for the driven vehicle.

**Plaintiff Jose Ortega**

29.     Prior to beginning his employment as an UBER driver, Plaintiff Jose Ortega was employed as a maintenance worker for E&S Maintenance US, Inc. (hereinafter referred to as "E&S"), located in Kings County, New York.

30.     While employed at E&S, Ortega earned approximately $400 per week in net income.

31.     While employed at E&S, Ortega began discussing the idea of becoming a professional driver with taxi drivers.

32.     At or around that time, Ortega began to notice advertising and marketing for UBER, which claimed that drivers would earn guaranteed money (i.e., salary) over a defined period of time.

33.     Thereafter, based on UBER's marketing and advertising materials Ortega began employment as a driver with UBER in or around August 2014.

34.     Ortega is still an UBER driver.

35.     Ortega is still employed by UBER as a black car driver.

36.     On average, Ortega works for UBER six days per week. On average, Ortega works for UBER approximately ten to twelve (10-12) hours per day. Accordingly, Ortega drives approximately 60 to 72 hours per week for UBER, on average.

37.     Defendants paid and continue to pay Ortega weekly.

38.     Initially, when Ortega first began driving for Defendants, UBER kept approximately 25% of the total gross fare monies he received while remitting the difference to Ortega.

39.     In or around, August of 2014, Defendants unilaterally changed the terms of Ortega's compensation. Thereafter, UBER began retaining approximately 28% of total gross fare monies collected by Ortega and remitted the rest of the fare monies to him.

40.     On average, as an UBER driver, Ortega has earned between $600 and $1000 in gross wages per week and UBER has compensated him same.

41.     However, throughout the course of Ortega's employment with UBER, Defendants shifted the burden of operating his vehicle onto Ortega.

42.     For example, UBER did not compensate Ortega for any of his incurred weekly/monthly/annual expenses, including but not limited to vehicle fuel, maintenance and repair, liability insurance, vehicle inspection and registration, mileage, and vehicle acquisition and carrying costs.

43.     Due to UBER's failure to reimburse Ortega for his expenses, despite all indicia that he is an employee of UBER, Ortega's net earnings have been reduced by hundreds of dollars each week.

44.     Ortega has not received guaranteed salary as advertised by UBER.

**Plaintiff Joce Martinez**

45.     Prior to beginning his employment as an UBER driver, Plaintiff Joce Martinez was employed as a livery driver for Prestige Car Service (hereinafter referred to as "Prestige"), located in Bronx County, New York.

46.     While employed at Prestige, Martinez earned approximately $500 per week in gross income.

47.     While employed at Prestige, Martinez heard a radio advertisement regarding UBER, which offered $500 to individuals who registered to become UBER drivers.

48.     Additionally, at or around that time, Martinez began to notice advertising and marketing for UBER, which claimed that drivers would earn a guaranteed amount of money over a defined period of time. At that time, UBER's advertising and marketing campaign claimed that drivers would earn $60,000.00 in their first year as an UBER driver.

49.     Thereafter, and partially as a result of the aforementioned advertising and marketing campaign, Martinez began employment as a driver with UBER in or around August 2014.

50.    Martinez is still an UBER driver. On average, Martinez works for UBER five to six days per week. On average, Martinez works approximately 5 to 10 (5-10) hours per day. Accordingly, Martinez drives approximately 25-60 hours per week for UBER, on average.

51.    Defendants paid and continue to pay Martinez weekly.

52.    On average, as an UBER driver, Martinez has earned approximately $700-$1,000.00 gross wages per week and UBER has compensated him same.

53.    However, throughout the course of Martinez' employment with UBER, Defendants shifted the burden of operating his vehicle onto Martinez.

54.    For example, UBER did not compensate Martinez for any of his incurred weekly/monthly/annual expenses, including but not limited to vehicle fuel, maintenance and repair, liability insurance, vehicle inspection and registration, mileage, and vehicle acquisition and carrying costs.

55.    Due to UBER's failure to reimburse Martinez for his expenses, despite all indicia that he is an employee of UBER, Martinez's net earnings have been reduced by hundreds of dollars each week.

56.    Martinez has not been compensated as advertised and marketed by UBER.

**UBER    Misclassifies    Drivers    as    Independent    Contractors    and    Instead    of Appropriately Classifying Its Drivers as Employees**

57.    UBER uniformly misclassifies all of its drivers as independent contractors when in fact they are employees.

58.    UBER exerts significant control over its drivers.

59.    Before beginning employment as a driver, UBER subjected Plaintiffs Ortega and Martinez to a sophisticated on-boarding and training process.

60.     Upon information and belief, any and all UBER drivers in New York State, including the putative class, were subjected to the same sophisticated on-boarding and training process prior to beginning employment as an UBER driver.

61.     Upon information and belief, any and all UBER drivers in the United States were subjected to the same sophisticated on-boarding and training process prior to beginning employment as an UBER driver.

62.     Prior to beginning their employment as a driver for UBER, individuals were required to view an online training video.

63.     This training video teaches and specifically instructs UBER drivers on how to interact with Defendants' customers.

64.     During this video, Defendants directed the plaintiffs and putative class to stock their cars with water, snacks, and phone chargers for use by the customer.

65.     During this video, the plaintiffs and putative class were also advised of UBER's dress code and directed to dress in a certain way that would convey the message that the driver is the rider's personal chauffeur.

66.     In addition to watching the training video, the plaintiffs and putative class were required to pass an examination qualifying them to drive for UBER. UBER refers to this test as the "City Competency Test" or "City Competency Exam."

67.     If an applicant does not earn a minimum score on the "City Competency Test" or "City Competency Exam," they will not be employed as an UBER driver.

68.     UBER also determines the rides and the fees that the plaintiffs and putative class can accept.  Individual rider fares are set by UBER though its App. Group fares are similarly

determined by UBER. Plaintiff and the putative class members have no ability to change the fares set by the UBER App or to offer the rider a credit.

69.     Within its App, UBER maintains a sophisticated review system of all of its drivers. To wit, the UBER App solicits feedback from each rider at the conclusion of the experience. This driver review system operates on a 5 star system. Every week, UBER sends each Plaintiff and putative class member an email that contains the individual driver's customer reviews and feedback for the preceding week. All UBER drivers must average a star rating of at least 4.5 out of a possible 5 stars. If a driver falls below the 4.5 star rating for the preceding week, the aforementioned weekly email will contain instructions and tips for improving the driver's rating.

70.     Also within those weekly emails are tips for improving performance and compensation, including, but not limited to, informing drivers of the best and most desirable hours to work. For example, UBER has emailed its drivers to inform them that they could have earned "X" amount more that week had they received fares during peak hour pricing.

71.     These emails also contain performance enhancing suggestions such as to drive slower or faster, to take better routes to the destination, to discuss different routes with the rider, and directives to carry water, snacks and phone chargers, particularly if a rider complained that the vehicle lacked these peripheral items.

72.     Rider feedback about a driver will have significant implications on the driver's future employment with UBER. If a driver fails to maintain a 4.5 star rating, UBER will deactivate that driver's ability to log in and access the App, thereby preventing the driver from connecting with and picking up riders. For all intents and purposes, preventing a driver from connecting with and picking up riders constitutes termination of the driver's employment. The

ability to discontinue an individual's employment, such as that between UBER and the plaintiffs and putative class members, is one of the hallmarks of an employer-employee relationship.

73.     Conversely, UBER drivers who engender favorable ratings will be afforded certain benefits (or bonuses) that "unsatisfactory" drivers are not afforded. These bonuses include discount codes to certain retailers and pre-paid cards and coupons that can be applied to defray the cost of fuel and maintenance of the driver's vehicle. Additionally, drivers who maintain a favorable rating will be given premier driving assignments, such as long distance rides for Defendants' VIP customers or the opportunity to work in exclusive geographic locations, such as the Hamptons in Long Island, New York. The ability to offer bonuses and incentives, such as those between UBER and the plaintiffs and putative class members, is one of the hallmarks of an employer-employee relationship.

74.     Additionally, UBER provides Plaintiffs and the putative class members with access to and log in credentials for its App. UBER's App is the sole and exclusive method for communications between drivers and riders. UBER tracked all of the fares that Plaintiffs and the Class Members earned through this App. The App also tracked the routes that drivers took to their destination. In addition, through this App, UBER calculated how much Plaintiffs and each Class Member earned. The ability to direct, monitor and control, such as that by UBER to the plaintiffs and putative class members, is one of the hallmarks of an employer-employee relationship.

### UBER Informs its Riders that Gratuities are Included in the Fare and Instructs its Drivers to Refuse Gratuities When Offered By Riders, Yet Fails to Segregate and Pay Gratuities Collected For Drivers And UBER Fails to Pay Class Members All Monies Due Under Its Contracts

75.     UBER directs its drivers to decline and refuse to accept tips from riders.

76.     However, to appease the insistent rider who demands to give a tip, UBER permits its driver to accept the tip if the rider offers it three times. Only then, is the driver permitted to accept the tip. Under no other circumstances is a driver permitted to accept a tip from a rider.

77.     UBER has informed and represented to its customers that a gratuity is included with the price of the fare. As of the date of this filing, UBER's message to its riders continues to be that a tip is not required – the following appears in the "Help" section on UBER's website under the question "DO I NEED TO TIP MY DRIVER?"[2]:

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file – there's no need to tip.

78.     Also, as of the date of this filing, the following appears in an even more conspicuous section of UBER's website, the "Ride" section, even after UBER reached a proposed settlement in California and Massachusetts :[3]

## No cash, no tip, no hassle

When you arrive at your destination, just hop out–we'll automatically charge the credit card on file. And there's no need to tip.

79.     The custom and practice in New York City is to tip taxi, limousine and livery drivers between 18 and 22% of the full fare. As a result of UBER's directive to drivers that they cannot accept a tip (absent the little-known policy that a gratuity can be accepted if offered three

---

[2] https://help.uber.com/h/1be144ab-609a-43c5-82b5-b9c7de5ec073
[3] https://www.uber.com/ride/

times), and its message to riders that there is no need to tip, UBER has created and advanced the presumption amongst reasonable consumers that a fair tip is included in the price of the fare.

80.     UBER's representations to riders there is no need to tip, there is no reason to carry cash and your fare is automatically charged and its directives to Class Members not to accept tips allows riders to believe that a portion of the fare charged is a gratuity.

81.     UBER has never remitted tips to Plaintiffs and the Class Members.

82.     UBER has retained all gratuities attributable and due to Plaintiffs and the Class Members despite representing to its customers and advertising that the gratuity is included in the total fare.

83.     UBER has failed to provide Plaintiffs and the Class Members with a rate of pay notice form as required by New York State Wage Theft Prevention Act.

84.     UBER has failed to provide Plaintiffs and the Class Members with pay stubs in compliance with the New York State Wage Theft Prevention Act.

85.     Plaintiffs and the Class Members have worked in excess of ten hours per day, or multiple shifts in which the spread of time from the beginning of the first shift until the conclusion of the final shift exceeded ten hours. Despite working more than eight hours a day, UBER failed to pay Plaintiffs or the Class Members spread of hours premiums.

86.     UBER has failed to provide Plaintiffs and the Class Members with itemized wage statements, minimum wages,  and reimbursement of employment related expenses.

87.     UBER has failed to keep accurate payroll records showing Plaintiffs and the Class Members' hours worked and wages paid.

88.     As a result of UBER's purposeful misclassification of its drivers as independent contractors instead of employees, UBER has been able to increase its profits and avoid the legal and tax consequences of employing Plaintiffs and the Class Members.

89.     As a result of UBER's purposeful misclassification of its drivers as independent contractors instead of employees, Plaintiffs and the Class Members have been defrauded and damaged in hundreds of millions of dollars in unpaid gratuities and overtime, reduced wages, and burdened with unreimbursed employment-related expenses.

90.     Under UBER's agreement with Class Members, UBER agrees to remit to Class Members, (a) the Fare less UBER's applicable service fee, (b) the tolls, and (c) depending on the region certain added taxes and ancillary fees, which in New York City includes the Black Car Fund.

91.     UBER does not remit to the Class Members all the applicable taxes and ancillary fees, including state and local sales tax and other ancillary fees.

92.     UBER includes as its fee a proportion of the taxes and ancillary fees that should be paid by the riders in a way that the Class Members bear a larger percentage of such amounts even though they should not bear any part of such charges as spelled out in the UBER agreements and applicable law and regulation. The end result is UBRER's service fee, which is taken out of the Class Members pay is inflated beyond the amount set forth in the applicable agreements to financial detriment and pecuniary loss to the Class Members.

93.     UBER cancels and/or adjusts the fares that have been earned by the Class Members because of rider complaints about the service.

94.     In such an instance the Class Member is unilaterally docked or deducted pay for alleged performance reasons.

95.     UBER also deducts from Class Members pay fares earned by the Class Member but UBER believe the Class Member took an inefficient route.

96.     Said deductions are not allowed by law and a true independent contractor, which Class Members are not, can set the method and means of work.

**UBER's Mass Marketing To Recruit Drivers**

97.     UBER prominently advertises on buses, billboards, public displays and the like to recruit drivers.

98.     UBER's advertisements and marketing display's prominently state "$5000 Guaranteed" [To Drivers] and similar promises of guaranteed compensation.

99.     In reality, no such compensation is guaranteed and the prominent displays are made to induce drivers to sign on with UBER and, like named Plaintiffs, induce them to leave their employment and work for UBER.

100.     The Class Members have sustained actual pecuniary loss as a result of UBER's false advertising.

**AS AND FOR A FIRST CAUSE OF ACTION:**
**Violations of New York State Labor Laws**

101.     Plaintiffs, on behalf of themselves and the Class Members, repeat and re-allege the allegations set forth in paragraphs 1 through 100 as if set forth fully herein.

102.     Plaintiffs and the putative class members are employees of UBER.

103.     As set forth above, UBER has substantial direction, supervision and control over its drivers, in contravention of its classification of Plaintiffs and the putative class members as independent contractors.

104.    Defendants' customers reasonably believed that the fares charged by Defendants included gratuities to be paid to the driver. Defendants are required to remit these gratuities to Plaintiffs and the Class Members, but have failed to do so.

105.    Plaintiffs and the putative class members routinely worked more than ten consecutive hours in a workday. Defendants willfully failed to compensate the plaintiffs and putative class members one hour's pay at the basic New York minimum hourly wage rate on days in which the length of their workday was more than 10 hours, as required by New York law.

106.    Defendants made illegal deductions from the plaintiffs and the putative class members' gratuities and wages in violation of New York Labor Law and New York Codes, Rules and Regulations.

107.    Defendants willfully failed to furnish the plaintiffs and the putative class members with a notice containing the rate of pay and the basis thereof, whether paid by the hours, shift, day, week, salary, piece, commission, or otherwise, the name of the employer, any "doing business as" names used by the employer, the physical address of the employer's main office or principal place of business and a mailing address if different, the telephone number of the employer, and anything else otherwise required by law.

108.    Defendants also willfully failed to furnish the plaintiffs and the putative class members with every payment of wages, a wage statement that included the phone number of the employer, the proper overtime rate, and anything else otherwise required by law.

109.    In addition to the foregoing, UBER has failed to keep required payroll records, failed to provide its drivers with the requisite meal and rest periods, failed to pay its drivers a minimum wage, and failed to pay its drivers at the premium rate for overtime.

110.    Given the foregoing, Plaintiffs and the putative class members seek damages against the defendants pursuant to New York Labor Law §196-d (for unlawfully retaining portions of gratuities intended for UBER's drivers); New York Labor Law §193, *et seq.* (for unlawfully retaining monies intended and specifically meant for UBER's drivers); New York Labor Law §195 (for failure by Defendants to keep required payroll records); New York Labor Law §191 (for failure to provide prompt payment of wages to driver employees upon termination and resignation); New York Labor Law §652 (for failure to pay minimum wages); 12 NYCRR §142-2.1 (for failure to pay Plaintiffs and Class Members in accordance with the basic minimum hourly wage rate allowable pursuant to the instant regulation, in accordance with New York State law); 12 NYCRR §142-2.2 (for failure to pay overtime); and 12 NYCRR §142-2.2 (for failure to compensate Plaintiffs and Class Members pursuant to the instant regulation, in accordance with New York State law).

111.    By virtue of the foregoing willful violations of New York Labor Law, Plaintiffs and the putative class members are entitled to recover their withheld gratuities, unpaid overtime and minimum wages, unpaid spread of hours compensation, statutory damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION:
### Unlawful Deductions and Kickbacks

112.    Plaintiffs, on behalf of themselves and the Class Members, repeat and re-allege the allegations set forth in paragraphs 1 through 111 as if set forth fully herein.

113.    New York Labor Law §193(1) prohibits employers from making any deductions from an employee's wages except for those permitted by law or those made for the benefit of the employee which are explicitly authorized in writing by the employee.

114.    New York Labor Law §193(2) prohibits employers from making any charge against an employee's wages or requiring an employee to make any payment by separate transaction, unless such payment is a permitted deduction pursuant to New York Labor Law §193(1).

115.    In requiring Plaintiffs and the putative class members, as employees, to acquire and maintain the driven vehicles, purchase fuel, pay for tolls, pay for the registration, inspection and insurance of the vehicles, workers compensation insurance, purchase a mobile device that conforms to UBER's requirements, purchase a minutes and data plan for said mobile device, purchase, install and use UBER's "Driver App", and by requiring Plaintiffs and the putative class members to solely bear these and other costs of operating UBER's business, Defendants have violated New York Labor Law §§193 and 198.

116.    By making deductions to wages because of rider complaints or Defendant's belief that Class Members took an inefficient route, UBER is making unlawful deductions against wages.

117.    By virtue of the foregoing, Plaintiffs and the putative class members are entitled to recover the cost of the tools of the trade the defendants illegally shifted to Plaintiffs and the putative class members, attorneys' fees and costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION:
### Tortious Interference with Business Relations

118.    Plaintiffs, on behalf of themselves and the Class Members, repeat and re-allege the allegations set forth in paragraphs 1 through 117 as if set forth fully herein.

119.    By accepting riders and agreeing to take that rider to a designation of the rider's choice for a fare, Class Members and their customers have entered into a business relationship.

120. UBER discourages its customers from providing gratuities to its drivers, expressly advises its customers that "there is no need to tip" its drivers, and prevents its driver from accepting a gratuity when initially offered.

121. UBER's affirmative act of collecting its drivers' gratuities, yet failing to remit the total proceeds of the gratuities to its drivers, constitutes unlawful tortious interference with the business relationship that exists between the drivers and riders, in direct contravention of New York State law.

122. As a result of the foregoing, Plaintiffs and the putative class members have been damaged and are entitled to restitution for any and all monies improperly withheld by Defendants.

**AS AND FOR A FOURTH CAUSE OF ACTION:**
**<u>Breach of Contract</u>**

123. Plaintiffs, on behalf of themselves and the Class Members, repeat and re-allege the allegations set forth in paragraphs 1 through 122 as if set forth fully herein.

124. UBER has entered into contracts, including, without limitation, those dated June 20, 2014, June 21, 2014, November 10, 2014, April 3, 2015, and December 10, 2015 (hereinafter referred to as "the contract(s)") as amended, with Plaintiffs and the putative class members which purport to set forth the terms of their employment as UBER drivers. These contracts, along with corresponding addenda, govern the fares, fees, and monies due to Plaintiffs and putative class members.

125. For example, the contracts dated April 3, 2015 include a section regarding "fare calculation and customer payment." The aforesaid section states, in pertinent part: "[…] Customer is also entitled to charge User for any Tolls, taxes or fees incurred during the provision of Transportation Services, and, if applicable. Customer: (i) appoints Uber as Customer's

limited payment collection agent solely for the purpose of accepting the Fare, applicable Tolls and, depending on the region and/or if requested by Customer, applicable taxes and fees from the User on behalf of the Customer via the payment processing functionality facilitated by the Uber Services; and (ii) agrees that payment made by User to Uber shall be considered the same as payment made directly by User to Customer. […] Uber agrees to remit to Customer on at least a weekly basis: (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending upon the region, certain taxes and ancillary fees. If Customer and Uber have separately agreed, Uber may deduct other amounts from the Fare prior to remittance to Customer […]." Other versions of the contract contain similar provisions.

126.    However, UBER fails to remit to the Class Members applicable taxes and ancillary fees, including sales tax and Black Car Fund fees, as set forth in Class Members' agreements with UBER. And rather than only take from Plaintiffs and the class members its commission, Uber also took New York sales tax and Black Car Fund fees out of the drivers' pay in contravention of the applicable contracts. The result is that Plaintiffs were charged with taxes and ancillary fees, which were not to be charged to them under their contracts with Uber.

127.    In addition, pursuant to the aforementioned contracts, if the applicable fare included taxes and/or Black Car Fund fees then Uber would take the service fee on the fare after the taxes and Black Car Fund fees. In direct contravention of these contracts, Uber deducted the service fees, taxes, and Black Car Fund fees out of the gross fare and the drivers are paying these ancillary charges and sales tax.

128.    As discussed above, UBER inflates the service fee charged Class Members by including applicable taxes and ancillary charges (including sales tax and Black Car Fund fees) in the fare instead of calculating the fare net of such charges, which UBER is prohibited by contract

from doing, as several versions of the contract, including, without limitation, the November 10, 2014, April 3, 2015, and December 10, 2015 iterations, expressly require UBER to calculate its service fee net of such charges.  The result of this practice is that the Class Members pay an inflated service fee contrary to their agreements with UBER. UBER also reduces monies paid to drivers by charging a safe ride fee.

129.    In addition, pursuant to these contracts, UBER is required to remit to its drivers the proceeds of all gratuities received.

130.    UBER has not remitted the total proceeds of all gratuities to Plaintiffs and the putative class members pursuant to the aforementioned contracts.

131.    UBER have never remitted any amount of gratuities to Plaintiffs and the putative class members as they were supposed to pursuant to the aforementioned contracts.

132.    At all times alleged herein, UBER has withheld and continues to withhold all gratuities paid by riders to its drivers in direct contravention of the aforementioned contracts.

133.    At all times alleged herein, UBER has withheld and continues to withhold all gratuities paid by riders to its drivers that are incorporated into the fare set by the UBER App in direct contravention of the aforementioned contracts.

134.    At all times alleged herein, UBER has withheld and continue to withhold a portion of the gratuities and/or tips given by riders to UBER drivers that are incorporated into the fare set by the UBER application in direct contravention of the aforementioned contracts.

135.    UBER's withholding of any portion of the gratuities constitutes a breach of the aforementioned contracts.

136.    As a result of the foregoing, Plaintiffs and the putative class members have been damaged and are entitled to restitution for any and all monies improperly withheld and

improperly calculated by Defendants to the detriment of Class Members.

## AS AND FOR A FIFTH CAUSE OF ACTION:
### Conversion

137.     Plaintiffs, on behalf of themselves and the Class Members, repeat and re-allege the allegations set forth in paragraphs 1 through 134 as if set forth fully herein.

138.     Defendants have unlawfully withheld gratuities which were intended for Plaintiffs and the putative class members.

139.     Defendants have unlawfully withheld funds paid by riders to cover the cost of tolls from Plaintiffs and the putative class members.

140.     Defendants have unlawfully withheld reimbursement of Plaintiffs and the putative class members' expenses. These expenses include, but are not limited to the cost of vehicle acquisition and carrying charges, fuel, maintenance, registration, insurance, inspection, and mileage.

141.     Defendants unlawfully take as part of its service fee a proportion of taxes and ancillary charges, such as sales tax and Black Car  Fund that should be surcharges paid by riders as part of their overall fare, thereby converting part of the Class Members fee for itself.

142.     By Defendants wrongful conduct as set forth herein, they have wrongfully exerted control over Class Members gratuities, fees and reimbursable expenses in a manner inconsistent with Class Members rights in such property.

143.     Plaintiffs and the putative class members never permitted Defendants to withhold any monies that were intended to be remitted to them.

144.     As a result of the foregoing, Plaintiffs and the putative class members have been damaged and are entitled to restitution for any and all monies improperly withheld by Defendants.

145.    As a consequence of Defendants' aforementioned withholdings, Plaintiffs are entitled to treble damages.

## AS AND FOR AN SIXTH CAUSE OF ACTION:
### False Advertising

146.    Plaintiffs, on behalf of themselves and the Class Members, repeat and re-allege the allegations set forth in paragraphs 1 through 143 as if set forth fully herein.

147.    UBER's marketing materials and advertisements to drivers induce them to work for UBER are materially misleading in that UBER offers guaranteed compensation without disclosing the actual conditions imposed.

148.    Named Plaintiffs and the class have been induced to work for UBER based upon UBER's misleading advertisements.

149.    Below is an example of one of these advertisements:



150.    To the limited extent UBER sets forth the actual conditions of employment, such conditions are buried in separate small and inconspicuous print so as to mislead drivers (employees).

151.    Under New York General Business Law § 350-a UBER's advertising activities to

recruit drivers constitutes false advertising.

152.    Named Plaintiff's Ortega and Martinez suffered actual pecuniary loses as a result of UBER's deceptive marketing materials as they were induced to give up reliable and consistent income for UBER's compensation method that unlawfully makes deductions from income, purposes untenable conditions, such as long work hours just to eke out a living (which were not disclosed) and by forcing class members to make illegal out-of-pocket expenditures.

153.    Such mandatory conditions imposed by UBER are not displayed along with the false guarantees UBER makes in its public advertisements.

154.    Class members are entitled to the guaranteed payments promised by UBER in its advertisements that UBER has failed to pay.

155.    As set forth above, UBER has made material misrepresentations of fact to its drivers, riders, and the public to the detriment of Plaintiffs and the putative class members.

## JURY DEMAND

156.    Plaintiffs, on behalf of themselves and the proposed class, hereby demand a trial by jury of all claims.

## REQUEST AND PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs individually and on behalf of the proposed class, request relief against the Defendants as set follows:

      a.  Notice to the Classes of the action;

      b.  Certify this case as a class action;

      c.  Award of damages, including compensatory, consequential, liquidated, punitive, and treble damages, as well as back pay and restitution for all charged gratuities, with interest, not remitted to Plaintiffs and Class

Members, in accordance with New York State and applicable Federal law;

d.   Award reimbursement, with interest, to the Plaintiffs and Class members of expenses and costs who were misclassified as independent contractors and as a consequence were required to bear;

e.   An injunction prohibiting all Defendants from engaging in each of the unlawful practices, policies, and patterns set forth herein;

f.   Reasonable attorneys' fees, costs, and expenses of this action;

g.   Pre-judgment and post-judgment interested as provided by law; and

h.   Such other, further, and different relief that the Court may deem just and proper.

Dated: Brooklyn, New York
January 8, 2018

Respectfully submitted,

JOSE ORTEGA and JOCE MARTINEZ, individually and on behalf of all others similarly situated,

By their attorneys,

HELD & HINES, LLP

_____/s/_____
Philip M. Hines, Esq.
Marc J. Held, Esq.
Scott B. Richman, Esq.
*Attorneys for Plaintiffs and Proposed Class*
Office and P.O. Address
2004 Ralph Avenue
Brooklyn, New York 11234
Tel: (718) 531-9700
Fax: (718) 444-5768
Email:  phines@heldhines.com
          mheld@heldhines.com
          srichman@heldhines.com

COBURN & GREENBAUM, PLLC


_____/s/_____
Jonathan W. Greenbaum
1710 Rhode Island Ave, NW
Second Floor
Washington, DC 20036
Email: jg@coburngreenbaum.com